1  BERNARD D. BOLLINGER, JR. (SBN 132817)
      Email: bbollinger@buchalter.com
2  PAUL S. ARROW (SBN 136870)
      Email: parrow@buchalter.com
3  ANTHONY J. NAPOLITANO (SBN 227691)
      Email: anapolitano@buchalter.com
4  BUCHALTER NEMER
   A Professional Corporation
5  1000 Wilshire Boulevard, Suite 1500
   Los Angeles, California 90017-2457
6  Telephone: (213) 891-0700
   Facsimile: (213) 896-0400
7
   **Creditor Information Hotline:  (213) 891-5800**
8
   Attorneys for Debtors and Debtors-in-Possession
9  GTS PROPERTY PORTFOLIOS B-3, LLC and
   GULFSTREAM APT. PORTFOLIO, LLC
10

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                    **LOS ANGELES DIVISION**

14

15  In re                          | Case No. 2:09-bk-14774-SB

16  GTS PROPERTY PORTFOLIOS B-3,    | [Jointly Administered Case Nos. 2:09-bk-
    LLC, a Nevada limited liability company,  | 14774-SB and 2:09-bk-15342-SB]
17
                    Debtors and    | Chapter 11
18                  Debtors-in-Possession.

19

20  ☐      Affects GTS PROPERTY      | **DEBTORS' JOINT DISCLOSURE
    PORTFOLIOS B-3, LLC, a Nevada limited  | STATEMENT DESCRIBING DEBTORS'
21  liability company               | JOINT CHAPTER 11 PLAN OF
                                     | REORGANIZATION [Affects both Debtors]**
22  ☐      Affects GULFSTREAM APT.
    PORTFOLIO, LLC, a Delaware limited  | [Chapter 11 Plan, Motion and Notice
23  liability company,              | concurrently filed herewith]

24  ☒      Affects both Debtors.    | **Disclosure Statement Hearing:**

25                                   | Date:      January 12, 2010
                                     | Time:      2:00 p.m.
26                                   | Place:     Courtroom 1575
                                     |            255 East Temple Street
27                                   |            Los Angeles, CA 90012

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894884v1

# TABLE OF CONTENTS

Page

I.     INTRODUCTION TO THIS DISCLOSURE STATEMENT ........................................... 1

II.    DISCLAIMERS AND NATURE OF INFORMATION CONTAINED IN
       DISCLOSURE STATEMENT ........................................................................................ 1

III.   ANSWERS TO FREQUENTLY ASKED QUESTIONS ABOUT
       REORGANIZATION ...................................................................................................... 2
       A.    Whow are the Debtors? ....................................................................................... 2
       B.    How Long Have Debtors Been in Chapter 11? .................................................. 2
       C.    What is Chapter 11? ............................................................................................ 3
       D.    What are Debtors Attempting to Do in Chapter 11? .......................................... 3
       E.    Have Debtors Proposed a Plan of Reorganization? ........................................... 3
       F.    If the Plan of Reorganization Governs How My Claim Is Treated, Why
             Am I Receiving This Disclosure Statement? ...................................................... 3
       G.    Has This Disclosure Statement Been Approved By the Court? .......................... 4
       H.    Why is Confirmation of the Plan of Roerganization Important? ........................ 4
       I.    What is Necessary to Confirm the Plan of Reorganization? .............................. 5
       J.    Are Creditors Entitled to Vote on the Plan of Reorganization? ........................ 6
       K.    How Will This Plan of Reorganization Treat My Claim? .................................. 6

IV.    PLAN APPROVAL PROCESS ....................................................................................... 6

V.     DEFINITIONS AND RULES OF CONSTRUCTION ................................................... 8
       A.    Definitions .......................................................................................................... 8
       B.    Rules of Construction and Computation of Time. ............................................ 20

VI.    BACKGROUND AND DESCRIPTION OF THE DEBTOR ........................................ 21
       A.    Acquisition of the Properties by Debtors. ........................................................ 21
       B.    Bethany's Failure to Properly Manage the Properties. ..................................... 23
       C.    The Commencement of Debtors' Bankruptcy Cases. ....................................... 23
       D.    The Property Management Transition. ............................................................. 24
       E.    Summary of Significant Repairs to the Properties. .......................................... 25
       F.    Retention of Former Bethany Employees ........................................................ 29
       G.    Marketing the Properties. ................................................................................ 30
       H.    Occupancy Levels at the Properties. ................................................................ 32

VII.   DEBTORS' ASSETS ..................................................................................................... 33
       A.    The Properties. .................................................................................................. 33
       B.    Insurance Claims. ............................................................................................. 34
       C.    Property Tax and Insurance Impound Account. ............................................... 35
       D.    Personal Property. ............................................................................................ 36

VIII.  DEBTORS' DEBT STRUCTURE ................................................................................ 37
       A.    GE Capital Loan. .............................................................................................. 37
       B.    Mechanics' and Materialmens' Lien Claims. ................................................... 37
       C.    Priority Claims. ................................................................................................ 37

|  |  |  |  |
|---|---|---|---|
|  | D. | General Unsecured Claims. | 38 |
|  | E. | Existing Equity Ownership. | 38 |
| IX. | | POTENTIAL AND ACTUAL LITIGATION CLAIMS | 38 |
|  | A. | Avoidance Actions Against GE Capital. | 38 |
|  | B. | Surcharge Claim Against GE Capital. | 39 |
|  | C. | Claims Between TIC Owners. | 39 |
|  | D. | Preference Actions Against Third Parties. | 41 |
|  | E. | Claims Against Bethany. | 41 |
|  | F. | Claims Against Lexington Insurance Company and Hoss Construction | 41 |
|  | G. | Other Claims and Reservation of Rights and Notice. | 42 |
| X. | | DEBTOR'S ACTIONS AND SIGNIFICANT POST-FILING EVENTS | 42 |
|  | A. | Administration of the Bankruptcy Case in General. | 42 |
| XI. | | SUMMARY OF THE PLAN | 44 |
|  | A. | Overview | 44 |
|  | B. | Classification of Claims and Interests | 46 |
|  | C. | Class 1 – Administrative Expense Claims. | 47 |
|  | D. | Class 2 – GE Capital Allowed Secured Claim. | 47 |
|  | E. | Class 3 – Mechanics' Lien Claims. | 48 |
|  | F. | Class 4 – Employee Wage Claims. | 48 |
|  | G. | Class 5 – Security Deposit Claims. | 49 |
|  | H. | Class 6 – Property Tax Claims. | 49 |
|  | I. | Class 7 – General Unsecured Claims – Trade Creditors. | 49 |
|  | J. | Class 8 – GE Capital Unsecured Deficiency Claim. | 49 |
|  | K. | Class 9 –Administrative Convenience Class. | 50 |
|  | L. | Class 10 – Existing Equity Interests. | 50 |
| XII. | | TREATMENT OF ALLOWED CLAIMS BY CLASS. | 50 |
|  | A. | Treatment of Class 1 – Administrative Expense Claims. | 50 |
|  | B. | Treatment of Class 2 – GE Capital Secured Claim. | 51 |
|  | C. | Treatment of Class 3 – Mechanic's LienHolder Claims. | 54 |
|  | D. | Treatment of Class 4 – Priority Unsecured Employee Wage Claims. | 56 |
|  | E. | Treatment of Class 5 – Priority Unsecured Security Deposit Claims. | 56 |
|  | F. | Treatment of Class 6 - Priority Unsecured Tax Claims. | 57 |
|  | G. | Treatment of Class 7 – General Unsecured Claims - Trade Creditors. | 58 |
|  | H. | Treatment of Class 8 – GE Capital Unsecured Deficiency Claim. | 59 |
|  | I. | Treatment of Class 9 – Administrative Convenience Class. | 60 |
|  | J. | Treatment of Class 10 – Existing Equity Interests. | 60 |
|  | K. | Voting by Classes / "Cram-Down" Request. | 60 |
| XIII. | | EXECUTORY CONTRACTS AND LEASES | 61 |
|  | A. | General Information. | 61 |
|  | B. | Rejection of Executory Contract and Claims Arising Therefrom. | 61 |
| XIV. | | MEANS FOR IMPLEMENTING THE PLAN | 62 |
|  | A. | Formation of Reorganized Debtor and Transfer of Assets. | 62 |

|  | B. | Reorganized Debtor – Powers, Duties and Management. | 62 |
|  | C. | Issuance of Equity Interests of Reorganized Debtor. | 64 |
|  | D. | New Value Contribution and Required Market Test. | 65 |
|  | E. | Deemed Substantive Consolidation. | 71 |
|  | F. | Feasibility. | 72 |
| XV. | | CHAPTER 7 LIQUIDATION ANALYSIS | 73 |
| XVI. | | TAX CONSEQUENCES OF THE PLAN | 76 |
|  | A. | Introduction. | 76 |
|  | B. | Federal Income Tax Consequences to Debtors. | 77 |
|  | C. | Federal Income Tax Consequences to Creditors. | 78 |
|  | D. | Transfer Tax Issues for the Florida Properties. | 81 |
|  | E. | Tax Consequences to Members. | 81 |
|  | F. | Admonishment to Creditors and Interest Holders. | 82 |
| XVII. | | AMENDMENTS AND REVOCATION TO THE PLAN | 82 |
|  | A. | Amendment of the Plan. | 82 |
|  | B. | Revocation or Withdrawal of the Plan. | 83 |
| XVIII. | | MISCELLANEOUS PROVISIONS | 83 |
|  | A. | Retention of Jurisdiction. | 83 |
|  | B. | Payment of Statutory Fees. | 84 |
|  | C. | Effectuating Documents and Further Transactions. | 84 |
|  | D. | Limitation of Liability. | 84 |
|  | E. | Releases. | 85 |
|  | F. | Successors and Assigns. | 86 |
|  | G. | Governing Law. | 86 |
| XIX. | | CONCLUSION | 87 |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894884v1

iii

DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN

## I.    INTRODUCTION TO THIS DISCLOSURE STATEMENT

GTS Property Portfolios B-3, LLC ("**GTS**") and Gulfstream Apt. Portfolio, LLC ("**Gulfstream**"), debtors and debtors-in-possession in the above-captioned jointly administered bankruptcy cases (collectively, "**Debtors**"), submit this Joint Disclosure Statement Describing Debtors' Joint Chapter 11 Plan of Reorganization (the "**Disclosure Statement**") in connection with Debtors' Joint Chapter 11 Plan of Reorganization dated December 7, 2009 (the "**Plan**").  A copy of the Plan is attached to this Disclosure Statement as **Exhibit 1**.  This Disclosure Statement is intended to provide creditors and interested parties with sufficient information from which to make an informed decision when voting to accept or reject the Plan.  Debtors have submitted this Disclosure Statement for approval by the Bankruptcy Court pursuant to Section 1125 of Title 11 of the United States Code (the "**Bankruptcy Code**").[1]

Section 1125(b) prohibits solicitation of an acceptance or rejection of a plan unless a copy of the plan or summary of the plan is accompanied by a disclosure statement approved by the Bankruptcy Court.  All words or phrases used in this Disclosure Statement shall have their usual and customary meanings.  Capitalized words or phrases have the definitions set forth in this Disclosure Statement and the Plan.

NO REPRESENTATIONS CONCERNING DEBTORS' BANKRUPTCY ESTATES, DEBTORS OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT AS APPROVED BY THE BANKRUPTCY COURT.

## II.    DISCLAIMERS AND NATURE OF INFORMATION CONTAINED IN DISCLOSURE STATEMENT

Debtors neither warrant nor represent that there are no inaccuracies in this Disclosure Statement, although the information provided is accurate to the best of the knowledge, information and belief of Debtors.  Creditors and interested parties should be aware that Debtors'

---

[1]  All statutory references are to the Bankruptcy Code unless otherwise noted.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

books and records, from which the information contained herein is derived, have not been audited, and therefore could contain inaccurate information. Debtors and their management have taken reasonable steps to ensure that the information provided is materially accurate to the best of their knowledge and belief.

MOREOVER, THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE COURT'S APPROVAL HEREOF ONLY SIGNIFIES THAT IF THE INFORMATION CONTAINED HEREIN IS ACCURATE, IT IS SUFFICIENT TO PROVIDE CREDITORS AND INTERESTED PARTIES AN ADEQUATE BASIS TO DECIDE WHETHER TO ACCEPT OR REJECT THE PLAN. COURT APPROVAL OF THE DISCLOSURE STATEMENT IS NOT A JUDICIAL ENDORSEMENT OF THE PLAN.

### III.    ANSWERS TO FREQUENTLY ASKED QUESTIONS ABOUT REORGANIZATION

As part of Debtors' effort to inform creditors regarding Debtors' Plan and the plan confirmation process, the following summary provides answers to various questions, which are often asked by a party receiving a disclosure statement. **THE FOLLOWING ANSWERS ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY**.

### A.    WHO ARE THE DEBTORS?

GTS Property Portfolios B-3, LLC, a Nevada limited liability company, and Gulfstream Apt. Portfolio, LLC, a Delaware limited liability company, are the Debtors in these jointly administered Bankruptcy Cases. Parts VI, VII, and VIII of this Disclosure Statement contain summaries of Debtors, their history, their assets and liabilities, and the events in these jointly administered Chapter 11 Bankruptcy Cases.

### B.    HOW LONG HAVE DEBTORS BEEN IN CHAPTER 11?

GTS commenced its Chapter 11 Bankruptcy Case, designated as Case No. 2:09-bk-14774-SB, on March 3, 2009. Gulfstream commenced its Chapter 11 Bankruptcy Case, designated as Case No. 2:09-bk-15342-SB, on March 10, 2009. The bankruptcy cases were jointly

administered on March 17, 2009.

### C.    WHAT IS CHAPTER 11?

Chapter 11 contains the business reorganization provisions of the Bankruptcy Code.  As applicable here, it allows a debtor to submit a plan providing new terms for the payment of its debts so that it may continue to stay in business.

### D.    WHAT ARE DEBTORS ATTEMPTING TO DO IN CHAPTER 11?

The principal objective of a Chapter 11 case is confirmation of a plan of reorganization that enables a financially distressed debtor to stay in business.  A plan of reorganization sets forth the means for treating impaired and unimpaired claims against a debtor. A claim is impaired under a plan of reorganization if the plan provides that such claim will not be repaid in full or that the legal, equitable, or contractual rights of the holder of such claim will be altered.  A claim is unimpaired if it will be paid in full and the legal, equitable or contractual rights of the holder of such claim are not altered by the plan of reorganization.  A holder of an impaired claim generally is entitled to vote on a plan of reorganization if such claim has been allowed under Section 502 of the Bankruptcy Code.

### E.    HAVE DEBTORS PROPOSED A PLAN OF REORGANIZATION?

Yes.  On December 7, 2009, Debtors filed their Plan with the Bankruptcy Court.  This Disclosure Statement contains a summary of the Plan in Section XI.  In sum, the Plan filed by Debtors is premised on restructuring Debtors' capital structure, infusion of additional capital by Debtors' principals, and contribution of the remaining undivided forty percent (40%) tenant-in-common interest in the Properties held by non-debtor entities to the Reorganized Debtor.  The amount and timing of distributions under the Plan are dependent on future events, namely the stabilization of the Properties and market factors.  The Plan is further described in this Disclosure Statement.

### F.    IF THE PLAN OF REORGANIZATION GOVERNS HOW MY CLAIM IS TREATED, WHY AM I RECEIVING THIS DISCLOSURE STATEMENT?

The Bankruptcy Code requires that Debtors solicit acceptances and rejections of the proposed Plan before the Plan can be confirmed by the Bankruptcy Court.  Before Debtors can

1    solict acceptances of the Plan, the Bankruptcy Court must approve the Disclosure Statement and

2    determine that the Disclosure Statement contains information adequate to allow creditors to make

3    informed decisions about the Plan.  After Bankruptcy Court approval of the Disclosure Statement,

4    the Disclosure Statement, the proposed Plan and a ballot are sent to the holders of Claims.

5    Creditors then have opportunity to vote to accept of reject the Plan and should consider this

6    Disclosure Statement prior to submitting their ballot.

7    **G.    HAS THIS DISCLOSURE STATEMENT BEEN APPROVED BY THE COURT?**

8
9    Yes.  On January 12, 2010, the Bankruptcy Court approved this Disclosure Statement as

10    containing information of a kind, and in sufficient detail, as is reasonably practicable in light of

11    the nature and history of Debtors and the condition of Debtors' books and records, to enable a

12    hypothetical, reasonable investor typical of holders of Claims of the relevant Classes to make an

13    informed judgment whether to vote to accept or reject the Plan.  The Bankruptcy Court's approval

14    of this Disclosure Statement does not constitute an endorsement of any of the information

15    contained in either the Disclosure Statement or the Plan.  Likewise, although Debtors and their

16    counsel have utilized information believed to be accurate in preparing this Disclosure Statement,

17    neither Debtors nor any of their counsel warrant the accuracy of the information contained in or

18    relied upon in preparing this Disclosure Statement, nor should this Disclosure Statement be

19    construed to be any representation or warranty whatsoever express, implied or otherwise, that the

20    Plan of Reorganization is free from risk, that acceptance or confirmation of the Plan will result in

21    a risk-free or assured restructuring of the debts of Debtors, or that the projections or plans of

22    Debtors for payment will be realized.

23    **H.    WHY IS CONFIRMATION OF THE PLAN OF REORGANIZATION IMPORTANT?**

24    Confirmation of the Plan by the Bankruptcy Court is necessary for Debtors to provide the

25    proposed treatment to Creditors under the Plan and stay in business.   Unless the Plan is

26    confirmed, Debtors are legally prohibited from providing you what has been proposed in the Plan

27    and Debtors will likely be liquidated resulting in no distribution to any Creditor other than GE

28    Capital.

### I. WHAT IS NECESSARY TO CONFIRM THE PLAN OF REORGANIZATION?

At a hearing scheduled by the Bankruptcy Court, the Court will consider whether the Plan should be confirmed. Section 1129 of the Bankruptcy Code contains the requirements for confirmation of a Plan of Reorganization. **YOUR VOTE IS IMPORTANT**. A form of ballot accompanies this Disclosure Statement. In order for the Plan to be accepted, at least two-thirds in dollar amount and more than one-half in number of the ***voting creditors*** in each Class must affirmatively vote for the Plan. The Court must find that the Plan complies with the applicable provisions of the Bankruptcy Code and that the proponent of the Plan has also complied with the Bankruptcy Code. See Part IV, *infra*, for a detailed discussion on the requirements of the plan approval process.

In the event the Plan is not accepted by all Classes of Claims or Interests, the Debtor may attempt to obtain confirmation under what is known as "cram-down." To obtain confirmation by cram-down, the Court must find that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired by the Plan and has not accepted the Plan.

The Bankruptcy Code provides several options for a Plan to be "fair and equitable" to a secured creditor. Included among these options are that a secured creditor retains its lien and receives deferred cash payments at a market interest rate totaling either the value of the property securing the claim or the amount of the Allowed Secured Claim as found by the Court, whichever is less. With respect to a class of unsecured claims, the requirement that the Plan be "fair and equitable" requires that the holder of an unsecured claim be paid the allowed amount of its claim or that no junior interest receive or retain any property on account of its prior claim. With respect to an interest, the requirement that the Plan be "fair and equitable" requires that the holder of an interest receive or retain property under the Plan of Reorganization having a value equal to the value of the holder's interest or that the holder of any interest that is junior not receive or retain property under the Plan on account of such junior interest.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894884v1

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

**J.    ARE CREDITORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION?**

Each creditor holding an Allowed Claim that is impaired by the Plan is entitled to vote on Debtors' Plan.  If you are an impaired creditor, a ballot to be used for voting on the Plan will be distributed to you.  If you lose your ballot, you may request another one from Debtors' Counsel.  Instructions for completing and returning the ballot are set forth on the ballot and should be reviewed carefully.

**K.    HOW WILL THIS PLAN OF REORGANIZATION TREAT MY CLAIM?**

Persons that are owed money by Debtors hold what are known as "claims".  The Plan organizes claims into classes based upon the type of claim and the treatment which it will receive under the Plan.  In order to determine how the Plan treats your claim, you must first determine which class covers your claim.

The following chart tells you where in the Plan to look to find the treatment of your claim.  Please note that the pages indicated in the following chart refer to the page number of the Plan, as well as the corresponding page number of the Disclosure Statement:

| CLASS | TYPE OF CLAIMS | Disclosure Statement Page No. | Chapter 11 Plan Page No. |
|:---:|:---|:---:|:---:|
| 1 | Administrative Expense Claims | 50 | 18 |
| 2 | GE Capital Secured Claims | 51 | 19 |
| 3 | Mechanics' Lien Claims | 54 | 22 |
| 4 | Priority Unsecured Employee Wage Claims | 56 | 23 |
| 5 | Priority Unsecured Security Deposit Claims | 56 | 24 |
| 6 | Priority Unsecured Tax Claims | 57 | 25 |
| 7 | General Unsecured Claims – Trade Creditors | 58 | 26 |
| 8 | GE Capital Unsecured Deficiency Claim | 59 | 27 |
| 9 | Administrative Convenience  Class | 60 | 28 |
| 10 | Existing Equity Interests | 60 | 28 |

**IV.    PLAN APPROVAL PROCESS**

To confirm the Plan, the Bankruptcy Code requires that a Bankruptcy Court make a series of findings concerning the Plan, including that:  (i) the Plan classifies Claims and Equity Interests in a permissible manner; (ii) the Plan complies with the applicable provisions of the Bankruptcy Code; (iii) the Proponent has complied with the applicable provisions of the Bankruptcy Code;

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894884v1

6

(iv) the Proponent has proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by Section 1124 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of holders of Claims or Equity Interests, except to the extent that "cram-down" is available under Section 1129(b) of the Bankruptcy Code, (vii) the Plan is feasible and Confirmation will not likely be followed by the need for further financial reorganization of Debtors; (viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan; and (ix) all fees and expenses payable under 28 U.S.C. § 1930 (relating to bankruptcy fees payable to the clerk of the Bankruptcy Court and the U.S. Trustee) have been paid or the Plan provides for the payment of such fees on the Effective Date.

The Proponent believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code. The Disclosure Statement and Plan classify all Creditors into Classes and set forth the treatment of each Class. You should examine the treatment of the Class under which your particular claim(s) may fall. Debtors believe that treatment of each Class of Claims complies with the requirements under Section 1129 of the Bankruptcy Code. Certain of these requirements are discussed in more detail below. The Proponent has proposed the Plan in good faith.

After the Bankruptcy Court approves the Disclosure Statement, holders of Allowed Claims may vote to accept or reject the Plan. After notice and hearing, the Bankruptcy Court may approve and confirm the Plan upon the affirmative vote of the necessary Classes of claims and interests. **Thus, if you do not vote on the Plan, the wishes of other creditors or interested parties may govern the treatment of your Claims or interests. Therefore, Debtors highly recommend that you participate in the voting process by timely providing Debtors with your ballot accepting or rejecting the Plan. PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY AS IT IS DESIGNED TO ASSIST YOU IN ULTIMATELY VOTING ON THE PLAN**.

## V.    DEFINITIONS AND RULES OF CONSTRUCTION

### A.    Definitions

Except as expressly provided otherwise herein, or unless the context otherwise requires, the following terms will have the meanings stated.  The singular/plural uses or the conjunctive and disjunctive uses thereof will be interchangeable, and the terms will include masculine, feminine and neutral genders.  Additional quoted terms are defined as set forth in the text of the Plan and/or Disclosure Statement.  The defined terms used in the Plan and Disclosure Statement are as follows:

1.    **Administrative Expense Claim** shall mean:  (a) every cost or expense of administration of the Bankruptcy Case, including any actual and necessary post-petition expenses of preserving the Estate; (b) any actual and necessary post-petition expenses of Debtors; (c) any professional fees allowed by the Bankruptcy Court pursuant to interim and final approvals in accordance with Sections 330, 331, and 503(b); and (d) all fees and charges assessed against the Estate under Chapter 123 of Title 28 of the United States Code.

2.    **Administrative Expense Claims Bar Date** shall mean the first Business Day after the 60th day after the Effective Date.

3.    **Allowed Claim** shall mean every Claim against the Bankruptcy Estate that has been scheduled by Debtors on Schedules D, E, and F to their bankruptcy petition, and every Claim against the Bankruptcy Estate as to which a proof of such Claim has been filed timely by the Bar Date (or appropriate application as to Administrative Expense Claims) and:  (i) as to which no objection to the allowance of such Claim has been filed within any applicable time period fixed by the Plan or the Bankruptcy Court; or (ii) as to which the order allowing such Claim has become final and non-appealable without any appeal, review, or other challenge of any kind to that order having been taken or being still timely.  If any Claim or the Creditor asserting such Claim is subject to any defense, setoff, counterclaim, recoupment, or other adverse Claim of any kind of Debtors, including, but not limited to, any pending appeal or unexpired right to appeal, that Claim will be deemed a Disputed Claim and it will not become an Allowed Claim unless and until all disputes are resolved or adjudicated fully and finally, with all appellate rights

having been exhausted.

4.    **Assets** shall mean Debtors' real and personal property, including, but not limited to, the Properties, and rights and interests appurtenant thereto, and any executory contracts, unexpired leases, permits and approvals relating to any of the foregoing.

5.    **Avoidance Actions** shall mean any and all rights of action of Debtors under Sections 506(c), 544, 545, 546, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, or similar state laws, other than those dismissed, released, settled, or compromised under the Plan.

6.    **Ballot** shall mean a form of ballot served by Debtors on the holders of all Claims entitled to vote on the acceptance or rejection of this Plan, which shall provide a checkbox for such Claimants to indicate their vote and, if applicable, checkboxes for the making of any additional elections that such Claimants are entitled to make under the terms of the Plan.

7.    **Bankruptcy Case** shall mean the above-captioned jointly administered bankruptcy case, designated as Case No. 2:09-bk-14774-SB and Case No. 2:09-bk-15342-SB, commenced by Debtors filing of a voluntary petition on the Petition Date.

8.    **Bankruptcy Code** shall mean Title 11 of the United States Code, 11 U.S.C. §101 *et. seq.*, as it may be amended from time to time.

9.    **Bankruptcy Court** or **Court** shall mean the United States Bankruptcy Court for the Central District of California or such other court that exercises jurisdiction over all or part of the Bankruptcy Case including the United States District Court for the Central District of California to the extent that the reference of the Bankruptcy Case is withdrawn.

10.    **Bankruptcy Estate** or **Estate** shall mean the estate created pursuant to Section 541 upon Debtors' commencement of the Bankruptcy Case.

11.    **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time, and any Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Bankruptcy Case.

12.    **Bar Date** shall mean July 31, 2009, the date set by the Bankruptcy Court by which creditors were required to have filed proofs of claim.

13. **Bethany** shall mean The Bethany Group, LLC, a California limited liability company.

14. **Bethany Holdings** shall mean Bethany Holdings Group, LLC, a Nevada limited liability company.

15. **Bethany Property Management Agreement** shall mean the Property Management Agreement (B3 Portfolio) dated September 6, 2009 by Bethany, as Agent, and Gulfstream, GTS, KT Terraza and FLJC, as Owners, for the retention of Bethany to manage the Properties prepetition.

16. **Business Day** shall mean every day except Saturdays, Sundays, and federal and state holidays observed by the Bankruptcy Court.

17. **Cash** shall mean cash and cash equivalents, including, but not limited to, bank deposits, checks and other similar forms of negotiable instruments of payment or exchange.

18. **Causes of Action** shall mean all of the Bankruptcy Estate's existing and potential claims and causes of action, including but not limited to any claims that may be brought by a debtor-in-possession under the Bankruptcy Code and applicable state law, and causes of action that were pending or could have been brought by Debtors at the Petition Date.

19. **Chartwell** shall mean Chartwell Management LLC, the property managers retained by Debtors pursuant to the Property Management Employment Order to manage the South Carolina Properties.

20. **Claim** shall mean "Claim" as defined in Section l01(5) of the Bankruptcy Code.

21. **Claimant** shall mean the holder of a Claim.

22. **Claims Objection Date** shall mean the date by which Debtors or any interested party must file objections to Claims, which shall be the first Business Day after 90 days after the Effective Date.

23. **Class** shall mean each of the classifications of Claims and Interests described in the Plan.

24. **Class 4 Employee Wage Claims** shall mean the accrued but unpaid pre-

1    petition wages of employees that did not receive a payment pursuant to this Court's Wage Order

2    plus the unpaid accrued vacation, sick and severance pay for all eligible pre-petition employees.

3        25.    **Class 8 Distribution Percentage** is the percentage paid of the Class 8 GE

4    Capital Unsecured Deficiency Claim calculated with regard to the total value of cash and the GE

5    TIC Interest that GE Capital receives pursuant to this Plan on account of its Class 8 Allowed

6    Claim.

7        26.    **Confirmation Date** shall mean the date the Bankruptcy Court enters the

8    Confirmation Order on the Court docket.

9        27.    **Confirmation Hearing** shall mean a hearing conducted by the Bankruptcy

10    Court pursuant to Section 1128(a) for the purpose of determining whether to enter a Confirmation

11    Order.

12        28.    **Confirmation Order** shall mean an order entered by the Bankruptcy Court

13    approving and confirming the Plan, which shall not have been stayed by a court of competent

14    jurisdiction.

15        29.    **Creditor** shall mean "Creditor" as defined in Section 101(10) of the

16    Bankruptcy Code and will include every holder of a Claim, whether or not such Claim is an

17    Allowed Claim.

18        30.    **Debtors** shall collectively mean GTS Property Portfolios B-3, LLC, a

19    Nevada limited liability company, and Gulfstream Apt. Portfolio, LLC, a Delaware limited

20    liability company.

21        31.    **Disbursing Agent** shall mean the Reorganized Debtor, or such other

22    person or entity specified in the Confirmation Order that will perform any duties of the

23    Disbursing Agent as set forth in this Plan.

24        32.    **Disclosure Statement** shall mean the "Joint Disclosure Statement

25    Describing Debtors' Joint Chapter 11 Plan Of Reorganization," in the form approved by the

26    Bankruptcy Court or as it may be altered, amended, or modified thereafter from time to time.

27        33.    **Disputed Claim** shall mean every Claim that is not an Allowed Claim.

28        34.    **Distribution Dates** shall mean the Initial Distribution Date and at least the

1    first Business Day of each calendar quarter thereafter, or any other date on which the Debtor

2    elects to or is required to make a distribution under the terms of this Plan.

3        35.    **Effective Date** shall mean the date selected by Debtors that is at least 10

4    days after but no more than 45 days after the Confirmation Date, unless the Confirmation Order is

5    stayed pursuant to an order of the Bankruptcy Court or another court of competent jurisdiction.

6    Debtors shall designate the dated selected as the Effective Date in a written designation filed with

7    the Court after the Confirmation Order is entered on the docket and on or before the Effective

8    Date.

9        36.    **Equity Auction Proceeds** shall mean the proceeds generated from the

10    New Value Auction of the New Value Interest.

11        37.    **Executory Contract** shall mean every unexpired lease and other executory

12    contract that is subject to being assumed or rejected under Section 365 of the Bankruptcy Code.

13        38.    **Final Order** shall mean an order or judgment of the Bankruptcy Court

14    which shall not have been reversed, stayed, modified or amended, and as to which the time to

15    appeal from or to seek review or rehearing of, shall have expired, and as to which no appeal or

16    petition for review, or rehearing is pending, or if appealed from, shall have been affirmed and no

17    further hearing, appeal or petition can be taken or granted, or as to which no stay has been entered

18    to affect the operative provisions of such order of judgment.

19        39.    **FLJC** shall mean B3 FLJC, LLC, a Delaware limited liability company.

20        40.    **GE Capital** shall mean General Electric Capital Corporation, a Delaware

21    corporation, and its successors and assigns.

22        41.    **GE Capital Claim** shall mean Claim of GE Capital as of the Petition Date

23    in the amount of $161,814,464.36 for monies that GE Capital alleges is due and payable under the

24    GE Capital Loan.

25        42.    **GE Capital Deficiency Claim** shall mean the allowed Unsecured Claim of

26    GE Capital treated under Class 8 of the Plan.

27        43.    **GE Capital Loan** shall mean the original loan commitment made by

28    GE Capital to Gulfstream on March 27, 2006, in the designated loan amount of $159,160,000.00,

evidenced by the GE Capital Loan and Security Documents, the GE Capital Tranche A Note, and the GE Capital Tranche B Note.

44.    **GE Capital Loan and Security Documents** shall mean all documents evidencing the terms of the Loan Agreement dated March 27, 2006 between Gulfstream, as Borrower, and GE Capital, as Lender, and all amendments thereto (the "**Loan Agreement**"); the UCC-1 Financing Statement filed with respect to Gulfstream with the Delaware Department of State on April 3, 2006 bearing File No. 6111575 7; any additional documents or amendment thereto relating to the TIC Assumption Security Amendments; and the following mortgages or deeds of trusts:

- For Ashton Ridge:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1162; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1188.

- For Deerfield:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1162; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1196.

- For Oakwood Village:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 13, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 583; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 13, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 617.

- For Ventura Landing:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 13, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 583; and Assignment of Rents and Leases dated as of

March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 12, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 609.

- For Cooper's Pond:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 6, 2006 in the Public Records of Hillsborough County, Florida, in Official Records Book 16317, Page 559; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 6, 2006 in the Public Records of Orange County, Florida, in Official Records Book 16317, Page 585.

- For Braesview:  Deed of Trust, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Grantor, for the benefit of GE Capital, as Beneficiary, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12040, Page 600; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12040, Page 620.

- For La Jolla:  Deed of Trust, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Grantor, for the benefit of GE Capital, as Beneficiary, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12039, Page 2174; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12039, Page 2193.

- For Quail Run:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 6, 2006 in the Official Records of Richland County, South Carolina, in Record Book 1170, Page 673; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 6, 2006 in the Official Records of Richland County, South Carolina, in Record Book 1170, Page 673.

- For Woodland Village:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 6, 2006 in the Official Records of Lexington County, South Carolina, in Record Book 10959, Page 313; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 6, 2006 in the Official Records of Lexington County, South Carolina, in Record Book 10959, Page 335.

45.    **GE Capital Surcharge Claim** shall mean the Debtors' Claim to be made in a pleading commencing an Adversary Proceeding seeking a determination that a portion of GE Capital's Allowed Secured Claim be surcharged pursuant to Section 506(c) of the Bankruptcy Code for the expenses paid by Debtors, including attorneys' fees and costs, to preserve GE Capital's secured interest in the Properties.

46.    **GE Capital Liens** shall mean all liens arising out of the GE Capital Loan and Security Documents.

47.    **GE Capital Secured Property Value** shall mean the Secured Property Value established with regard to the GE Capital's allowed Secured Claim.

48.    **GE Capital TIC Interest** shall mean the undivided ten percent (10%) tenant-in-common interest to the Properties that Reorganized Debtor will contribute to GE Capital in satisfaction of the GE Capital Unsecured Deficiency Claim.

49.    **GE Capital Tranche A Note** shall mean the Promissory Note dated March 27, 2006, executed by Gulfstream in favor of GE Capital, in the designated loan amount of $153,400,000.00.

50.    **GE Capital Tranche B Note** shall mean the Promissory Note dated March 27, 2006, executed by Gulfstream in favor of GE Capital, in the designated loan amount of $6,500,000.00 (and reduced to $5,760,000.00 pursuant to the GE Capital Loan Agreement).

51.    **General Unsecured Claim** shall mean every Unsecured Claim that will be classified and paid under the Plan, and which is not an Administrative Expense Claim, Priority Unsecured Claim, or a Claim classified within any other Class under this Plan.

52.    **GTS** shall mean debtor GTS Property Portfolios B-3, a Nevada limited liability company, and debtor and debtor-in-possession in the above-captioned jointly administered bankruptcy case.

53.    **GTSI** shall mean Great Transamerican Strand Investments, Inc., a Delaware corporation, and the holder of one hundred percent (100%) of the shares of GTSPPI.

54.    **GTSPPI** shall mean GTS Property Portfolios, Inc., a Nevada corporation, the holder of one hundred percent (100%) of the membership interests of GTS, Gulfstream, KT

Terraza and FLJC.

55.    **Gulfstream** shall mean debtor Gulfstream Apt. Portfolio, LLC, a Delaware limited liability company, and debtor and debtor-in-possession in the above-captioned jointly administered bankruptcy case.

56.    **Initial Distribution Date** shall mean the first date on which any payment under this Plan is made, which shall be no later than the 10th Business Day following the Effective Date.

57.    **Interests** shall mean any existing, pre-Confirmation Date equity security of Debtors, including, but not limited to, the limited liability company membership interests, warrants, options or other rights exercisable or convertible into such limited liability company membership interests.

58.    **KT Terraza** shall mean KT Terraza I, LLC, a Delaware limited liability company.

59.    **Lien(s)** shall mean a lien as defined in Section 101(37) of the Bankruptcy Code, except a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 550, 552, 553, or 549 of the Bankruptcy Code.

60.    **Lincoln** shall mean Lincoln Property Company and its affiliates retained by Debtors pursuant to the Property Management Employment Order to manage the Florida Properties and the Texas Properties.

61.    **Local Property Managers** shall mean Chartwell and Lincoln collectively.

62.    **LTV** shall mean LT Ventures, LLC, the financial advisors and portfolio asset managers retained by Debtors pursuant to the Property Management Employment Order.

63.    **Mechanics' Lienholders** shall mean the parties who assert mechanic's and materialmen's liens against the Properties.

64.    **Mechanics' Lienholders Claims** shall mean the Allowed Claim of the Mechanics' Lienholders.

65.    **Person** shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated association or organization, or other

"person" as defined in Section 101 of the Bankruptcy Code as well as any governmental agency, governmental unit or associated political subdivision.

66.    **Petition Date** shall collectively mean March 3, 2009 and March 10, 2009 for GTS and Gulfstream, being the respective dates on which Debtors filed their voluntary petition in the Bankruptcy Court.

67.    **Plan** shall mean the Joint Chapter 11 Plan of Reorganization filed by Debtors on December 7, 2009, along with every modification or amendment thereof or thereto.

68.    **Plan Expense Reserve Fund** shall mean a sum of money to be reserved for the payment of expenses relating to the administration of the Bankruptcy Case, including without limitation the claims of Debtors' professionals, court costs and any fees owed to the Office of the United States Trustee.  The Plan Expenses Reserve Fund shall be funded on the Effective Date with Debtors' operating reserves and Equity Auction Proceeds, if any, and thereafter disbursed in accordance with the Plan and any applicable further Orders of the Court.

69.    **Plan Section 1111(b) Interest Rate** shall mean 2.00% per annum, or such other rate of interest as shall be mutually agreed upon by Debtors and the holders of Claims that elect treatment of their Allowed Claims pursuant to Section 1111(b) of the Bankruptcy Code, and that are entitled to receive interest from Debtors under the terms of the Plan, or such other rate as determined by the Court to meet requirements under Section 1129(a) and (b) of the Bankruptcy Code.

70.    **Plan Secured Interest Rate** shall mean 4.75% per annum, or such other rate of interest as shall be mutually agreed upon by Debtors and the holders of Claims entitled to receive interest from Debtors under the terms of the Plan, or such rate as determined by the Court to meet requirements under Section 1129(a) and (b) of the Bankruptcy Code.

71.    **Plan Unsecured Interest Rate** shall mean that rate of interest in effect on the Effective Date that is the Federal Judgment Interest Rate pursuant to 28 U.S.C. § 1961.

72.    **Preference Period** shall mean collectively the ninety day (or one year for insiders) periods of time pursuant to Section 547(b)(4) preceding the date of the filing of the bankruptcy petition of each respective Debtor.

73.    **Priority Unsecured Claim** shall mean every Unsecured Claim against Debtors that is not an Administrative Expense Claim, a General Unsecured Claim or a Secured Claim, and which is asserted by the Creditor holding such Claim to be entitled to priority under any applicable provisions of Section 507(a).

74.    **Properties** shall mean the following nine multi-family residential apartment complexes located in Texas, Florida and South Carolina:

- Ashton Ridge is a 356 unit apartment complex located at 5959 Fort Caroline Road, Jacksonville, Duval County, Florida ("**Ashton Ridge**");

- Deerfield is a 256 unit apartment complex located at 11711 Lane Avenue South, Jacksonville, Duval County, Florida ("**Deerfield**");

- Oakwood Village is a 278 unit apartment complex located at 4755 North Goldenrod Road, Orlando, Orange County, Florida ("**Oakwood**");

- Ventura Landing is a 184 unit apartment complex located at 6203 Curry Ford Road, Orlando, Orange County, Florida ("**Ventura**");

- Cooper's Pond is a 463 unit apartment complex located at 6221 North Dale Mabry Highway, Tampa, Hillsborough County, Florida ("**Cooper**" and together with Ashton Ridge, Deerfield, Oakwood, and Ventura, the "**Florida Properties**");

- Braesview is a 396 unit apartment complex located at 11501 Braesview Drive, San Antonio, Bexar County, Texas ("**Braesview**");

- La Jolla is a 300 unit apartment complex located at 10707 IH 10 West, San Antonio, Bexar County, Texas ("**La Jolla**" and together with Braesview, the "**Texas Properties**");

- Quail Run is a 332 unit apartment complex located at 3509 Lake Avenue, Columbia, Richland County, South Carolina ("**Quail Run**"); and

- Woodland Village is a 308 unit apartment complex located at 2221 Bush River, Columbia, Lexington County, South Carolina ("**Woodland Village**" and together with Quail Run, the "**South Carolina Properties**").

75.    **Property Management Employment Order** shall mean this Court's Order Granting Debtor's Emergency Motion Pursuant to 11 U.S.C. § 327 for Order Authorizing Debtor to Employ LTVentures, LLC as Portfolio Asset Manager and to Employ Local Property Managers entered on April 2, 2009.

76.      **Property Revenue** shall mean any and all income generated by the Properties.

77.      **Proponent** shall mean Debtors GTS and Gulfstream.

78.      **Rent Ready Units** shall mean apartment units in a sufficiently habitable condition for prospective tenants to immediately move into.

79.      **Reorganized Debtor** shall mean the post-confirmation limited liability company that will be formed to hold the equity interests of GTS, Gulfstream, KT Terraza and FLJC following the Effective Date to be governed by its Articles of Organization and Operating Agreement and any amendments thereto required under the Plan, as well as the terms of the Plan.

80.      **Schedules** or **Debtors' Schedules** shall mean the schedules of assets and liabilities, the list of holders of interests, and the statements of financial affairs filed by Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements may have been or may be supplemented or amended from time to time.

81.      **Secured Claim** shall mean every Claim against Debtors (including every secured portion of a Claim which is not fully secured) that is asserted by the Creditor holding such Claim to be secured by a lien, security interest, or assignment encumbering property in which Debtors holds an interest; provided, however, that such Claim will be a Secured Claim only to the extent of the validity, perfection, and enforceability of the claimed lien, security interest, or assignment and only to the extent of the value of the interest of the Creditor holding such Claim against such property of Debtors.

82.      **Secured Property Value** shall mean the value of any Claimant's lien or security interest in property of Debtors, which shall be equal to the lesser of: (a) the Claimant's Claim; or (b) the fair market value of all property of Debtors securing such claim, less the value of any security interests of higher priority in the same property held by other Claimants.

83.      **Security Deposit Claim** shall mean any Claim of an individual arising from the deposit, before the Petition Date, of money in connection with the rental of a unit at one of the Properties, which was not refunded, in whole or in part, to residents that vacated their respective units at the Properties prior to the Petition Date, up to the statutory limit of $2,425.00

per claimant provided for in Section 507(a)(7).

84.  **TIC Agreement** shall mean the Tenant-In-Common Agreement concerning the Properties executed on or about September 15, 2006 by the TIC Owners.

85.  **TIC Assumption Agreement** shall mean the Assumption Agreement entered into on August 29, 2006, Gulfstream, as the existing borrower, and FLJC, KT Terraza, and GTS, collectively, as the additional borrowers, and GE Capital, as administrative agent.

86.  **TIC Assumption Security Amendments** shall mean all documents evidencing the amendment of the GE Capital Loan and Security Documents with respect to the acquisition of tenant-in-common interests to the Properties entered into on August 29, 2006 by Gulfstream, as existing borrower, GTS, KT Terraza and FLJC, as grantees, and GE Capital, as administrative agent, and recorded thereafter in various public records offices.

87.  **TIC Owners** shall mean collectively debtor Gulfstream, debtor GTS, KT Terraza and FLJC.

88.  **Unsecured Claim** shall mean every Claim against the Debtor, regardless of the priority of such Claim, which is not a Secured Claim.

### B.  Rules of Construction and Computation of Time.

The following rules of interpretation and computation of time shall govern the Disclosure Statement and the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or Schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections, articles, and schedules are references to sections, articles, and schedules of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than

1   to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted

2   for convenience of reference only and are not intended to be a part of or to affect the

3   interpretation of this Plan; (h) subject to the provisions of any contract, certificates of

4   incorporation, by-laws, instrument, release, or other agreement or document entered into in

5   connection with this Plan, the rights and obligations arising under this Plan shall be governed by,

6   and construed and enforced in accordance with, federal law, including the Bankruptcy Code and

7   Bankruptcy Rules; (i) the rules of construction set forth in Section 102 of the Bankruptcy Code

8   will apply; and (j) in computing any period of time prescribed or allowed by this Plan, the

9   provisions of Bankruptcy Rule 9006(a) will apply.

## VI.    BACKGROUND AND DESCRIPTION OF THE DEBTOR

### A.    Acquisition of the Properties by Debtors.

Bethany entered into a purchase and sale contract to purchase the Properties on

November 2, 2005, as amended.  On March 1, 2006, Bethany Holdings, an affiliate of Bethany,

formed Multi Enterprise II, LLC as its wholly-owned subsidiary.  Also on March 1, 2006,

Bethany Holdings (through Multi Enterprise II) formed Gulfstream Apt. Portfolio, LLC as the

wholly-owned subsidiary of Multi Enterprise II.  Gulfstream was formed for the purpose of

acquiring title to the Properties.

On March 27, 2006, Gulfstream, as borrower, and GE Capital, as lender, entered into the

Loan Agreement, whereby GE Capital agreed to provide financing to Gulfstream to acquire the

Properties.  GE Capital ultimately financed the acquisition of the Properties at an approximate

95% loan-to-value ratio.  Concurrently with the execution of the Loan Agreement, Gulfstream

executed the limited recourse, GE Tranche A Promissory Note payable to GE Capital in the

principal amount of $153,400,000 bearing interest at a fixed rate of 6.19% per annum for the

initial advance and at a variable rate of 1.35% per annum over the London Inter-Bank Offer Rate

("**LIBOR**") for subsequent advances.  Gulfstream also executed the limited recourse, GE Tranche

B Promissory Note payable to GE Capital in the principal amount of $5,760,000 bearing interest

at a variable rate, adjusted monthly, equal to 7.5% per annum in excess of LIBOR.  Gulfstream

executed deeds of trust in favor of GE Capital securing the GE Capital Loan, which were

1    recorded in the appropriate county recorder's offices where each of the Properties were located.

2    The acquisition of the Properties by Gulfstream closed on or about March 31, 2006.

3        In connection with the acquisition of the Properties, Bethany Holding desired to sell

4    partial interests in the Properties to certain "tenant-in-common" investors.  At that time, GTS, KT

5    Terraza and FLJC had been interested in acquiring tenant-in-common interests in the Properties.

6    On August 15, 2006, GTS, as Buyer, entered into a Purchase and Sale Agreement Re: Improved

7    Real Property and Joint Escrow Instructions with Gulfstream, as Seller, and acquired an

8    undivided fifty percent (50%) tenant-in-common interest in each of the Properties.  Similarly, on

9    August 15, 2006, KT Terraza, as Buyer, entered into a Purchase and Sale Agreement Re:

10   Improved Real Property and Joint Escrow Instructions with Gulfstream, as Seller, and acquired an

11   undivided thirty percent (30%) tenant-in-common interest in each of the Properties.  Finally, on

12   August 15, 2006, FLJC, as Buyer, entered into a Purchase and Sale Agreement Re: Improved

13   Real Property and Joint Escrow Instructions with Gulfstream, as Seller, and acquired an

14   undivided ten percent (10%) tenant-in-common interest to each of the Properties.   At the

15   culmination of these transactions, Gulfstream retained only an undivided ten percent (10%)

16   tenant-in-common interest to each of the Properties.

17       In connection with the tenant-in-common acquisition, on August 29, 2006, Gulfstream, as

18   the Existing Borrower, and FLJC, KT, and GTS, collectively, as the Additional Borrowers, and

19   GE Capital entered into the TIC Assumption Agreement whereby GTS, KT Terraza and FLJC

20   assumed jointly and severally the liabilities and obligations arising under the GE Capital Loan.

21   On September 15, 2006, the TIC Owners consisting of Gulfstream, GTS, KT Terraza, and FLJC

22   entered into the TIC Agreement with respect to the Properties.  The TIC Agreement set forth the

23   rights and obligations of the TIC Owners.  Specifically, the TIC Agreement provided Gulfstream

24   with the exclusive right to manage the properties, either by itself or by hiring a management

25   company.  The other TIC Owners, including GTS, were passive investors which at that time had

26   little, if any, knowledge of the Properties' operation.  Pursuant to its obligations under the TIC

27   Agreement, Gulfstream and the other TIC Owners entered into the Bethany Property

28   Management Agreement pursuant to which each jointly hired Bethany to manage and operate the

1 Properties.  Bethany was an affiliate of Gulfstream, each having common ultimate ownership by

2 Bethany Holdings.

3 **B.      Bethany's Failure to Properly Manage the Properties.**

4 From September 2006 onward, GTS, KT Terraza and FLJC were passive investors in the

5 Properties and relied upon the property management expertise and experience of Bethany

6 Management to handle the property management function for the Properties.  In November 2008,

7 Bethany ceased making payments to GE Capital on the GE Capital Loan, and by January 2009,

8 Bethany had failed to pay its vendors and employees.

9 In February 2009, it became clear that Bethany was no longer able to handle the

10 management of the Properties.  This was evidenced by (i) Bethany's continued failure to pay

11 vendors and employees for up to three months, (ii) the declining occupancy at each of the

12 Properties, (iii) lack of marketing for the Properties, and (iv) Bethany's failure to conduct routine

13 maintenance to prevent the Properties from slipping into disrepair.  Bethany's lack of

14 management led to significant deterioration of the Properties, above-normal vacancy rates, and

15 unacceptable living conditions.

16 In February 2009, GTS began taking proactive measures to save the Properties from

17 complete devastation.  At this point, LTV was retained to assist in a potential restructuring of the

18 debt encumbering the Properties and to assess the physical conditions of the Properties.  On

19 February 27, 2009, KT Terraza and FLJC joined GTS in terminating the Property Management

20 Agreement with Bethany Management.  At that point, GTS determined that a reorganization of

21 these Properties and their related indebtedness would best be accomplished under Chapter 11 of

22 the Bankruptcy Code.

23 **C.      The Commencement of Debtors' Bankruptcy Cases.**

24 On March 3, 2009, GTS commenced its Chapter 11 bankruptcy case designated as *In re*

25 *GTS Property Portfolios B-3, LLC*, Case No. 2:09-bk-14774-SB.  Since Gulfstream had the

26 exclusive right to manage the Properties pursuant to the TIC Agreement, GTSPPI, the parent of

27 GTS, and a subsidiary of GTSI, purchased the interests of Gulfstream from Multi Enterprise II on

28 March 9, 2009.  And on March 10, 2009, Gulfstream commenced its own Chapter 11 bankruptcy

1   case designated as *In re Gulfstream Apt. Portfolio, LLC*, Case No. 2:09-bk-15342-SB.

2   Debtors moved quickly to remedy the problems at the Properties by seeking to employ

3   LTV on an emergency basis as their portfolio asset manager and financial advisor to facilitate the

4   rehabilitation of the Properties.    Debtors also sought emergency authorization from the

5   Bankruptcy Court to use the cash collateral of GE Capital.  At the same time, Debtors opposed a

6   motion for relief from stay filed by GE Capital and the U.S. Trustee's request that the Bankruptcy

7   Court appoint a Chapter 11 Trustee to administer Debtors' bankruptcy estates.  Ultimately, on

8   March 11, 2009, the Bankruptcy Court was persuaded by the strength of Debtors' proposed

9   manner of addressing the exigent circumstances and authorized the Debtors to employ LTV as the

10  financial advisor and portfolio asset manager, and to employ the Local Property Managers.  The

11  Bankruptcy Court also authorized Debtors to use cash collateral through the beginning of April

12  2009.

13          **D.      The Property Management Transition.**

14  LTV and the Local Property Managers took over management of the Properties in mid-

15  March 2009 shortly after the commencement of this case.  Debtors, LTV and the Local Property

16  Managers immediately began working on a plan to stabilize the Properties, remedy the most

17  significant life, health, and safety repairs required at each of the Properties, and market the

18  Properties in order to increase the occupancy rates.  During the week of March 16, 2009, D. Scott

19  Lee of LTV visited each of the nine properties and met with the lead property managers for each

20  of the Properties:  Todd Abedon of Chartwell for the South Carolina Properties, Chris Burns of

21  Lincoln for the Florida Properties, and Allyson McKay of Lincoln for the Texas Properties.  The

22  focus of LTV and the Local Property Managers over the initial five months was to (i) create and

23  implement property stabilization plans for each of the Properties, (ii) identify and prioritize the

24  critical life, health and safety deficiencies that needed the most immediate repairs, and (iii) sort

25  through budget issues necessary to stabilize the properties.

26          The transition to the Local Property Mangers was seamless and the condition of the

27  Properties has dramatically improved as a result of their efforts.  The stabilization plans have paid

28  off and the initial critical life safety repair issues and numerous minor issues have been

1  remediated.  During September and October, 2009, Mr. Lee of LTV again inspected the

2  Properties and met with the Local Property Managers to review progress and to develop a plan to

3  continue increasing occupancy for each of the Properties.

4        **E.    Summary of Significant Repairs to the Properties.**

5        Debtors' March Supplemental Cash Collateral Brief [Docket No. 63], May Supplemental

6  Cash Collateral Brief [Docket No. 104], July Supplemental Cash Collateral Brief [Docket

7  No. 142], and October Supplemental Cash Collateral Brief [Docket No. 199] provide an

8  exhaustive review of the progress made by LTV and the Local Property Managers in remediating

9  the critical life, safety and health issues affecting each of the nine Properties as well as other

10  minor repair issues.  In March, 2009, LTV and the Local Property Managers identified 81 critical

11  life-safety repairs that needed to be remediated at the Properties.  As of December 1, 2009, almost

12  all of these repairs have been completed with the exception of the fire-damaged building at

13  Braesview.  From the Petition Date through November 29, 2009, there have been approximately

14  12,395 individual service requests of which 71% have been completed.  As a result of the work of

15  LTV and the Local Property Managers, the property rehabilitation phase is largely complete.

16  Accordingly, this Disclosure Statement will provide only a high level review of the repair issues

17  rather than the exhaustive analysis that was included in the prior briefing to the Bankruptcy

18  Court.

19        **Ashton Ridge**:  In March 2009, Lincoln identified the following critical issues affecting

20  the property:  drug and vagrant activity, water intrusion, sagging floor joints in units, swimming

21  pools that were closed due to algae and code violations, landscape overgrowth, inadequate

22  lighting, and patio repairs.  All of these repair issues have been addressed and remediated.  Most

23  importantly, crime on the Property has diminished significantly thereby allowing daytime security

24  patrols to be phased out.  Lincoln is now addressing subsequently identified repair issues,

25  including, roof leaks in two of the buildings, breezeway ceiling repairs for two buildings, and

26  mold remediation in an apartment.

27        In addition to the minor repair issues that arise in the course of managing an apartment

28  complex, there are still two significant capital projects remaining that concern Ashton Ridge.  The

1   first is the reconstruction of a building that was damaged by fire.  The estimated repair cost is

2   approximately $750,000, which is fully insured less a $100,000 deductible, which has already

3   been paid by Debtors.   The second capital project involves a requirement of the City of

4   Jacksonville Fire Marshall to retrofit all nine of the three-story buildings with a monitored fire-

5   alarm system.  A scope of work as been developed and bids are being solicited.  Cost is estimated

6   at $70,000 and completion is targeted for March 31, 2010.

7       Debtors and the Local Property Managers have identified additional repair items that need

8   to be addressed at this Property, and estimate that the total cost to complete the remaining repairs

9   to be approximately $88,000 over the next six months.  This excludes the costs related to the

10   conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in

11   Part VI.G., *infra*.

12   **Cooper's Pond:**  In March 2009, Lincoln initially identified the following critical issues

13   affecting this Property:  inadequate exterior lighting; landscaping overgrowth; pestilence issues;

14   mold growth in six units; inoperable laundry room; loose handrails and banisters; sidewalk

15   erosion; parking lot erosion; swimming pools closed due to algae and violations; and community

16   ponds and waterways had extensive algae growth and inoperable fountains.  All of these issues,

17   with the exception of the inoperable fountains in the ponds, have been addressed and remediated.

18   Recently, Lincoln identified additional repair issues and is in the process of remediating the

19   following:  an inoperable motor for the lift station; presence of mold in seven additional units;

20   cleaning of storm drain system; restoration of the waterway fountains; parking lot sealing;

21   balcony rebuilds for twenty units; and minor roof repairs.

22       Debtors and the Local Property Managers have identified additional repair items that need

23   to be addressed at this Property, and estimate that the total cost to complete the remaining repairs

24   to be approximately $75,000 over the next nine months.  This excludes the costs related to the

25   conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in

26   Part VI.G., *infra*.

27   **Deerfield:**  In March 2009, Lincoln identified the following critical issues affecting this

28   Property:  landscaping overgrowth, water intrusion in two units, mold growth in two units, water

1   intrusion in clubhouse/leasing office, and inoperable access gate.  Recently, Lincoln identified

2   additional repair issues and is in the process of remediating the following:  remediation of mold in

3   three additional units; fire panel box repairs; sidewalk grinding.

4          Debtors and the Local Property Managers have identified additional repair items that need

5   to be addressed at this Property, and estimate that the total cost to complete the remaining repairs

6   to be approximately $11,000 over the next four months.  This excludes the costs related to the

7   conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in

8   Part VI.G., *infra*.

9          **Oakwood Village:**   In March 2009, Lincoln initially identified the following critical

10  issues affecting this Property:  mold growth in units; swimming pools closed due to algae and

11  violations; subsided sidewalks; damaged stairwells and laundry room ceilings.  All of these issues

12  have been addressed and remediated.  Lincoln identified an additional unit with mold and is in the

13  process abating the mold issue.

14         Debtors and the Local Property Managers have not identified additional repair items that

15  need to be addressed at this Property excluding the costs related to the conversion of vacant

16  apartments to Rent Ready Units, which is discuss in more detailed in Part VI.G., *infra*.

17         **Ventura Landing:**   In March 2009, Lincoln initially identified the following critical

18  issues affecting this Property:   collapsed and broken sewage lines; mold growth in units;

19  pestilence issues; missing, loose or broken balcony railings and staircase banisters; swimming

20  pools closed due to algae and violations; and significant damage to units.  Most significantly, the

21  City of Orlando had issued approximately 140 non-compliance notices relating to various

22  deficiencies at the Property.   Presently, all of the foregoing issues have been addressed and

23  remediated.   Lincoln has recently identified two additional apartments requiring mold

24  remediation, and is about to commence electrical repairs for certain exterior lighting fixtures.

25         Debtors and the Local Property Managers have not identified additional repair items that

26  need to be addressed at this Property excluding the costs related to the conversion of vacant

27  apartments to Rent Ready Units, which is discuss in more detailed in Part VI.G., *infra*.

28         **Quail Run:**   In March 2009, Chartwell initially identified the following critical issues

affecting this Property:  collapsed and broken sewage lines; exposed exterior electrical wiring; four flat roofs that required immediate replacement; landscaping overgrowth; swimming pools closed due to algae and violations; and mold growth in units.  All of these issues have been addressed and remediated.  Chartwell subsequently identified leaks in five additional flat roofs and repairs are currently underway.

Debtors and the Local Property Managers have identified additional repair items that need to be addressed at this Property, and estimate that the total cost to complete the remaining repairs to be approximately $18,000 over the next six months.  This excludes the costs related to the conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in Part VI.G., *infra*.

**Woodland Village:**  In March 2009, Chartwell initially identified the following critical issues affecting this Property:  exposed exterior electrical wiring; leaking flat roofs; sewage backups; landscaping overgrowth; swimming pools closed due to algae and violations; and mold growth in units.  All of these issues have been addressed and remediated.  Chartwell has subsequently identified the following issues that are in need of repair:  damaged tenant patios; damaged retaining wall; damaged privacy fence gates; and roof overhang on two buildings.

Debtors and the Local Property Managers have identified additional repair items that need to be addressed at this Property, and estimate that the total cost to complete the remaining repairs to be approximately $65,000 over the next six months.  This excludes the costs related to the conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in Part VI.G., *infra*.

**Braesview:**  In March 2009, Lincoln initially identified the following critical issues affecting this Property:  fire damaged eight-unit building; swimming pools closed due to algae, leak and violations; damaged access gates and perimeter fencing; broken window in clubhouse; unusable fire extinguishers; poor lighting in stairwells; and sidewalk and pavement damage.  All of these issues with the exception of the fire damaged building have been addressed and remediated.  The fire damaged building has been secured and bids have been received to complete restoration of the building.  Lincoln has subsequently identified the following issues

1    that need to be addressed at the Property:  damaged sprinkler systems; damaged fence; poor

2    drainage at rear of the Property; rotted exterior siding and balconies.  Lincoln is currently

3    accepting bids on some of these items, while others are in progress.

4         Debtors and the Local Property Managers have identified additional repair items that need

5    to be addressed at this Property, and estimate that the total cost to complete the remaining repairs

6    to be approximately $38,000 over the next nine months.  This excludes the costs related to the

7    conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in

8    Part VI.G., *infra*.

9         **La Jolla:**   In March 2009, Lincoln initially identified the following critical issues

10   affecting this Property:  swimming pools closed due to algae, leak and violations; damaged

11   garage doors; damaged access gates and perimeter fencing; expired fire extinguisher inspections;

12   mold in garages; leaking roofs; and inoperable fitness equipment.  All of these issues with the

13   exception of the damaged garage doors have been addressed and remediated.  The contractor

14   retained to repair the garage doors failed to show up to commence the project.  Lincoln is

15   currently soliciting bids to finish these repairs.  Also, Lincoln has subsequently identified the

16   following issues that need to be addressed at the Property:  boilers in need of replacement;

17   additional roof leaks; gutter installations; inoperable utility meters; fence welds; and sprinkler

18   system repairs.  Lincoln is currently accepting bids on some of these items, while others have

19   been completed or are in progress.

20        Debtors and the Local Property Managers have identified additional repair items that need

21   to be addressed at this Property, and estimate that the total cost to complete the remaining repairs

22   to be approximately $40,000 over the next nine months.  This excludes the costs related to the

23   conversion of vacant apartments to Rent Ready Units, which is discuss in more detailed in

24   Part VI.G., *infra*.

25        **F.    Retention of Former Bethany Employees**

26        Many of the former Bethany employees were retained by Lincoln and Chartwell in

27   various capacities.  As a result of Bethany's mismanagement of the Properties, these employees

28   had not received a paycheck in the two months prior to the Petition Date.  Debtors sought to

1  remedy this injustice, and on May 1, 2009, the Bankruptcy Court entered its Order Granting

2  Stipulation Re Payment of Employee Wages Pursuant to Debtors' Emergency Motion for Order

3  Authorizing Payment of Wages Pursuant to 11 U.S.C. § 363(b) [Docket No. 95] (the "**Wage**

4  **Order**"), which authorized payment of unpaid pre-petition wages to former Bethany employees

5  who were subsequently retained by the Local Property Managers.

6      In May 2009, the Local Property Managers issued retro paychecks to each of the affected

7  employees.  The total amount of unpaid compensation was approximately $187,848.99.  As a

8  result of these payments, Debtors have received various notes expressing gratitude for the

9  payments and acknowledging the hard work that the Debtors, LTV, and the Local Property

10  Managers have done in remedying the issues at the Properties.

11      The Wage Order only authorized payment of accrued unpaid wages.  The remaining

12  accrued vacation and sick time will be paid pursuant to the Plan of Reorganization.  Additionally,

13  the employees that were not retained by the Local Property Managers will also receive payment

14  pursuant to the Plan.  Part X.D, *infra*, of this Disclosure Statement describes the proposed

15  treatment of the Class 4 Employee Wage Claims.

16      **G.    Marketing the Properties.**

17      Bethany did not and could not market the Properties to prospective tenants because the

18  Properties themselves were in a significant state of disrepair.  The buildings had significant life-

19  safety repair issues, the curb appeal was atrocious due to landscape overgrowth and trash build

20  up, and the tenant populations were less than neighborly.  In five short months, LTV and the

21  Local Property Managers addressed and corrected these issues.  During the tail end of that

22  rehabilitation phase, the Local Property Managers began implementing their marketing plans for

23  the Properties.  The result has been steady increase in occupancy of rent-paying and law-abiding

24  tenants since July 2009.  As part of their marketing campaigns, the Local Property Managers have

25  implemented the following programs:

26    •    Placement of advertisements in local area apartment rental magazines and
          newspapers and apartment-specific internet sites, such as
27        ApartmentGuide.com, Rent.com, Apartments.com, MyNewPlace.com,
28        CraigsList.org and LincolnApts.com.

- Increased signage, balloons, flags and banners to advertise vacancies and move-in specials to draw attention to the Properties.

- Holding open houses for prospective tenants and resident appreciation parties to encourage participation in lease renewal and tenant referral programs.

- Preparation of furnished and/or unfurnished model apartments in each of the floor plans available at each Property.

- Use of leasing consultants to solicit local area businesses for referrals.

- Providing current tenants with rent creditors for successful referrals.

- Implementing competitive rent concessions and move-in specials to compete with the peer apartment complexes in each of their respective markets.

- Use of tenant renewal programs whereby all residents with expiring leases receive phone calls and letters from the property management staff soliciting their renewal and offering incentives such as free carpet shampoo, touch-up paint, or window cleaning.

Additionally, to combat the negative reputation that Ashton Ridge and Ventura Landing earned as havens for drug and criminal activities, the property managers for those Properties are in the process of changing the property names to Caroline Square and Renaissance Place, respectively. These name changes will be implemented once the sign permits have been obtained from the applicable city or county agencies.

The aggressive conversions of dilapidated vacant units to Rent Ready Units have contributed to the success of the marketing programs. At the commencement of these bankruptcy cases, there were **zero** Rent Ready Units available at any of the Properties in a sufficiently habitable condition for prospective tenants to immediately move into.[2] As of November 29, 2009, 1,240 units have been converted to "rent ready" condition, and of that amount, 1,143 units have been leased. This ensures that the Properties have approximately 10 to 12 Rent Ready Units available in various floor plans to facilitate the capture of new tenants. As the current stock of Rent Ready Units are leased, it will be critical for the Properties to continue their rehabilitation

---

[2] An inventory of Rent Ready Units is critical to Debtors' rehabilitation efforts not only because an inventory of units is necessary to be able to increase occupancy, but also because prospective tenants typically view the premises to be rented before committing to a rental agreement.

1  plans of converting un-rentable vacant apartments to rent ready status. And as net rental income

2  increases, additional funds will be available to continue turning market-ready rental units until the

3  Properties achieve their target occupancy levels. A chart illustrating the total number of

4  remaining units that need to be converted to a Rent Ready Unit and the associated costs for

5  accomplishing such conversion is attached hereto as **Exhibit 6**.

6       **H.    Occupancy Levels at the Properties.**

7       The plain simple truth is that nobody wants to live in an apartment complex with raw

8  sewage backing up into the apartment buildings, leaking roofs, mold, poor lighting, inadequate

9  security, overgrown vegetation and a criminal tenant population. These were the problems that

10  Debtors, LTV and the Local Property Managers faced in March 2009. Compounding these

11  problems was a tenant population with a significant number of delinquent tenants, as well as

12  "rent-rolls" that were significantly overstated by Bethany.[3] Thus, apartments were inspected and

13  lease audits were conducted to confirm actual occupancy, evictions of delinquent tenants ensued,

14  police patrols were increased to expel criminally-oriented tenants, and rehabilitation repairs were

15  commenced.

16       Of course, all of these actions had a dramatic effect on the Properties' overall occupancy.

17  Once the Properties were physically restored and the undesirable tenants purged, the Local

18  Property Managers had a clean slate with which to rebuild the tenant populations. For the first

19  four months of these Bankruptcy Cases, occupancy dropped from 72% to 62% as the critical

20  repairs were completed and the stabilization plans took hold. For the week ending July 5, 2009,

21  occupancy bottomed out at 61.6% and has been rebounding steadily to 68% as of November 29,

22  2009. A key component to the increase of occupancy relates to the improvement of the reputation

23  of the Properties and the increase in creditworthiness of the tenant base. As these communities

24  are rebuilt with dependable, law-abiding residents, the stability of the Properties will increase and

25  rent delinquencies will decrease, thereby resulting in an increase of the overall value of the

26  _____

27  [3]  When Debtors first assumed control of the Properties, it became clear that the pre-petition rent roll occupancy numbers maintained by Bethany were inaccurate and did not reflect the actual tenant population at each of the Properties. Because of Bethany's failure to actively manage the Properties in the months preceding the petition date, many units that had been reported as occupied were actually vacant.

28

Properties.

The following chart illustrates a favorable trend in occupancies at the Properties and is based on the pre-petition rent rolls, and weekly data compiled by LTV from the Local Property for March 26, 2009, April 5, 2009, May 3, 2009, June 7, 2009, July 5, 2009, August 2, 2009, September 6, 2009, October 4, 2009, November 1, 2009, and November 29, 2009 compiled from the Local Property Managers.

| Property | Pre-Petit. | Mar. 2009 | April 2009 | May 2009 | June 2009 | July 2009 | Aug. 2009 | Sept. 2009 | Oct 2009 | Nov. 2009 | 11/29 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ashton Ridge (FL) | 73% | 74% | 72% | 64% | 49% | 44% | 43% | 43% | 46% | 48% | 53% |
| Cooper's Pond (FL) | 61% | 60% | 59% | 55% | 51% | 48% | 50% | 51% | 53% | 60% | 63% |
| Deerfield (FL) | 51% | 60% | 58% | 55% | 50% | 49% | 52% | 57% | 59% | 62% | 63% |
| Oakwood Village (FL) | 70% | 53% | 51% | 45% | 48% | 48% | 45% | 44% | 46% | 46% | 49% |
| Ventura Landing (FL) | 71% | 70% | 68% | 64% | 57% | 51% | 46% | 38% | 40% | 40% | 39% |
| Quail Run (SC) | 69% | 70% | 69% | 70% | 70% | 67% | 67% | 73% | 76% | 74% | 75% |
| Woodland Village (SC) | 70% | 69% | 69% | 71% | 68% | 70% | 72% | 75% | 75% | 75% | 73% |
| Braesview (TX) | 93% | 94% | 93% | 90% | 91% | 90% | 92% | 93% | 92% | 90% | 91% |
| La Jolla (TX) | 83% | 82% | 84% | 80% | 79% | 86% | 90% | 92% | 89% | 92% | 92% |
| **Overall** | **72%** | **71%** | **69%** | **66%** | **63%** | **61.6%** | **63%** | **64%** | **65%** | **66%** | **68%** |

## VII.    DEBTORS' ASSETS

### A.    The Properties.

As discussed above, GTS holds an undivided fifty percent (50%) tenant-in-common interest in each of the nine Properties, and Gulfstream holds an undivided ten percent (10%) tenant-in-common interest in each of the same nine Properties.  Prior to the commencement of these bankruptcy cases, the Properties were in a significant state of disrepair with dwindling tenant populations.  During the first six months of this case, Debtors, LTV and the Local Property

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

1  Managers worked tirelessly to restore the Properties to a competitive market condition.  A

2  property condition summary report prepared by LTV is attached hereto as **Exhibit 3**.

3      Cushman and Wakefield ("**Cushman**") has been engaged by an affiliate of Debtors to

4  conduct an appraisal of the Properties.  Cushman estimated that the current value of the Properties

5  as of November 1, 2009 is as follows:

| Property | November 1, 2009 Value |
|---|---|
| Ashton Ridge (FL) | $   8,100,000 |
| Cooper's Pond (FL) | $   9,800,000 |
| Deerfield (FL) | $   9,000,000 |
| Oakwood Village (FL) | $ 13,500,000 |
| Ventura Landing (FL) | $   9,700,000 |
| Quail Run (SC) | $   9,000,000 |
| Woodland Village (SC) | $   9,000,000 |
| Braesview (TX) | $ 14,700,000 |
| La Jolla (TX) | $   8,800,000 |
| **TOTAL** | $  91,600,000 |

A copy of the Cushman Summary Report is attached hereto as **Exhibit 4**.

    **B.    Insurance Claims**.

    Prior to the commencement of these Bankruptcy Cases, a fire damaged an eight (8) unit

apartment building located at the Braesview property in Texas.   The insurance company,

Lexington Insurance Company ("**Lexington**"), has refused to tender the remaining insurance

proceeds due for this casualty loss.  Debtors are investigating whether to commence an adversary

proceeding against Lexington and the general contractor, Hoss Construction, for turnover of the

remaining insurance proceeds and completion of the repair project.  This potential litigation is

discussed further in Part IX, *infra*.

    After the commencement of these Bankruptcy Cases, a fire damaged an eleven (11) unit

apartment building located at the Ashton Ridge property in Florida.  Debtors are working with the

insurance companies, Lexington and Allied World Assurance, the general contractor, Coastal

Reconstruction, Inc., and GE Capital to restore that building to market-ready condition.  The

insurance companies have already advanced approximately $272,761 for the initial repairs. Debtors anticipate that the insurance companies will advance the remaining $250,000 of insurance proceeds and that construction will be completed within the next six months.

**C.    Property Tax and Insurance Impound Account**.

Debtors have established the debtor-in-possession bank account of GTS as the property tax and insurance impound account.  Since Bethany had failed to impound amounts for property taxes and insurance prior to the commencement of this case, and because Debtors needed all free operating cash flow to complete the critical, life-safety repairs during the first five months of these bankruptcy cases, Debtors did not begin accruing the property tax and insurance impounds until June 2009.  At that time, to make up for the impound deficiency, Debtors began impounding property tax and insurance funds on an accelerated basis.

On November 25, 2009, Debtors made approximately $1,050,000 in tax payments for the five Florida Properties in order to take advantage of the State of Florida's four percent (4%) discount for early payment of taxes.  Debtors will continue to make monthly deposits into this impound account and will pay the remaining property taxes and insurance in accordance with the following schedule.

| | | |
|---|---|---|
| **NOVEMBER 1, 2009 CASH POSITION** | | **$1,395,208.11** |
| **NOVEMBER EARLY PAYMENTS MADE** | | |
| Ashton Ridge - Nov 30, 2009 | ($202,069.48) | |
| Ventura Landing - Nov 30, 2009 | ($130,682.79) | |
| Oakwood Village - Nov 30, 2009 | ($177,302.35) | |
| Coopers Pond - Nov 30, 2009 | ($339,670.91) | |
| Deerfield - Nov 30, 2009 | ($197,613.80) | |
| **Total:** | **($1,047,339.33)** | |
| | | |
| November 30, 2009 Impounds | | $469,374.00 |
| **DECEMBER 1, 2010 CASH POSITION** | | **$817,242.78** |
| | | |
| December 31, 2009 Impounds | | $575,051.00 |
| **JANUARY 1, 2010 CASH POSITION** | | **$1,392,293.78** |

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

**JANUARY REQUIRED PAYMENTS**

| | | |
|---|---|---|
| Quail Run - Jan 15, 2010 | ($300,717.34) | |
| Woodland Village - Jan 15, 2010 | ($225,865.73) | |
| Property Insurance - Jan 28, 2010 | ($731,371.00) | |
| Braesview - Jan 31, 2010 | ($433,557.00) | |
| La Jolla - Jan 31, 2010 | ($287,026.74) | |
| **Total:** | **($1,978,537.81)** | |
| | | |
| January 30, 2010 Impounds | | $613,592.00 |
| **FEBRUARY 1, 2010 CASH POSITION** | | **$27,347.97** |
| | | |
| February 28, 2010 Impounds | | $333,342.00 |
| **MARCH 1, 2010 CASH POSITION** | | **$360,689.97** |

**MARCH REQUIRED PAYMENTS**

| | | |
|---|---|---|
| General Liability Insurance | ($135,000.00) | |
| **Total:** | **($135,000.00)** | |
| | | |
| March Impounds | | $340,092.00 |
| | | |
| **MARCH 31, 2010 CASH POSITION** | | **$565,781.97** |

After March 31, 2010, Debtors will resume impounding additional funds for property taxes and insurance on a straight-line basis at a rate of approximately $275,000 per month, an amount that is $155,000 per month less than the $430,000 per month average that Debtors will impound for November 2009 through March 2010.

**D.    Personal Property**.

Pursuant to the terms of the TIC Agreement, Debtors also hold an interest in personal property located at each of the Properties.    Such property consists of office equipment, maintenance supplies, cleaning supplies, appliances for common areas, golf carts and other personal property that would typically be used in the operation and management of multi-family residential apartment complexes.    Each of the Properties has an operating account and a segregated security deposit account, and Gulfstream has a separate debtor-in-possession bank account, which is general used for capital expense reserves for the Properties.    The aggregate balance of the property level operating accounts and security deposit accounts was $510,707 and $145,131, respectively, as of November 29, 2009.    The balance of the Gulfstream reserve account was $657,146 as of the same date.    A copy of Debtors' cash balance report prepared by LTV is

attached hereto as **Exhibit 5**.

## VIII.  DEBTORS' DEBT STRUCTURE

### A.  GE Capital Loan.

The Properties are encumbered by GE Capital Liens, which secure repayment of the GE Capital Loan.  On July 29, 2009, GE Capital filed the GE Capital Claim, asserting an aggregate balance of the GE Capital Loan as of the Petition Date of $161,814,464.36.

### B.  Mechanics' and Materialmens' Lien Claims.

Prior to the Petition Date, Bethany or Gulfstream contracted with various contractors and material suppliers to provide labor and supplies to the Properties for various repairs and maintenance.  A number of these entities recorded mechanics' liens against the Properties pursuant to the applicable mechanics' lien and materialmens' lien statutes for the States in which the Properties are located to secure payment of the balance of the contract price they claim to be owed.  Debtors estimate that the aggregate amount necessary to satisfy the claims of all entities that have asserted pre-petition mechanics' lien and materialmen's lien claimants is approximately $1,700,000.00.

### C.  Priority Claims.

Prior to the Petition Date, Bethany had failed to pay its employees for a period of six weeks for wages, vacation pay, sick pay or severance pay.  Debtors obtained authorization from this Court to pay the accrued but unpaid wages of the former Bethany employees that were retained by the Local Property Managers.  Debtors did not pay any of the accrued vacation, sick or severance pay of such individuals, or any of the unpaid compensation of any individual not retained by the Local Property Managers.  Debtors estimate that there are priority wage claims totaling approximately $160,050.27.

Additionally, prior to the Petition Date, Bethany appears to have used certain funds in the security deposit accounts related to for ongoing operating expenses for the Properties or for unlawful distributions to Bethany's principals.  Debtors estimate that there are priority security deposit claims for tenants that vacated the Properties prior to the Petition Date in the amount of $62,238.89.  Lastly, Debtors estimate that there are priority tax claims for unpaid 2008 taxes in

1 the amount of $11,323.49.

2     **D.**    **General Unsecured Claims**.

3     There are approximately $1,900,000 of general unsecured claims against Debtors arising

4 from Creditors that provided services, such as landscaping, cleaning, repair and maintenance, and

5 advertising, as well as materials to the Properties.  These trade creditors may have contracted

6 directly with Bethany, as the property manager, in which Debtors are liable under an agency

7 theory, or directly with the individual apartment complex erroneously believing it to be a separate

8 legal entity.

9     **E.**    **Existing Equity Ownership**.

10     The holder of the existing equity interest in debtor GTS is GTSPPI, having a 100%

11 membership interest.  The holder of the existing equity interest in debtor Gulfstream is GTSPPI,

12 having a 100% membership interest.  GTSPPI also owns a 100% membership interest in KT

13 Terraza, and a 100% membership interest in FLJC, which are the non-debtor entities that hold the

14 remaining thirty percent (30%) and ten percent (10%) tenant-in-common interests, respectively,

15 in the Properties.

16     **IX.**    **POTENTIAL AND ACTUAL LITIGATION CLAIMS**

17     Under the Plan, the Reorganized Debtor shall be empowered to prosecute any Cause of

18 Action, claim, lawsuit, contested matter and adversary proceeding that could have been brought

19 by Debtors as debtors-in-possession.  Debtors have conducted a preliminary investigation of

20 potential Causes of Action to be asserted in the Bankruptcy Case and have made the following

21 preliminary conclusions concerning such claims:

22     **A.**    **Avoidance Actions Against GE Capital.**

23     A review of the GE Capital Loan and Security Documents and the documents concerning

24 the acquisition of the tenant-in common-interests by the TIC Owners has revealed that there does

25 not appear to be a viable cause of action based upon a fraudulent conveyance or similar causes of

26 action that would result in the blanket avoidance or subordination of the GE Capital Liens.

27 Debtors do not currently believe that pursuit of any such cause of action would benefit creditors.

28     Similarly, it does not currently appear that there is a viable preference action against GE

Capital based upon the TIC Assumption Security Amendments.  While additional document review and analysis of this issue is in progress, it appears that the manner in which personal property rights were granted to TIC Owners under the TIC Agreement will impact the value of any such cause of action.

### B.    Surcharge Claim Against GE Capital.

Debtors believe that they have a valuable cause of action against GE based upon Section 506(c) of the Bankruptcy Code, which permits a debtor to recover certain expenses from a secured creditor's collateral.  In order to recover, the expenses must be:

1.    Reasonable.  The amount of the expenses must be reasonable for the goods or services provided.  In addition, reasonableness may also be measured against the amount of expenses the secured creditor would have incurred in foreclosing on the property.

2.    Necessary.  The expenses must be necessary to preserve or dispose of the secured creditor's collateral.  Costs to repair and maintain secured property generally qualify as necessary.

3.    Beneficial.  The expenses must confer a benefit on the secured creditor. Many courts require a showing of a direct and quantifiable benefit to the creditor.

Since Debtors believe it indisputable that the value of the Properties has increased during the course of these bankruptcy cases as a result of expenditures associated with repair and maintenance of the Properties and related fees associated with Debtors' cases, they intend to pursue an action against GE Capital to apply the GE Capital Surcharge Claim against the GE Capital Secured Property Value or otherwise obtain consideration from GE Capital equivalent to the amount of the GE Capital Surcharge Claim.

### C.    Claims Between TIC Owners.

Debtors have undertaken an analysis of whether it is possible that either Debtor – or any of the TIC Owners – could have (a) a claim that it alone would have separate and apart from its membership in the tenancy in common, or (b) a claim against another Debtor or TIC Owner.  As described below, that analysis has revealed that none of the TIC Owners have any such claims.

Since each of the tenants in common was organized as a single purpose entity for the

1   purposes of investing in the Properties and none of the TIC Owners appear to have undertaken

2   any separate business other than owning its respective portion of the tenancy in common, any

3   claims held by any of the TIC Owners must, on their face, relate to the ownership or operation of

4   the Properties.  The TIC Agreement describes the circumstances that could rise to inter-TIC

5   claims, limiting them to (i) adverse actions taken by one or more of the TIC Owners adverse to

6   the other TIC Owners, or (ii) a contribution by on e TIC Owner of more than its ratable share to

7   operations costs or debt service.

8   　　　　One such potential claim concerns any obligation of Gulfstream for failing to terminate

9   the Property Management Agreement, but an analysis of the factual background fails to support

10  such a claim.  While Gulfstream was initially appointed as manager of the tenancy in common

11  under the TIC Agreement, whatever management responsibility Gulfstream had under the TIC

12  Agreement was in turn delegated, at the direction and with the consent of each of the TIC

13  Owners, to Bethany pursuant to the Property Management Agreement.  Neither the TIC

14  Agreement nor the Property Management Agreement appears to impose any extra monitoring or

15  related duties on Gulfstream as compared to any other TIC Owners.  Thus, since none of the TIC

16  Owners appear to have had enough individual control to create liability between them, it appears

17  that if liability for mismanagement arises out of action or inaction, that liability attaches to

18  Bethany as agent to *all* of the TIC Owners.  The viability of claims by Debtors against Bethany is

19  discussed below.

20  　　　　Debtors also investigated whether there are claims between TIC Owners arising under the

21  TIC Agreement for the payment by any TIC Owner of more than its ratable share to obligations

22  of the Properties. There is no evidence obtained to date that demonstrates the existence of any

23  such claims.

24  　　　　Finally, even if any such claims did exist, and it appears that they do not, the identity of

25  creditors with claims against the TIC Owners prevents the payment of claims from one TIC

26  Owner to another from increasing the return to the creditors of any one TIC Owner.  The payment

27  of any such claims would not change the ultimate economic outcome from the creditors'

28  perspective, and the costs of pursuing and/or defending any such claim would only diminish the

1    total assets available for distribution to the joint creditors.

2    ### D.    Preference Actions Against Third Parties.

3    Although Bethany appears to have ceased operations prior to the commencement of the

4    Preference Period, it is possible that vendors that provided services related to the Properties

5    received payments during the Preference Period.  Debtors are currently investigating the payment

6    records of the pre-petition operating accounts for the Properties and will commence those actions

7    against third parties if appropriate.

8    ### E.    Claims Against Bethany.

9    While Bethany appeared to have breached the Property Management Agreement and

10    could be liable for damages arising from that breach, there appears to be significant doubt about

11    the ability to collect any such claim.  Numerous Bethany-related entities are currently the subject

12    of bankruptcy proceedings and the 2004 Examinations of Bethany's principals has not revealed

13    any ready source of payment for any judgment that might be obtained.  Debtors are continuing to

14    investigate the viability of this claim and its value, if any, to Debtors' estates.

15    ### F.    Claims Against Lexington Insurance Company and Hoss Construction

16    On May 25, 2008, a fire destroyed an 8-unit apartment building located at the Braesview

17    apartment complex.  Lexington Insurance Company was the insurer of record for this casualty

18    loss.  The original replacement cost value for the loss was estimated at $720,498.38.  After

19    payment of the $100,000 deductible, the full amount due from Lexington was $620,498.38.

20    Lexington advanced approximately $519,817.85 to Bethany, GE Capital's real estate

21    management affiliate, GEMSA, and/or Hoss Construction.  The remaining balance due and owing

22    from Lexington is approximately $100,000.  However, Lexington has indicated they will not fund

23    any of the remaining insurance proceeds due to the fact that the insured party cannot substantiate

24    the scope of work already completed with the previously dispersed funds.  A significant amount

25    of work remains to complete the repairs to this building.  Debtors estimate that cost to complete

26    construction is approximately $275,800 to $388,940.  As a result, Debtors believe that they have

27    claims against Lexington for disbursement of the remaining insurance proceeds and against Hoss

28    Construction for breach of contract, but that the proceeds from any such claims would likely be

1  subject to the GE Capital Liens.

2      **G.    Other Claims and Reservation of Rights and Notice**.

3      Debtors reserve all rights hereunder to commence, continue, amend and prosecute all

4  actions, causes of action, objections to claims, setoffs, recoupment rights, defenses and

5  counterclaims or any other matters after confirmation of the Plan and through the Reorganized

6  Debtor after the Effective Date, as against all:

7          1.      Persons that have filed or do file proofs of claim in this case;

8          2.      all Persons involved in the litigation described herein;

9          3.      all Persons against which Debtors have pre-petition Claims; and

10         4.      any parties to post-petition transactions with Debtors.

11  Debtors reserve the right to amend or supplement this paragraph at any time prior to the Effective

12  Date of the Plan.

13      **X.    DEBTOR'S ACTIONS AND SIGNIFICANT POST-FILING EVENTS**

14      Debtors have made a concerted effort to implement promptly its reorganization in this

15  Bankruptcy Case.  In that regard, Debtors have taken considerable action in this Bankruptcy Case

16  since the Petition Date, including but not limited to the following:

17      **A.    Administration of the Bankruptcy Case in General**.

18      **Case Commencement and Administrative Matters:**  On March 3, 2009, GTS

19  commenced its Bankruptcy Case by voluntarily filing its Chapter 11 bankruptcy petition.  On

20  March 10, 2009, Gulfstream commenced its Bankruptcy Case by voluntarily filing its Chapter 11

21  bankruptcy petition.  On March 17, 2009, this Court entered its order authorizing the joint

22  administration of these bankruptcy cases.  On May 22, 2009, this Court entered its order granting

23  Debtors' motion for order limiting notice.

24      **Employment and Compensation of Professionals:**  On June 8, 2009, the Court entered

25  its Order Authorizing Employment of Buchalter Nemer, PC as General Bankruptcy Counsel to

26  Debtor GTS [Docket No. 130], and its Order Authorizing Employment of Buchalter Nemer, PC

27  as General Bankruptcy Counsel to Debtor Gulfstream [Docket No. 129].  On April 2, 2009, the

28  Court entered the Property Manager Employment Order, which authorized Debtors to retain LTV

1    as the portfolio asset manager and financial advisor and Lincoln and Chartwell to serve as the

2    Local Property managers for the Properties.

3      **Bar Date for Proofs of Claims and Interests:**  On May 22, 2009, this Court entered its

4    Order Fixing Deadline for Filing Proofs of Claims and Interest, which set July 31, 2009 as the

5    deadline.  On May 29, 2009, Debtors filed and served their Notice of Last Date to File Proofs of

6    Claims or Interests setting the claim filing deadline as of July 31, 2009 to all parties entitled to

7    notice.

8      **Cash Collateral Use:**  On March 11, 2009, the Court granted Debtors' initial request for

9    use of cash collateral through April 7, 2009 over the opposition of GE Capital.  Since then, the

10   Court has granted Debtors' continued use of cash collateral for two to three month periods at a

11   time.  Some of these extensions have been over the objections of GE Capital, while some have

12   been with GE Capital's consent.  Most recently, Debtors filed a Supplemental Brief seeking

13   continued use of cash collateral through January 31, 2010 [Docket No. 199], which GE Capital

14   opposed.  The Court granted this most recent request on November 25, 2009.

15     **GE Capital's Motions for Relief from Stay:**  On March 6, 2009, GE Capital filed a

16   Motion for Relief from Stay seeking authorization to proceed with judicial proceedings to

17   foreclose on the Properties.  GE Capital also filed another motion on March 6, 2009 seeking to

18   excuse Chartwell, which was the prepetition receiver over the South Carolina Properties, from

19   complying with the turnover requirements of the Bankruptcy Code.  Debtor vigorously opposed

20   these motions, and on March 11, 2009, the Court denied both of GE Capital's motions.  The

21   Order Denying the Turnover Motion was entered on March 17, 2009, and the Order Denying the

22   Relief from Stay Motion was entered on March 18, 2009.  On October 8, 2009, GE Capital filed a

23   second Motion Seeking Relief from the Automatic Stay.  Again Debtors opposed this motion, and

24   at the hearing on the second relief from stay motion, the Court decided to continue the hearing

25   until January 12, 2009.

26     **Debtor's Disclosure Statement:**  On June 23, 2009 and September 28, 2009, Debtors

27   filed joint motions seeking extensions of the exclusivity periods within which Debtors were

28   required to file and confirm plans of reorganization.  The Court entered its order granting the first

extension motion on August 26, 2009, and the second extension motion on November 12, 2009. Recently, debtor GTS filed a motion seeking to extend the plan exclusivity period by seven days to harmonize the plan filing deadlines of GTS and Gulfstream, which were one-week apart due to the one week difference in Debtors' Petition Dates. Debtors filed this Disclosure Statement and corresponding Plan on December 7, 2009, within the proscribed exclusivity periods.

**Pending Adversary Proceedings and Motions:** Currently, the following significant adversary proceedings and motions are still pending:

- No adversary proceedings are pending.

- GE Capital's Motion for Relief from Automatic Stay has been continued to January 12, 2010 at 2:00 p.m. Debtors intend to file an objection.

**Reporting and U.S. Trustee Requirements:** Due to the complexities of these bankruptcy cases, Debtors sought extensions of time within which to file their Schedules to the Bankruptcy Petition and Statements of Financial Affairs. This Court granted such request on March 19, 2009. Thereafter, Debtors timely filed their Schedules and Statements of Financial Affairs. After conducting a thorough review of their books and records, Debtors subsequently amended their schedules in August 2009 to acknowledge Debtors' liability to creditors that had contracted directly with Bethany or the Properties. With respect to the U.S. Trustee's requirements, Debtors attended their initial interview with the U.S. Trustee as well as the Section 341(a) Meeting of Creditors, which was held on May 14, 2009. Debtors have timely submitted their 7-Day Package and their Monthly Operating Reports to the U.S. Trustee as well. Debtors have opened the required post-petition DIP bank accounts and are current on quarterly payments to the Office of the U.S. Trustee.

## XI.   SUMMARY OF THE PLAN

### A.   OVERVIEW

Debtors' Plan is premised on the continued operation of the Properties and use of the cash flows generated therefrom to make distributions to the holders of Allowed Claims and Interests in accordance with the priorities set forth in the Plan. In order to adequately capitalize the Reorganized Debtor, Debtors' Plan is a "new value" Plan whereby GTSPPI will contribute to the

1    Reorganized Debtor the equity interests of FLJC, which holds an undivided ten percent tenant-in-

2    common interests in the Properties, and the equity interests of KT Terraza, which holds an

3    undivided thirty percent (30%) tenant-in-common interest in the Properties.  Moreover, GTSPPI

4    will also contribute approximately $1,000,000 in cash to the Reorganized Debtors in order to

5    provide adequate working capital and to fund initial Plan payments as outlined in the LTV 10-

6    Year Projection.

7        With respect to the treatment of secured creditors, Debtors' Plan bifurcates the GE Capital

8    Claim into a secured claim and an unsecured deficiency claim.  The amount of the GE Capital

9    Secured Claim is $91,600,000, which is equal to the appraised value of the Properties.  The GE

10   Capital Secured Claim will be reduced by the GE Capital Surcharge Claim.  Debtors' Plan will

11   make monthly interest payments to GE Capital over a 10-year period with a balloon payment

12   accomplished through a sale or refinancing of the Properties at the end of the 10th year.  Since the

13   Mechanics' Lienholders Claims are junior in priority to the GE Capital Claim and are fully

14   undersecured, the Mechanics' Lienholders will be treated under the Plan with the class of

15   unsecured trade creditor claims.

16       With respect to the treatment of priority unsecured creditors.  Debtors' Plan proposes to

17   pay such priority claimants one hundred percent (100%) of their Allowed Claims quarterly over

18   the one year period following the Effective Date.  With respect to the treatment of unsecured

19   creditors, Debtors' Plan proposes pay unsecured creditors in three separate classes.  The GE

20   Capital Unsecured Deficiency Claim will be separately classified to enable Reorganized Debtor

21   to provide GE Capital with an undivided ten percent (10%) tenant-in-common interest in the

22   Properties in satisfaction of the GE Capital Unsecured Deficiency Claim.  Debtors' have

23   estimated the value of the GE Capital TIC Interest to be approximately $3,356,891.  GE Capital

24   will also receive $500,000 paid over two years on account of its GE Capital Unsecured

25   Deficiency Claim.  This provides GE Capital with approximately a 5.5% recovery for the GE

26   Capital Unsecured Deficiency Claim.  The Class 7 Unsecured Creditors – Trade Creditors will

27   receive an equivalent percentage of their Allowed Unsecured Claims paid out over three years at

28   the Plan Unsecured Interest Rate.  The final class of unsecured creditors is an administrative

convenience class consisting of trade creditors with Allowed Unsecured Claims of less than $500.00, which will be paid on the Effective Date.

With respect to equity interests, GTSPPI will contribute its 100% equity interest in GTS and its 100% equity interest in Gulfstream to Reorganized Debtor.  As of the Effective Date, GTSPPI will own 100% of the equity interest of Reorganized Debtor.  This transfer will avoid the imposition of approximately $500,000 in transfer taxes that would arise in the event that the actual tenant-in-common interests were transferred to a new entity.

## B.    CLASSIFICATION OF CLAIMS AND INTERESTS

The Bankruptcy Court set a Claims Bar Date of July 31, 2009.  To date, approximately 140 claims have been filed in this Case.  Some filed proofs of claim are duplicates.  Debtors have amended their schedules to their respective bankruptcy petitions on December 4, 2009 to fully account for all Claims against Debtors' bankruptcy estates.   The Plan contemplates that all scheduled Claims and all Proofs of Claim filed by Creditors will become an Allowed Claim on the Effective Date; provided, however, that Debtors have not filed any objections to such Claims prior to the Claims Objection Date.

From a review of the filed claims to date and the Debtor's schedules, Debtors' best estimate of the amount of claims that will be asserted in each Class are summarized in the chart below.  All claims remain subject to claims objections prior to the Claims Objection Date.  The following chart summarizes Debtors' estimates of Claims by each Class created under the Plan.

| CLASS | TYPE OF CLAIMS | Estimated Claims |
|---|---|---|
| 1 | Administrative Expense Claims | $      600,000 (est.) |
| 2 | GE Capital Secured Claims | $    91,600,000 |
| 3 | Mechanics' Lien Claims | $      1,788,536 |
| 4 | Priority Unsecured Employee Wage Claims | $         160,050 |
| 5 | Priority Unsecured Security Deposit Claims | $           62,239 |
| 6 | Priority Unsecured Tax Claims | $           11,323 |
| 7 | GE Capital Unsecured Deficiency Claim | $    70,214,464 |
| 8 | General Unsecured Claims – Trade Creditors | $      1,886,007 |
| 9 | Administrative Convenience Class | $           25,447 |
| 10 | Existing Equity Interests | N/A |

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

All Claims and Interests are classified under the Plan as set forth in this Section.  At the time of the confirmation hearing, any Class that does not contain an Allowed Claim (or a Claim temporarily or provisionally allowed by Bankruptcy Court for voting purposes) will be deleted from the Plan with respect to voting on confirmation of the Plan.  The Classes of Claims under this Plan are as follows:

**C.    CLASS 1 – ADMINISTRATIVE EXPENSE CLAIMS**.

This Class is comprised of all Administrative Expense Claims, including Claims of Debtors' bankruptcy counsel and other professionals, such as LTV, retained by Debtors, unpaid United States Trustee's Fees, and any other Allowed Claims expressly approved by the Court under Section 503(b).  This Class is estimated to include approximately $450,000 of attorneys' fees and costs of Buchalter Nemer plus $125,000 for the 20% holdback of compensation due and owing to LTV.  Debtors expect that the unpaid Administrative Expense Claims will total no more than $600,000 at the Effective Date.  Debtors anticipate that most Administrative Expense Claims will be funded through the net operating proceeds of the Properties and the Equity Auction Proceeds.

**D.    CLASS 2 – GE CAPITAL ALLOWED SECURED CLAIM**.

This Class is comprised of the GE Capital Allowed Secured Claim.  GE Capital asserts or will assert that its Allowed Secured Claim is secured by a first priority lien on the Properties and the Property Revenue derived therefrom, pursuant to the terms of the GE Capital Loan and Security Documents.  GE Capital has asserted that indebtedness is in excess of $161.8 million.  The value of the Properties is $91.6 million.  Accordingly, the GE Capital Secured Claim is $91.6 million and the GE Capital Unsecured Deficiency Claim is approximately $70.9 million.

a)    **Valuation of Secured Claim**.  The *amount* of the Allowed Secured Claim of GE Capital is subject to the provisions of Section 506(a) of the Bankruptcy Code in that it is limited to the value of the property of Debtors in which GE Capital holds a valid lien interest.

b)    **Debtors' Disputes re Claim Amount**.  The *amount* of the GE Capital Secured Claim (and any Allowed Unsecured Claim) of GE Capital is subject to Debtors' surcharge claims against GE Capital under Section 506(c) of the Bankruptcy Code.

c)      **Adjudication of GE Capital Allowed Secured Claim**.  The GE Capital Allowed Secured Claim will not become an Allowed Secured Claim until such time as the Court enters an order that has become a Final Order resolving the various disputes regarding the amount of GE Capital's Secured Claim subject to any reduction for the GE Capital Surcharge Claim.  Such adjudication will take place in connection with the confirmation hearing on Debtors' Plan.

d)      **Disallowed Class 2 Claims**.  Any portion of the Class 2 Claim that is Disallowed as a Class 2 Allowed GE Capital Secured Claim but is otherwise an Allowed Claim shall be treated as a Class 7 – GE Capital Unsecured Deficiency Claim in accordance with the Court orders Allowing such Claims.

**E.      CLASS 3 – MECHANICS' LIEN CLAIMS**.

This Class is comprised of the holders of Allowed Claims that are secured by valid and perfected statutory liens on the Properties pursuant to the applicable laws of the States in which the Properties are located relating to the provision of labor, professional services, materials, machinery, fixtures or tools in the construction, alteration or repair of any building, other structure or improvement upon or for the benefit of the Properties ("**Mechanic's Lien Statutes**").  Debtors are aware of numerous mechanics' liens recorded as of the Petition Date.  A list of claimants asserting liens against the Properties (current as of December 1, 2009) that will be treated under Class 3 is attached hereto as **Exhibit 7**.  Since the Mechanics' Lien Claims are completely undersecured, these Allowed Claims will be treated as Unsecured Claims – Trade Creditors under Class 7 of this Plan.  Moreover, any unperfected liens or other claims on account of the Properties or Debtors of the type identified in the Mechanic's Lien Statutes will be treated as Unsecured Claims - Trade Creditors under Class 7 of this Plan.

**F.      CLASS 4 – EMPLOYEE WAGE CLAIMS**.

This Class is comprised of the holders of any Allowed Unsecured Claims entitled to priority pursuant to Section 507(a)(4) for unpaid employee wage claims.  Class 4 Allowed Claims will be Allowed and paid subject to the statutory cap presently set at $10,950.00 as provided in the treatment provisions of Class 4, with the balance being treated as a General Unsecured Claim

1    in Class 7 of this Plan (or Class 9 depending on the residual balance of such Claim).  A list of

2    Claimants (current as of December 4, 2009) that will be treated under Class 4 is attached hereto

3    as **Exhibit 8**.

4    　　　　**G.    CLASS 5 – SECURITY DEPOSIT CLAIMS**.

5    　　　　This Class is comprised of the holders of any Allowed Claims for a refund of Security

6    Deposits under Section 507(a)(7).  Class 5 Allowed Claims will be Allowed and paid subject to

7    the statutory cap presently set at $2,425.00 as provided in the treatment provisions of Class 5,

8    with the balance being treated as a General Unsecured Claim in Class 7 of this Plan (or Class 9

9    depending on the residual balance of such Claim).  A list of Claimants (current as of December 4,

10   2009) that will be treated under Class 5 is attached hereto as **Exhibit 9**.

11   　　　　**H.    CLASS 6 –PROPERTY TAX CLAIMS**.

12   　　　　This Class is comprised of the holders of Allowed Claims arising out of the pre-petition

13   assessment by any governmental unit of any ad valorem property tax under Section 507(a)(8) of

14   the Bankruptcy Code.  A list of Claimants (current as of December 4, 2009) that will be treated

15   under Class 6 is attached hereto as **Exhibit 10**.

16   　　　　**I.    CLASS 7 – GENERAL UNSECURED CLAIMS – TRADE CREDITORS**.

17   　　　　Class 7 shall consist of the holders of Allowed Claims arising from the provision of labor,

18   professional services, materials, machinery, fixtures or tools in the construction, alteration or

19   repair of any building, other structure or improvement upon or for the benefit of Debtors'

20   Properties.  From a review of its records, Schedules to its Bankruptcy Petitions and the Proofs of

21   Claim filed to date, Debtors estimate that the amount of Class 7 Allowed Claims will be in excess

22   of $3.5 million, which includes the Class 3 unsecured deficiency claims of Mechanics'

23   Lienholders, and any Class 4 and Class 5 Allowed Claims that exceed the statutory limits

24   proscribed by Section 507(a) of the Bankruptcy Code.  A list of Claimants (current as of

25   December 1, 2009) that will be treated under Class 7 is attached hereto as **Exhibit 11**.

26   　　　　**J.    CLASS 8 – GE CAPITAL UNSECURED DEFICIENCY CLAIM**.

27   　　　　Class 8 is comprised of all Allowed Claims of GE Capital asserted by GE Capital that is

28   not the Allowed GE Capital Secured Claims as provided for in Class 2.  The total Claim asserted

1  by GE Capital is believed to be in the approximate amount of $161,800,000.  Based on the value

2  of the Properties, Debtors believe that the unsecured deficiency claim allowed in Class 7 will be

3  approximately $70,200,000.

4  **K.    CLASS 9 –ADMINISTRATIVE CONVENIENCE CLASS**.

5  This Class consists of Allowed Claims that would ordinarily be treated in Class 7 but for

6  the amount of such Allowed Claim does not exceed $500.00 pursuant to Section 1122(b) of the

7  Bankruptcy Code.  This Class will also consist of holders of Allowed Claims that exceed the

8  $500.00 administrative convenience limit, but that elect to have their Allowed Claim reduced to

9  the $500.00 administrative convenience amount.  There are a sufficient number of smaller claims

10  to support the creation of this Class 9.  A list of Claimants (current as of December 1, 2009) that

11  will be treated under Class 9 is attached hereto as **Exhibit 12**.

12  **L.    CLASS 10 – EXISTING EQUITY INTERESTS**.

13  Class 10 is comprised of the holders of the existing membership interests in GTS and

14  Gulfstream and includes any interest in Debtors, as well as any rights or Claims asserted against

15  Debtors with regard to such Interests.

16  **XII.    TREATMENT OF ALLOWED CLAIMS BY CLASS.**

17  The following is the description of the treatment proposed for the Claims by each Class of

18  Creditors, Class of Interests, and holders of Administrative Expense Claims of these Estates as

19  classified in the Plan.  The Plan is intended to treat all Claims against the Estates of whatever

20  character, whether or not contingent or liquidated, and whether or not allowed by the Court

21  pursuant to Section 502(h) of the Bankruptcy Code.  However, only those Claims that are

22  Allowed Claims under the Plan, and allowed pursuant to Section 502(a) of the Bankruptcy Code,

23  will receive payment under the Plan.

24  **A.    TREATMENT OF CLASS 1 – ADMINISTRATIVE EXPENSE CLAIMS.**

25  Class 1 Allowed Claims shall be paid in full on the later of (1) the Effective Date, (2) the

26  date on which such Claim becomes an Allowed Claim, or (3) the date that payment of such

27  Allowed Claim is due under ordinary business terms.  In the event Debtors do not have sufficient

28  funds to pay all Allowed Administrative Expense Claims that are due in full on the Effective

1    Date, any unpaid balance, upon prior agreement in writing by the holder of such Allowed

2    Administrative Claim and Debtor, may be paid on an agreed deferred schedule.    Any such

3    agreements shall be disclosed in writing prior to the Effective Date, and shall not prejudice the

4    priority of such Allowed Administrative Claim in any further or other proceedings thereafter.

5    ***Class 1 Claims are not entitled to vote on the Plan.***

6    **B.    TREATMENT OF CLASS 2 – GE CAPITAL SECURED CLAIM**.

7         1.    Valuation Limitation.

8    The Class 2 Allowed Claim shall be limited to the GE Capital Secured Property Value,

9    less the value of the GE Capital Surcharge Claim, if any.    In the event Debtors and GE Capital are

10   not able to agree on the Secured Property Value on or before the Confirmation Date, Debtors may

11   file a motion to value the secured portion of GE Capital's Allowed Claim pursuant to Section

12   502(b) of the Bankruptcy Code.    The valuation issue may be determined at the Confirmation

13   Hearing or at a separate hearing.

14        2.    Lien Retention.

15   To the extent determined by a Final Order arising out of an Adversary Proceeding or other

16   proceeding regarding the valuation of the GE Capital Surcharge Claim, the holder of the Allowed

17   Class 2 Secured Claim shall retain its lien interests in the Properties as security for its Allowed

18   Secured Claim.    The GE Capital Loan and Security Documents shall remain of record, except that

19   they shall be modified by written and recorded amendment as necessary to be made consistent

20   with the terms of the Plan, the Confirmation Order, and any Final Order regarding the Class 2

21   Claims.

22        3.    Section 1111(b) Election.

23   As set forth in more detail below, if the holder of the Class 2 Claim timely elects to be

24   "fully secured" under Section 1111(b)(2) of the Bankruptcy Code, then the Secured Property

25   Value must still be determined for purposes of calculating interest payments due under the Plan,

26   but the amount of the lien securing the Allowed Class 2 Secured Claim will not be limited to the

27   Secured Property Value.    Thus, if GE Capital timely makes the Section 1111(b) election, the

28   interest payments due to GE Capital will be reduced based on the Plan Section 1111(b) Interest

Rate.  The mention of any valuation report, appraisal, or opinion of value in this Plan or in the

Disclosure Statement shall not act to bind Debtors or any other party to a particular valuation of

the Properties, which remains to be determined by agreement or by the Court.

        4.        Payment of the Allowed Class 2 Secured Claim.

        a)        <u>Bifurcated Claim.</u>

        5.        Unless GE Capital is eligible to and timely elects in writing (See Fed. R.

Bankr. P. 3008) to be "fully secured" by asserting its rights under Section 1111(b)(2) of the

Bankruptcy Code, any Allowed Claims of GE Capital in excess of the Allowed Class 2 Secured

Claim shall be treated as a Class 8 GE Capital Unsecured Deficiency Claim.  The principal and

interest on the GE Capital Allowed Class 2 Claim shall be paid as set forth in this subsection if

GE Capital's Allowed Claim is valued and bifurcated into an Allowed Secured Class 2 Claim and

an Allowed GE Capital Unsecured Deficiency Claim treated under Class 8.

        (1)        **Payments on the Allowed Secured Class 2 Claim**.

Following entry of a Final Order determining the value of the GE Capital Secured Property Value

and the GE Capital Surcharge Claim, and therefore, the amount of the Allowed Class 2 Claim,

Reorganized Debtor shall commence making monthly payments to GE capital on account of the

Allowed Class 2 Claim.  Reorganized Debtor shall pay the Holder of the Allowed Class 2 Claim

monthly interest-only payments calculated based on the Plan Secured Interest Rate over a 10-year

period.  The balance of the Allowed Secured Class 2 Claim shall be paid in full at the end of the

10th year following the Effective Date accomplished through the sale or refinancing of the

Properties.  Debtors anticipate that the Property Revenue from the ongoing operation of the

Properties will be sufficient to pay monthly payments to GE Capital on account of its Allowed

Class 2 Claim.  Payment in full or partial satisfaction of the Allowed Class 2 Claim may be made

at any time without penalty.  The 10-Year Financial Projections attached hereto as **Exhibit 2**

provides a detail analysis of the payments to Holder of the Allowed Class 2 Claim.  The

following chart summarizes such payments:

| Estimated GE Capital Secured Property Value: | $91,600,000 |
|---|---|
| Anticipated Effective Date: | May 1, 2010 |
| Payment Frequency: | Monthly |
| Estimated Periodic Payment: | $362,583.33 |
| Plan Secured Interest Rate: | 4.75% |
| Estimated Total Payment: | $135,110,000.00 |

(2)  **Interest on the Allowed Secured Class 2 Claim**. Commencing on the Effective Date, the Allowed Secured Class 2 Claim shall accrue interest at the Plan Secured Interest Rate.  Interest shall not be capitalized, and there shall not be interest assessed on the unpaid, accrued interest.

b)  <u>ALTERNATIVE - Fully Secured Treatment – 1111(b) Election.</u>

In the event that GE Capital is eligible to and elects to be "fully secured" by asserting an election to be treated under Section 1111(b) of the Bankruptcy Code, then GE Capital shall receive the alternative treatment set forth in this subsection.  If Section 1111(b) treatment is timely and validly elected, then GE Capital's Allowed Class 2 Claim will receive the same treatment set forth above in subsection (I) Bifurcated Treatment, except the following modifications shall apply:

(1)  **No Deficiency Claim**.  GE Capital shall forgo and waive any unsecured deficiency claim and shall have no Allowed Unsecured Claim in Class 8;

(2)  **Interest on the Allowed Secured Class 2 Claim**. Commencing on the Effective Date, the Allowed Secured Class 2 Claim shall accrue interest at the Plan Section 1111(b) Interest Rate.  Interest shall not be capitalized, and there shall not be interest assessed on the unpaid, accrued interest.

(3)  **Extended Term**.  Because of the large difference between the full lien amount and the value of the Properties, the effect of this election would be to require a substantially larger payout to Class 2 Claims over the life of the Plan, even though interest will only be earned and paid on the GE Capital Secured Property Value.  To accommodate for the potential additional amounts due over and above the GE Capital Secured Property Value, the payment terms under this election shall be extended.  Thus, under the Section 1111(b) election,

1  the period for Class 2 payments shall be extended to at least a 20-year period, and at the end of

2  such time (*i.e.*, the 20th-year Anniversary of the Effective Date) the entire unpaid amount of the

3  Class 2 Allowed Secured Claim must be fully satisfied.

4            (4)    **Final Payoff**.  Under the Section 1111(b) election, the

5  Allowed Class 2 Secured Claim (on the Effective Date) shall be deemed satisfied in full when the

6  gross amount of distributions made to GE Capital under the Plan (whether denominated principal

7  or interest payments) equals the Allowed Class 2 Secured Claim.

8        6.    Additional Limitations on Class 2 Allowed Claim.

9        Under any of the foregoing provisions, the Allowed Class 2 Secured Claim shall not

10  include any default interest, prepayment penalties, yield maintenance premiums, late charges,

11  amounts due under any penalty rate provision or penalty provisions of the GE Capital Loan or the

12  GE Capital Loan and Security Documents, or attorneys' fees or costs that accrued or arose after

13  the Petition Dates.  After the Effective Date, the holder of the Class 2 Allowed Secured Claim

14  may not seek reimbursement or add to the amount of the Class 2 Allowed Secured Claim any

15  default interest, appraisal fees, title costs, charges, attorneys' fees or other amounts unless there

16  has been a default by Debtors with respect to the payments required under the Plan.  Any and all

17  costs, fees, late fees, default interest, penalty provisions or charges arising or relating to events

18  occurring prior to the Effective Date shall be waived and forever released unless included and

19  allowed as part of the Allowed Class 2 Secured Claim.  On the Effective Date, the GE Capital

20  Loan and Security Documents shall be deemed amended such that the terms of the Plan shall

21  control; no condition that existed prior to the Effective Date, including the filing of these Cases,

22  shall serve as a basis for asserting a default under the GE Capital Loan and Security Documents.

23  *The Class 2 Claim is impaired and its Holder is entitled to vote to accept or reject the Plan*.

24      **C.**    **TREATMENT OF CLASS 3 – MECHANIC'S LIENHOLDER CLAIMS**.

25        The Allowed Class 3 Mechanic's Lienholder Claims shall be treated as follows:

26        1.    Treatment of Class 3 Claims.

27          (a)    **Valuation Limitation**.  The Class 3 Allowed Claim shall be

28  limited to the value of the holders ("**Class 3 Claimants**") of all Allowed Class 3 Secured Claims'

validly perfected lien interests in the Properties as of the Petition Date, less any senior liens or Allowed Secured Claims having higher priority ("**Secured Property Value**").  In the event Debtors and Class 3 Claimants are not able to agree on the Secured Property Value applicable to Class 3 on or before the Confirmation Date, then Debtors may file a motion to value the secured portion of Class 3 Claimants' Allowed Claims pursuant to Section 502(b) of the Bankruptcy Code.  The valuation issue may be determined at the Confirmation Hearing or at a separate hearing.  The Class 3 Allowed Secured Claims shall have *pari passu* priority within one another. It is anticipated that the Secured Property Value will be substantially less than the total amount of the GE Capital Claim thereby leaving the Class 3 Allowed Claims completely undersecured. Accordingly, the entire amount of the Class 3 Allowed Claims will be treated in Class 7.  For purposes of the Plan, the holders of the Allowed Class 3 Secured Claim shall release any lien interests in the Properties in exchange for payment of their Allowed Class 3 Secured Claims.

> (b)  **Section 1111(b) Election**.  Since the Class 3 Allowed Claims are completely undersecured, such liens securing those Claims are of inconsequential value and are thereby prevented from making the Section 1111(b) election.

> 2.  Payment of the Allowed Class 3 Secured Claims.

> (a)  **Bifurcated Claims**.  Any Allowed Claims of Class 3 Claimants in excess of the Allowed Class 3 Secured Claim shall be treated as a Class 7 General Unsecured Claims.  Debtors anticipate that the entirety of the Allowed Class 3 Claims will be an unsecured deficiency claim treated under Class 7.  For payment information on Class 7, see Treatment of Allowed Class 7 Claims, *infra*.

> (b)  **ALTERNATIVE -Fully Secured Treatment – 1111(b) Election**. Since the value of the liens securing the Class 3 Allowed Claims are of inconsequential value, the Class 3 Claimants are not entitled to the Section 1111(b) election.

***Class 3 Claims are impaired and their holders are entitled to vote to accept or reject the Plan***.

**D.    TREATMENT OF CLASS 4 – PRIORITY UNSECURED EMPLOYEE WAGE CLAIMS**.

(a)    The holder of an Allowed Class 4 Claim will be paid on account of the Class 4 Claim an amount equal to the lesser of: (1) the statutory cap of $10,950.00 set forth in Section 507(a)(4) of the Bankruptcy Code, or (2) the amount of the unpaid accrued wages, vacation, sick and severance pay on which the Allowed Class 4 Claim is based.  The Reorganized Debtor shall pay each holder of an Allowed Class 4 Claims one hundred percent (100%) of the Allowed Class 4 Claims quarterly over the one year period following the Effective Date of the Plan.  Interest shall accrue on the Allowed Class 4 Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full.  Any Claims asserted in Class 4 that are Allowed Claims that exceed the statutory cap shall be treated as a General Unsecured Claim in Class 7 of the Plan.  The following chart summarizes the payments to the holders of the Class 4 Allowed Claims:

| | |
|---|---|
| Total Amount of Class 4 Allowed Claims: | $160,050.27 |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment: | May 1, 2011 |
| Estimated Total Payment: | $160,310.35 |
| Plan Unsecured Interest Rate: | 0.26% |
| Percent of Allowed Claim Paid: | 100% |

*Class 4 Claims are impaired and their holders are entitled to vote to accept or reject the Plan*.

**E.    TREATMENT OF CLASS 5 – PRIORITY UNSECURED SECURITY DEPOSIT CLAIMS**.

(a)    The holder of an Allowed Class 5 Claim will be paid on account of the Class 5 Claim, an amount equal to the lesser of: (1) the statutory cap of $2,425.00 set forth in Section 507(a)(7) of the Bankruptcy Code, or (2) the amount of the security deposit on which the Allowed Class 5 Claim is based.  The Reorganized Debtor shall pay each Holder of an Allowed Class 5 Claims one hundred percent (100%) of the Allowed Class 5 Claims quarterly over the one year period following the Effective Date of the Plan.  Interest shall accrue on the Allowed Class 5

Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full.  Any Claims asserted in Class 5 that are Allowed Claims that exceed the statutory cap shall be treated as a General Unsecured Claims in Class 7 of the Plan.  The following chart summarizes the payments to the holders of the Class 5 Allowed Claims:

| | |
|---|---|
| Total Amount of Class 5 Allowed Claims: | $62,238.89 |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment: | May 1, 2011 |
| Estimated Total Payment: | $62,340.03 |
| Plan Unsecured Interest Rate: | 0.26% |
| Percent of Allowed Claim Paid: | 100% |

*Class 5 Claims are impaired and their holders are entitled to vote to accept or reject the Plan*.

## F.    TREATMENT OF CLASS 6 - PRIORITY UNSECURED TAX CLAIMS.

The holder of an Allowed Class 6 Claim will be paid on account of the Class 6 Claim, an amount equal to the assessed ad valorem property tax under Section 507(a)(8) of the Bankruptcy Code.  The Reorganized Debtor shall pay each Holder of an Allowed Class 6 Claims one hundred percent (100%) of the Allowed Class 6 Claims on or before 60th day following the Effective Date of the Plan.  Interest shall accrue on the Allowed Class 6 Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full.  The following chart summarizes the payments to the holders of the Class 6 Allowed Claims:

| | |
|---|---|
| Total Amount of Class 6 Allowed Claims: | $11,323.49 |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | June 29, 2010 |
| Payment Frequency: | Once |
| Estimated Total Payment: | $11,328.40 |
| Plan Unsecured Interest Rate: | 0.26% |
| Percent of Allowed Claim Paid: | 100% |

*Class 6 Claims are impaired and their holders are entitled to vote to accept or reject the Plan*.

**G.      TREATMENT OF CLASS 7 – GENERAL UNSECURED CLAIMS -
TRADE CREDITORS.**

The holders of Allowed Class 7 Claims shall receive, on account of their Allowed Class 7 Claims, deferred cash payments equal to a percentage of their Allowed Class 7 Claim to be calculated with regard to the Class 8 Distribution Percentage.  For example, if the Class 8 GE Capital Unsecured Deficiency Claim is valued at $70 million, and the GE Capital TIC Interest that GE Capital will receive in satisfaction of its Class 8 deficiency claim is valued at $7.0 million, then the Class 8 Distribution Percentage is ten percent (10%), and the holders of the Allowed Class 7 Claims will receive a ten percent (10%) distribution on account of their Allowed Class 7 Claim.  The current percentage is calculated to be 5.5%, subject to any upward revision on or before the Confirmation Hearing.

The Reorganized Debtor shall pay each Holder of an Allowed Class 7 Claim the Class 8 Distribution Percentage of the Allowed Class 7 Claims quarterly over a two year period with the first payment commencing on the Effective Date and with each subsequent payment made every ninety (90) days thereafter until the Allowed Class 7 Claim is paid in full.  Interest shall accrue on the Allowed Class 7 Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full.  The following chart summarizes the payments to holders of the Class 7 Allowed Claims:

| | |
|---|---|
| Total Amount of Class 7 Allowed Claims Greater Than $500: | $1,886,006.74 |
| Amount of Class 3 Claim Greater Than $500: | $1,788,535.65 |
| Amount of Class 4 Unsecured Excess Claim Greater than $500: | $9,842.34 |
| Total Amount Treated Under Class 7: | $3,684,384.73 |
| Percent of Allowed Claim Paid: | 5.5% |
| Amount of Class 7 Claims to be Paid: | $202,641.16 |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment Date | May 1, 2012 |
| Estimated Total Payment: | $203,233.89 |
| Plan Unsecured Interest Rate: | 0.26% |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

*Class 7 Claims are impaired and their holders are entitled to vote to accept or reject the Plan.*

### H.    TREATMENT OF CLASS 8 – GE CAPITAL UNSECURED DEFICIENCY CLAIM.

1.    Class 8 consists of the GE Capital Unsecured Deficiency, which shall be calculated pursuant to a Final Order by this Court determining the amount of the GE Capital Secured Property Value and any reduction for the GE Capital Surcharge Claim.  GE Capital shall receive, on account of its Allowed Class 8 - GE Capital Unsecured Deficiency Claim, the GE Capital TIC Interest, which is an undivided ten percent (10%) tenant-in-common interest in the Properties.  Prior to the Effective Date, GTSPPI will transfer its one hundred percent (100%) equity interest in FLJC to Reorganized Debtor.  Within five (5) business days following the Effective Date, Reorganized Debtor will transfer its one hundred percent (100%) equity interest in FLJC to GE Capital or its authorized designee.  Debtors have determined that transfer of the equity interest of the entity which holds the undivided tenant-in-common interest rather than the actual tenant-in-common interest will eliminate the imposition of transfer taxes for the Properties.  *See* Part XVI, *infra*, for a more detailed discussion on the tax implications of this Plan.  The following chart summarizes the payments to the Holder of the Class 8 Allowed Claim:

| | |
|---|---|
| Total Amount of Class 8 Allowed Claim: | $70,214,464 |
| Anticipated Effective Date: | May 1, 2010 |
| GE Capital TIC Interest Distribution Date: | May 6, 2010 |
| GE Capital TIC Interest Percentage: | 10% |
| Value of GE Capital TIC Interest: | $3,356,891 |
| Amount of New Value Cash Contribution | $500,000 |
| Initial Cash Contribution Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment Date | May 1, 2012 |
| Estimated Total Payment: | $501,462.50 |
| Plan Unsecured Interest Rate: | 0.26% |
| Total Consideration for Class 8 Allowed Claim: | $3,858,353.50 |
| Percent of Allowed Claim Paid: | 5.5% |

*The Class 8 Claim is impaired and its Holder is entitled to vote to accept or reject the Plan.*

**I.    TREATMENT OF CLASS 9 – ADMINISTRATIVE CONVENIENCE CLASS**.

1.    Class 9 – Administrative Convenience Class shall consist of Allowed Class 7 Claims where the amount of such Allowed Claim is less than or equal to $500.00 pursuant to Section 1122(b) of the Bankruptcy Code.  Class 9 shall also consist of the Allowed Claims of Classes 3, 4, 5, 6, and 7, where the amount of such claim is greater than $500.00 and where the Holder of such claim elects to have such Claim reduced to $500.00 and treated as a Class 9 Claim.   The total amount of these Allowed Claims is approximately $25,447.02.   Since the eligible Class 4 (unsecured portion), 7 and 9 Creditors are receiving a 5.5% payment on account of their Allowed Claims, any holder with a face value of a Claim up to $9,100 could elect treatment in Class 9.   Debtors anticipate that this could result in an additional $135,000 of payments on the Effective Date to Class 9 Allowed Claims.   The holders of an Allowed Class 9 Claim will receive on account of the Class 9 Claim a payment of $500.00 on the Effective Date.  The following chart summarizes the payments to the holder of the Class 8 Allowed Claim:

| Total Amount of Class 9 Allowed Claims: | $25,447.02 |
| --- | --- |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | May 1, 2010 |
| Payment Frequency: | Once |
| Estimated Total Payment: | $25,447.02 |
| Percent of Allowed Claim Paid: | 100% |

*Class 9 Claims are impaired and their holders are entitled to vote to accept or reject the Plan*.

**J.    TREATMENT OF CLASS 10 – EXISTING EQUITY INTERESTS**.

The holders of the existing membership interests in Debtors shall not receive anything on account of its existing equity interest.   Instead, GTSPPI will contribute the New Value Contribution, which will permit it to acquire an equity interest in the Reorganized Debtor. *Class 10 Interests are held by Insiders or Affiliates of Debtors and they are not entitled to vote to accept or reject the Plan*.

**K.    VOTING BY CLASSES / "CRAM-DOWN" REQUEST**.

The holders of Allowed Claims or Interests in the following Classes hold Claims or

1    Interests that are impaired under the Plan and therefore are entitled to vote on the acceptance or

2    rejection of the Plan:  **Classes 2, 3, 4, 5, 6, 7, 8 and 9**.  Debtors have requested in the Plan that

3    confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code be approved with

4    respect to any Class of Claims or Interests that is impaired and does not vote to accept the Plan,

5    and with respect to any Class of Claims or Interests that is deemed to have rejected the Plan.

6    ## XIII.   EXECUTORY CONTRACTS AND LEASES

7    ### A.    General Information.

8        Certain unexpired contracts and leases and claims thereunder are treated pursuant to

9    Section 365 of the Bankruptcy Code and separate provisions in the Plan.  In general, an executory

10   contract is a contract on which material performance remains due from both contracting parties.

11   A lease is a temporary conveyance of the right to use and occupy real property or personal

12   property in exchange for payment of rent.  Executory contracts and unexpired leases that are not

13   otherwise assumed or rejected pursuant to a motion filed with the Court prior to the Confirmation

14   Date, shall be assumed as of the Confirmation Date and the cure amount with respect to such

15   executory contracts and unexpired leases shall be paid by the Reorganized Debtor as soon as

16   practicable following the Effective Date.  Debtors anticipate that there will be minimal, if any,

17   cure amount(s) due on the Effective Date.  Upon entry of the Confirmation Order, all defaults

18   under such assumed executory contracts shall be deemed cured or to be cured within a reasonable

19   time, and Debtors shall be deemed to have been provided adequate assurance of future

20   performance under the terms of this Plan.

21   ### B.    Rejection of Executory Contract and Claims Arising Therefrom.

22       Debtors do not anticipate rejecting any executory contracts or leases in connection with

23   this reorganization.  If Debtors do determine that rejection is warranted, Debtors will file a motion

24   seeking rejection with the Court prior to the Confirmation Hearing.  Rejection of an executory

25   contract relieves Debtors and their Estates from the obligation to perform the contract or lease

26   after the Petition Date and after the Confirmation Date.  However, a party to an executory

27   contract that is rejected may assert a Claim against Debtors for certain damages.  Any creditor

28   who has a Claim arising out of the rejection of an executory contract by Debtors must file a Proof

1   of Claim within 30 days after the earlier of:  (1) any order providing the executory contract has

2   been rejected, or (2) the Effective Date of the Plan.  If such a Claim is Allowed by the Bankruptcy

3   Court it will be treated in accordance with the provisions of Class 7, General Unsecured Claims,

4   pursuant to Section 507(g) of the Bankruptcy Code.

5   ## XIV.   MEANS FOR IMPLEMENTING THE PLAN

6   ### A.        Formation of Reorganized Debtor and Transfer of Assets.

7   On or before the Effective Date, Reorganized Debtor will be formed as a Delaware limited

8   liability company by the filing of the Reorganized Debtor Certificate of Formation with the

9   Delaware Secretary of State.   Reorganized Debtor will be treated as a partnership for federal

10  income tax purposes.   If any changes to the Reorganized Debtor's corporate documents are

11  required under the terms of this Plan or the Confirmation Order, then such amendments shall be

12  made prior to the Effective Date.   On the Effective Date, GTSPPI will contribute the 100%

13  membership interests of GTS and Gulfstream to Reorganized Debtor.   Further, Reorganized

14  Debtor will acquire substantially all of the assets of Debtors.   In addition, contemporaneously

15  with such acquisition, Reorganized Debtors will assume the obligations set forth in the Plan.

16  ### B.        Reorganized Debtor – Powers, Duties and Management.

17  After the Confirmation Date, as well as after the Effective Date, the Reorganized Debtor

18  shall be empowered to and shall continue its ordinary course business operations.   The

19  Reorganized Debtor shall be governed by its Articles of Organization and Operating Agreement,

20  and be empowered to do all business without Bankruptcy Court approval including but not

21  limited to the items discussed below, unless such act is specifically limited by this Plan.

22          1.     Leasing of Units at the Properties.  The Reorganized Debtor shall have the

23  power to operate its business and the Properties in the ordinary course.  Reorganized Debtor's

24  operations shall include all decisions with regard to the rental and marketing of the Properties and

25  performing repairs to the Properties necessary to retain a competitive market housing product.

26          2.     Authority to Prosecute Claims.  The Reorganized Debtor shall have the

27  power to bring, dismiss or compromise any Causes of Action, and other proceedings discussed

28  herein, and all matters pertaining to the implementation of this Plan.

3.      Retention and Payment of Professionals.    Until the Effective Date, all applicable Bankruptcy Code Sections and Rules pertaining to the employment and compensation of Professionals shall be applicable to the Case.  However, from and after the Effective Date, the Reorganized Debtor is empowered to retain and compensate professional persons in the ordinary course of business for all services provided after the Effective Date.

4.      Act as Disbursing Agent.    Unless otherwise set forth in the Confirmation Order, the Reorganized Debtor shall act as Disbursing Agent under the Plan.  The Disbursing Agent shall ensure that Initial Distributions provided for under this Plan are accurately and timely made.  The Disbursing Agent shall create and maintain a register of all Allowed Claims and a record of all payments made on account of such Allowed Claims.  The Disbursing Agent shall calculate (with the assistance of any professionals deemed necessary) the pro-rata distributions and make other calculations necessary to implement the provisions of this Plan regarding distributions to Creditors.

5.      Extraordinary Transactions Regarding the Properties.    If at any time after the Effective Date, the Reorganized Debtor obtains opportunities for new financing, new equity funds, or a sale of the Properties that is sufficient satisfy the Allowed Claims and Interests hereunder that have not been previously satisfied, and such opportunity is in the Reorganized Debtor's business judgment a beneficial transaction for the Reorganized Debtor and Creditors and Interest holders, the Reorganized Debtor may proceed with such transaction after satisfying the following conditions:  (1) Reorganized Debtor shall provide prior written notice of the proposed transaction to any unpaid creditors holding Allowed Claims or Disputed Claims under the Plan at least fifteen (15) days prior to entering into such transaction (though the Reorganized Debtor may enter into such transaction if it is expressly subject to the provisions of the Plan and this Paragraph), (2) any person, including the Reorganized Debtor, may request a court hearing to object to or to facilitate consummation of the proposed transaction within the fifteen (15) day period (or prior thereto for the Reorganized Debtor).  The standard in such hearing shall be whether the proposed transaction satisfies the criteria in this paragraph and is generally in the best interests of the Reorganized Debtor, its Creditors and its holders of Interest.

6.      Vesting of Property.  Pursuant to Sections 541(a) and 1141(b) of the Bankruptcy Code, all property of Debtors will vest in the Reorganized Debtor at Confirmation, free and clear of all liens, Claims, encumbrances and interests, except as expressly provided in the Plan in regard to Allowed Secured Claims.

7.      Post Confirmation Management and Compensation.  The Reorganized Debtor itself shall be managed after the Effective Date by the current management of GTSPPI, LTV and the Local Property Managers, the very same individuals that were instrumental in the successful rehabilitation, repopulation and turnaround of the Properties. Debtors shall not compensate the management of GTSPPI for their management services, except for reimbursement of direct expenses made or incurred by them on behalf of the Reorganized Debtor or the Properties after the Effective Date that are otherwise authorized under the Plan.  Following confirmation, the Reorganized Debtor shall retain LTV to continue serving as its portfolio asset manager and financial advisor and Chartwell and Lincoln to serve as local property managers.

8.      Post Confirmation Notice.  Any Creditor desiring to be notified of any court proceedings or other notices under the Plan to be made after the Effective Date **must file** a Request for Notice with Debtors and the Clerk of the Bankruptcy Court within thirty (30) days of receiving a written notice of the entry of the Confirmation Order.  The Confirmation Order will set forth this requirement, and shall be served on all creditors and interested parties.  All parties requesting such notice or entitled to notice shall be included on the post-confirmation notice list (the "**Post Confirmation Notice List**").

9.      Reports After the Effective Date.  The Reorganized Debtor, beginning six-months after the Effective Date, and thereafter at least once per year, shall provide parties on the Post-Confirmation Notice List a financial report summarizing the operations of the Reorganized Debtor, the receipts and disbursements made by the Reorganized Debtor, and an update of the payments made to each Class under the Plan.

**C.      Issuance of Equity Interests of Reorganized Debtor.**

Reorganized Debtor will be authorized to issue one class of limited liability company membership interest, referred to in this Disclosure Statement as the "**New Shares**."  The New

Shares consist of the Series A Shares, which Reorganized Debtor shall be authorized to issue 10,000 shares.  On the Effective Date, Reorganized Debtor issue all 10,000 shares of the Series A Shares to the successful New Value Auction Bidder.  The Series A Shares shall be validly issued, fully paid and non-assessable as of the Effective Date.  The Series A Shares shall be fully vested upon issuance.  New Shares generally will be entitled to allocation of profits and losses, and the distribution of cash flow from operations and capital transactions, by Reorganized Debtor. Reorganized Debtor will make distributions from available cash designed to enable the holders to pay taxes on operating income allocated to them by Reorganized Debtor, such taxes being computed on the assumption that each holder is subject to taxation at the maximum effective federal, state and local income tax rates applicable to a corporation doing business in California ("**Tax Distributions**").  No Tax Distributions shall be made on account of cash liquidity events, *e.g.*, a sale of the assets of Reorganized Debtor for cash.

The New Shares will be entitled to a single vote per share.  Subject to certain exceptions, all the holders of New Shares will vote together as a class.  Subject to a Shareholders Agreement to be entered into as of the Effective Date among Reorganized Debtor and the holders of New Shares, the holders of New Shares shall be entitled to elect the Board of Directors of Reorganized Debtor.  Certain matters may require the affirmative vote or written consent of holders of a supermajority of the then outstanding New Shares.  In addition, certain matters may require the affirmative vote or written consent of a majority or supermajority of each series of New Shares. Additional classes of limited liability company interests may be authorized by the Board.

### D.    New Value Contribution and Required Market Test.

1.    <u>New Value Contribution</u>.    GTSPPI will acquire one hundred percent (100%) of the equity interests of Reorganized Debtor (the "**New Value Interest**") in exchange its contribution of (i) one hundred percent (100%) of its equity interests in KT Terraza, (ii) one hundred percent (100%) of its equity interests in FLJC, and (iii) $1,000,000 (the "**New Value Contribution**").  GTSPPI will be entitled to receive a fifteen percent (15%) preferred divided on account of the cash component of the New Value Contribution payable from Net Cash Flow as provided for in **Exhibit 2.**

1  　　　　2.    <u>Market Test of New Value</u>.    In order to determine whether GTSPPI's

2  proposed New Value Contribution is fairly valued and to maximize the amount of the New Value

3  Contribution, Debtors will conduct an auction of the New Value Interest (the "**New Value**

4  **Auction**") prior to the Confirmation Hearing.    The New Value Auction shall take place on

5  _____, 2010, which is two Business Days prior to the date of the Confirmation Hearing, at

6  the offices of Buchalter Nemer located at 1000 Wilshire Boulevard, Suite 1500, Los Angeles,

7  California 90017.

8  　　　　3.    <u>New Value Auction Procedures</u>.    The New Value Auction shall be

9  conducted in accordance with the following procedures:

10  　　　　a.    Qualification of Competing Bidders.    In order for a competing bidder to

11  qualify to bid at the New Value Auction (a "**Qualified Bidder**") each competing bidder must:

12  　　　　(i)    submit with its New Value Competing Bid (as defined below)

13  　　information sufficient so as to demonstrate the Qualified Bidder's financial ability

14  　　to consummate the transaction as proposed (which information may be considered

15  　　by the Debtors' professionals and which information may be submitted in

16  　　confidence, provided that failure to disclose information to an objecting party may

17  　　adversely effect such Qualified Bidder's status as a competing bidder) and must

18  　　be determined by Debtors to be able to consummate such transaction.    Each such

19  　　Qualified Bidder agrees, by submitting a bid, to comply with all reasonable

20  　　requests from the Debtors for information regarding the Qualified Bidder's

21  　　financial condition and ability to consummate the transactions; and

22  　　　　(ii)    submit a New Value Competing Bid (as defined below) so that it is

23  　　received by Debtors by 12:00 p.m. PST on _____, 2010 (the "**Bid Due**

24  　　**Date**") [which date shall be five (5) Business Days prior to the date of the

25  　　Confirmation Hearing] through the following representatives:

26  　　　　　　Bernard D. Bollinger, Jr., Esq.
27  　　　　　　Buchalter Nemer, PC
　　　　　　　1000 Wilshire Boulevard, Suite 1500
28  　　　　　　Los Angeles, California 90017

Telephone: (213) 891-0700
Facsimile: (213) 896-0400

(iii)    submit a deposit in the amount of twenty percent (20%) of the proposed New Value Competing Bid (the "**Deposit**"), via cashier's check or wire transfer payable to Gulfstream Apt. Portfolio, LLC, as Debtor-in-Possession, pursuant to wire instructions available upon request from Debtors;

(iv)    by entering into a New Value Acquisition Agreement,

(v)    by entering into a New Value Acquisition Agreement or submitting a New Value Competing Bid, each Qualified Bidder shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the New Value Auction and/or sale of the New Value Interest; and

(vi)    As the initial bidder, GTSPPI is deemed a Qualified Bidder without the need to comply with the foregoing.

b.    <u>Competing Bids</u>.  The term "New Value Competing Bid" means an offer to purchase the New Value Interest in a writing signed by an authorized representative of the Qualified Bidder and which:

(i)    contains a detailed description of all relevant terms or conditions that differ from the terms and conditions contained in the respective New Value Agreement (to the extent not disclosed, the terms of the bid shall be presumed to be identical to those in the applicable New Value Agreement except for those terms relating to the Break-Up Fee and Expense Reimbursement);

(ii)    is accompanied by (a) a proposed agreement, executed by an authorized representative of the Qualified Bidder subject only to Debtors' acceptance at the conclusion of the New Value Auction (as the same may be modified during the auction) and approval of the Bankruptcy Court, and (b) a redline showing the differences between the Bidder's proposed agreement and the New Value Agreement;

1    (iii)    is accompanied by the Deposit described above;

2    (iv)    is accompanied by appropriate evidence of corporate authority for

3    submitting a New Value Bid on the Qualified Bidder's behalf; and

4    (v)    proposes a closing date no later than the Confirmation Date.

5    c.    Auction.  If a New Value Competing Bid by a Qualified Bidder other than

6    by GTSPPI is timely submitted, the New Value Auction will be held at the place and on the date

7    and time noted above.

8    d.    Bidding Process at the New Value Auction.  The New Value Auction will

9    be conducted by Debtors, subject to the Court's further orders, as follows:

10    (i)    New Value Bids.  Debtors shall have the discretion to conduct the

11    New Value Auction as it deems likely to maximize the proceeds from sale of the

12    New Value Interest, net of transaction and other costs.  GTSPPI's proposed New

13    Value Contribution as set forth herein shall be deemed to be the opening bid.

14    (ii)    First Overbid.  The first overbid, if any, shall be the highest

15    Competing Bid with a Present Cash Value (defined below) that exceeds the offer

16    set forth herein by at least the amount of the maximum Break-Up Fee and

17    Expense Entitlement plus an amount to be determined by Debtors and disclosed

18    upon request to competing Bidders (the "**First Overbid**").  The term "**Present**

19    **Cash Value**" means the value attributed to a Competing Bid by Debtors as

20    though it were made in cash at closing, taking into account discounts for future

21    payments, discounts for risks, the Break-Up Fee and Expense Entitlement, and, as

22    appropriate, intangible benefits.  Debtors shall upon request explain to the

23    Bankruptcy Court at the Confirmation Hearing its analysis respecting Present

24    Cash Value of each Competing Bid.

25    (iii)    Bid Increments.  Each bid after the First Overbid shall exceed the

26    previous bid in Present Cash Value by an amount to be determined by Debtors

27    and announced at or prior to the New Value Auction.

28    (iv)    Bidding Rounds.  Each Qualified Bidder shall have a reasonable

1  opportunity after the commencement of the New Value Auction to make an

2  overbid.  If no overbids are made, Debtors will close the bidding and award the

3  sale to the Qualified Bidder whose bid has the highest Present Cash Value as

4  determined by Debtors and approved by the Court.  If a qualified overbid is made,

5  each Qualified Bidder will have a reasonable opportunity to make additional

6  overbids.

7      (v)    Prohibition on Credit Bidding.  The New Value Auction is a sale

8  of the equity interests of Reorganized Debtor and is being conducted under

9  Sections 1123 and 1129 of the Bankruptcy Code.  As such no holder of a lien on

10  any assets of the Debtors shall be permitted to credit bid pursuant to Section

11  363(k) of the Bankruptcy Code as such section is inapplicable to the New Value

12  Auction.

13      e.    Winning Bids and Next Highest Bids.  At the conclusion of the auction

14  process, including the combined portions referenced above, Debtors shall declare the last and

15  highest bid for the New Value Interest as determined by Debtors the "**Winning Bid**" (made by

16  the "**Winning Bidder**").  The next highest or otherwise best offer after the Winning Bid is the

17  "**Next Highest Bid**" (made by the "**Next Highest Bidder**").

18      f.    Back Up Bidder(s).  By participation in the New Value Auction, each

19  Qualified Bidder agrees that if it is a Next Highest Bidder, its Next Highest Bid will remain open

20  for five (5) business days after conclusion of the Confirmation Hearing in order to consummate

21  the sale of the New Value Interest to the Next Highest Bidder if for any reason the Winning

22  Bidder fails to close the sale contemplated by the Winning Bid.

23      g.    Deposits.  Debtors shall place all Deposits into a non- interest bearing trust

24  account pending conclusion of the Confirmation Hearing.  The Deposit (and interest thereon, if

25  any) of the Winning Bidder will constitute a deposit toward the Winning Bidder's payment

26  obligations and will constitute non-exclusive liquidated damages in the event the transaction does

27  not close as a result of a breach by the Winning Bidder.  The Deposit of the Next Highest Bidder

28  shall be returned to the Next Highest Bidder the earlier of two (2) business days after the closing

1  of the transaction and seven (7) business days after conclusion of the Confirmation Hearing.  All

2  other Bid Deposits together with interest thereon will be returned to their respective Competing

3  Bidders within two (2) business days of the conclusion of the Confirmation Hearing.

4         h.    Modification.  Debtors may supplement or modify the Bid Procedures as

5  they deem appropriate at or before the Auction.

6         i.    Breakup Fee and Expense Reimbursement.  Debtors are authorized to enter

7  into Purchase Agreements providing GTSPPI with a break-up fee (the "**Break-Up Fee**") and

8  reimbursement of Plan-related expenses (the "**Expense Reimbursement**") in the aggregate

9  amount of $500,000.  The Bankruptcy Court hereby approves Debtors' payment to GTSPPI of the

10  Break-Up Fee and the Expense Reimbursement in the event of a Break-Up Entitlement (as

11  defined below).  The Bankruptcy Court finds and concludes that (a) Debtors' determination to

12  agree to the Break-Up Fee and Expense Reimbursement is a good faith business judgment,

13  reasonable under the circumstances; (b) payment of the Break-Up Fee and Expense

14  Reimbursement is in the best interests of creditors in these cases; (c) inclusion of the Break-Up

15  Fee and Expense Reimbursement is likely to encourage bidding from other persons with interest

16  in the New Value Interest; (d) the Break-Up Fee and Expense Reimbursement represent a fair and

17  reasonable percentage of the proposed purchase price and is reasonably related to the risk, effort,

18  and likely expense of GTSPPI; (e) the Break-Up Fee and Expense Reimbursement are consistent

19  with comparable fees and expense reimbursements outside the bankruptcy context; and

20  (f) payment of the Break-Up Fee and Expense Reimbursement under the circumstances of a

21  Break-Up Entitlement is thus an actual, necessary expense of the estate.

22         j.    Break-Up Entitlement.  "**Break-Up Entitlement**" shall mean (a) GTSPPI

23  has not withdrawn its offer for the New Value Interest prior to the Auction; (b) GTSPPI is not the

24  Winning Bidder at the New Value Auction; and (c) the Winning Bidder (or the Next Highest

25  Bidder, if not the GTSPPI) actually closes the purchase of the New Value Interest in accordance

26  with the results of the New Value Auction (or in accordance with subsequent orders of the Court

27  following the New Value Auction).  In the event of a Break-Up Entitlement, at closing of the sale

28  of the New Value Interest to the Winning Bidder (or Next Highest Bidder, if appropriate), (a) the

1    Break-Up Fee shall be paid at closing from the proceeds of closing; and (b) Debtors shall reserve

2    from the sale proceeds the maximum Expense Reimbursement and shall retain such amount

3    pending further order of the Court respecting final determination of the amount of such Expense

4    Reimbursement to which GTSPPI is entitled.  GTSPPI's right to such funds (to the extent of the

5    Court's determination of amounts due) shall be senior in interest to that of any other Person,

6    including without limitation any prepetition or postpetition secured creditor of Debtors.  The

7    Expense Reimbursement shall be an administrative claim payable forthwith upon such

8    submission to Debtors of documentation supporting the Expense Reimbursement, with the Court

9    retaining jurisdiction to resolve any such claim on shortened notice upon request of either party.

10           k.      If no Competing Bids are received from Qualified Bidders prior to the Bid

11    Due Date, Debtors shall expeditiously so notify the Court and other appropriate parties-in-

12    interest.  In such event, the New Value Auction will not be held and the Court will hold the

13    Confirmation Hearing.  If any Competing Bids are received from Qualified Bidders prior to the

14    Bid Due Date, Debtors shall expeditiously so notify the Court, GTSPPI, and other appropriate

15    parties-in-interest.  In such event, the New Value Auction will be held as described above,

16    followed by the Confirmation Hearing as scheduled above.

17           **E.      Deemed Substantive Consolidation.**

18           The Plan is premised upon a "deemed" substantive consolidation of Debtors solely for

19    purposes of allowance of Claims, voting confirmation and distributions under the Plan.  As a

20    result of this limited substantive consolidation, (a) all property, rights and claims of Debtors shall

21    be deemed pooled for purposes of allowance, treatment and distributions under the Plan, (b) a

22    holder of a Claim against more than one Debtor arising from or relating to the same underlying

23    debt that would otherwise constitute Allowed Claims against each Debtor, including, without

24    limitation, Claims based on joint and several liability, contribution, indemnity, subrogation,

25    guaranty and similar legal concepts, shall have only one Allowed Claim on account of such

26    Claims, and (c) all Intercompany Claims shall be disregarded.  The Plan contemplates that the

27    Reorganized Debtor will succeed to the interests of both Gulfstream and GTS upon entry of the

28    Confirmation Order.  The Plan will serve as a motion pursuant to Section 105(a) of the

1   Bankruptcy Code seeking entry of an order substantively consolidating the Cases for the limited

2   purposes described herein.

3       **F.      Feasibility.**

4       Another requirement for Plan confirmation involves the feasibility of the Plan, which

5   means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for

6   further financial reorganization, of Debtors or any successor to Debtors under the Plan, unless

7   such liquidation or reorganization is proposed in the Plan.

8       There are at least two important aspects of a feasibility analysis.  The first aspect

9   considers whether Debtors will have enough cash on hand on the Effective Date of the Plan to

10  pay all the claims and expenses which are entitled to be paid on such date.  Debtors maintain that

11  this aspect of feasibility is satisfied as illustrated here:

12

| Debtors' Cash on Hand as of Effective Date: | $ 1,715,000 |
|---|---|
| **To Pay:** Administrative Claims | $    600,000 (est.) |
| **To Pay:** Statutory Costs & Charges | $      25,000 (est.) |
| **To Pay:** Other Plan Payments Due | $    160,000 (est.)*** |
| Capital Expense Reserve | $    700,000 |
| Balance after Effective Date Payments: | $    230,000 |

17  ***Note:  The only Class that will be paid on the Effective Date is the Class 9 - Administrative

18  Convenience Class, which consists of unsecured claims of less than $500.00.  The total amount of

19  these Allowed Claims is approximately $25,447.02 and other unsecured creditors that elect to

20  waive their Class 3, 4 (unsecured portion), and 7 claims to be treated in Class 9 and receive up to

21  a $500 payment.  Since the Class 7 Creditors are receiving a 5.5% payment on account of their

22  Allowed Claims, any holder with a face value of a Claim of $9,100 could elect treatment in

23  Class 9.  Debtors anticipate that this could result in an additional $135,000 of payments on the

24  Effective Date to Class 9 Allowed Claims.

25  The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

26

| Cash in DIP Operating and Reserve Accounts: | $    715,000 |
|---|---|
| **Plus:** New Value Contributions: | $ 1,000,000 |
| **TOTAL:** | $ 1,715,000 |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894884v1

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

1       The second aspect considers whether Debtors will have enough cash over the life of the

2   Plan to make the required Plan payments.  Debtors have provided financial statements which

3   include projected financial information over the life of the Plan.  Please refer to **Exhibits 2 and 5**

4   for the relevant financial information.  **YOU ARE ADVISED TO CONSULT WITH YOUR**

5   **ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS**

6   **PERTAINING TO THESE FINANCIAL STATEMENTS.**  As Debtors' financial projections

7   demonstrate, Reorganized Debtor will generate sufficient cash flow to pay these Plan payments

8   for the life of the Plan.  Debtors contend that Debtors' financial projections are feasible.

9      **XV.   CHAPTER 7 LIQUIDATION ANALYSIS**

10       Section 1129(a)(7)(A)(ii) of the Bankruptcy Code permits the Bankruptcy Court to

11   confirm the Plan only if each member of an impaired class of Claims or Interests who has voted

12   to reject the Plan receives or retains at least the amount or value that would be received if Debtors

13   were liquidated in a case under Chapter 7 of the Bankruptcy Code.  Debtors have considered

14   liquidation of Debtors under the provisions of Chapter 7 of the Bankruptcy Code.  Debtors

15   believe that an immediate sale of the Properties is not a practical resolution of Debtors' financial

16   condition.

17       In a Chapter 7 bankruptcy case, Debtors' assets would be sold by a Chapter 7 trustee.

18   Secured creditors are paid first from the sales proceeds of assets on which the secured creditor has

19   a valid, perfected lien.  Administrative claims are paid next.  Then unsecured creditors are paid

20   from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with

21   the same priority share in proportion to the amount of their allowed claim in relationship to the

22   amount of total allowed unsecured claims.  Finally, interest holders receive the balance that

23   remains after all creditors are paid, if any.

24       For the Court to be able to confirm this Plan, the Court must find that all creditors and

25   interest holders who do not accept the Plan will receive at least as much under the Plan as such

26   holders would receive under a Chapter 7 liquidation.  Debtors maintain that this requirement is

27   met here for the following reasons:  The fair market value of Debtors' assets are less than the

28   amount of the secured claims.  Moreover, a forced liquidation or orderly liquidation will yield

significantly less than the stated fair market value of Debtors' assets.  Cushman has determined that the liquidation value for the Properties if sold in the present market would be no more than $69,300,000.  The following table provides the liquidation value as determined by Cushman for each of the Properties:

| Property | Liquidation Value |
|---|---|
| Ashton Ridge (FL) | $  6,100,000 |
| Cooper's Pond (FL) | $  6,700,000 |
| Deerfield (FL) | $  6,800,000 |
| Oakwood Village (FL) | $  9,500,000 |
| Ventura Landing (FL) | $  6,600,000 |
| Quail Run (SC) | $  7,400,000 |
| Woodland Village (SC) | $  7,400,000 |
| Braesview (TX) | $ 11,760,000 |
| La Jolla (TX) | $  7,040,000 |
| **TOTAL** | $ 69,300,000 |

Present market conditions indicate that a liquidation sale, if one could be obtained within a reasonable time, would result in a grossly discounted sale price and would not provide the opportunity for creditors and interest holders of this estate to recover a meaningful sum on their Claims.

Additionally, in a chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy estate in an amount not to exceed 25% of the first $5,000 of all moneys disbursed, 10% on any amount over $5,000 but less than $50,000, 5% on any amount over $50,000 but not in excess of $1 million, and 3% on all amounts over $1 million.

Hence, in a liquidation, all proceeds of Debtors' businesses and assets (net of costs of sale and the trustee's fees) would be first applied to satisfy the GE Capital Claim and Mechanic's Lien Claims.  The liquidation value of Debtors' assets is less than the aggregate amount of all the Secured Claims.  Therefore, no Class of Unsecured Claims would receive any value from the liquidation of the Debtors' tangible assets.  The following table demonstrates, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such

creditor or interest holder would receive under a Chapter 7 liquidation.

**ASSETS VALUE AT LIQUIDATION VALUES:**

CURRENT ASSETS
a.  Cash on hand                                             $   1,300,000
b.  Accounts receivable                                      $        N/A
c.  Inventories                                              $        N/A

    TOTAL CURRENT ASSETS                 $

FIXED ASSETS
a.  Office furniture & equipment                             $     380,000
b.  Machinery & equipment                                    $        N/A
c.  Automobiles                                              $        N/A
d.  Building & Land                                          $  69,300,000

    TOTAL FIXED ASSETS                   $  69,680,000

OTHER ASSETS
a.  Customer list                                            $        N/A
b.  Other intangibles                                        $        N/A

    TOTAL OTHER ASSETS                   $        N/A

**TOTAL ASSETS AT LIQUIDATION VALUE**                       **$ 70,980,000**
                                                     =========

**Less:**
Secured creditor claims listed on Schedule D                ($  163,604,303)
**Less:**
Chapter 7 trustee fees and expenses                         ($      2,152,650)
**Less:**
Chapter 11 administrative expenses                          ($  250,000 est.)
**Less:**
Priority claims,                                            ($  220,000 est.)
excluding administrative expense claims
                                                     =========

(1) Total shortfall                                         ($  95,250,000 est.)

(2) Total amt of unsecured claims                           $   3,940,000 (est.)

      The following table demonstrates that all creditors and interest holders will receive at least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation:

| Class of Claims | Payout Under Plan | Payout Under Chapter 7 |
|---|---|---|
| Class 1 - Administrative Expense Claims | 100% | 0% |
| Class 2 - GE Capital Secured Claims | 100% | 77% |
| Class 3 - Mechanics' Lien Claims | 5.5% | 0% |
| Class 4 - Priority Unsecured Employee Wage Claims | 100% | 0% |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

| | | |
|---|---|---|
| Class 5 - Priority Unsecured Security Deposit Claims | 100% | 0% |
| Class 6 - Priority Unsecured Tax Claims | 100% | 0% |
| Class 7 - General Unsecured Claims – Trade Creditors | 5.5% | 0% |
| Class 8 - GE Capital Unsecured Deficiency Claim | 5.5% | 0% |
| Class 9 - Administrative Convenience  Class | 100% | 0% |
| Class 10 - Existing Equity Interests | N/A | N/A |

## XVI.  TAX CONSEQUENCES OF THE PLAN

### A.  Introduction.

The implementation of the Plan may have federal, state and local tax consequences to Debtors and Debtors' creditors and interest holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

The discussion below summarizes only certain of the federal income tax consequences associated with the Plan's implementation, except as otherwise noted.  This discussion does not attempt to comment on all aspects of the tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular creditor or shareholder which may modify or alter the consequences described herein.  A creditor or interest holder may find that the tax consequences of the Plan to such creditor or interest holder differ materially from the tax consequences discussed below because of such creditor's or interest holder's facts and circumstances.  This discussion does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax, except as noted below.

The following discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), the regulations promulgated thereunder, existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax law, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan are

1    uncertain due to the lack of applicable legal authority and may be subject to judicial or

2    administrative interpretations that differ from the discussion below.

3    **CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH**

4    **THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM**

5    **AND TO DEBTORS OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN,**

6    **INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

7    **NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WAS INTENDED OR**

8    **WRITTEN TO BE USED, CAN BE USED BY ANY TAXPAYER OR MAY BE RELIED**

9    **UPON OR USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING**

10    **PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE**

11    **INTERNAL REVENUE CODE.  ANY WRITTEN STATEMENT CONTAINED IN THIS**

12    **DISCLOSURE STATEMENT RELATING TO ANY FEDERAL TAX TRANSACTION**

13    **OR MATTER MAY NOT BE USED BY ANY PERSON TO SUPPORT THE**

14    **PROMOTION OR MARKETING OF OR TO RECOMMEND ANY FEDERAL TAX**

15    **TRANSACTION(S) OR MATTER(S).**

16    **B.    Federal Income Tax Consequences to Debtors**.

17    Debtors are a pass-through entity for federal and state income taxes, and therefore do not

18    have any income tax liabilities on account of the Plan.  Debtors file only informational returns

19    and profit or losses are passed through to the members, and dealt with on such member's tax

20    returns.

21    As a result of the Plan's implementation, a portion of Debtors' aggregate outstanding

22    indebtedness will be treated for tax purposes as having been discharged.  (Any amount of

23    potential discharged indebtedness for federal income tax purposes will be referred to herein as a

24    "**Debt Discharge Amount**").  In general, the Internal Revenue Code provides that a taxpayer

25    who realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross

26    income in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any

27    consideration given for such discharge.  No income from the discharge of indebtedness is realized

28    to the extent that payment of the liability being discharged would have given rise to a deduction.

1    If a taxpayer is in a bankruptcy case under Title 11 and the discharge of indebtedness

2    occurs pursuant to a plan approved by the court (such as the Plan in this case, if confirmed), such

3    discharge of indebtedness is specifically excluded from gross income.  If the taxpayer is insolvent

4    before a cancellation or deemed cancellation of debt and does not become solvent by reason of

5    the cancellation or deemed cancellation, such cancellation or deemed cancellation of indebtedness

6    is specifically excluded from gross income.  In cases, such as Debtors', where both a case

7    commenced under the Bankruptcy Code and insolvency are present, the tax rules applicable in the

8    bankruptcy context trump and render inapplicable the insolvency tax rules.

9    Accordingly, Debtors will not be required to include in gross income any Debt Discharge

10    Amount as a result of the Plan.  The Internal Revenue Code requires certain tax attributes of a

11    Debtor to be reduced by the Debt Discharge Amount excluded from gross income.  Tax attributes

12    are reduced in the following order of priority:  current year net operating losses and net operating

13    loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of

14    property of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit

15    carryovers.

16    **C.**    **Federal Income Tax Consequences to Creditors**.

17    The tax consequences of the Plan's implementation to a creditor may depend on many

18    factors, including the type of consideration received by the creditor in exchange for its Claim,

19    whether the creditor reports income on the cash or accrual method, whether the creditor receives

20    consideration in more than one tax year of the creditor, and whether all the consideration received

21    by the creditor is deemed to be received by that creditor in an integrated transaction.  The tax

22    consequences upon the receipt of Cash, debt instruments or other property allocable to interest are

23    discussed below under "Receipt of Interest."  **CREDITORS ARE ADVISED TO SEEK**

24    **THEIR OWN TAX COUNSEL TO PROPERLY ASSESS THE TAX CONSEQUENCES**

25    **IN THEIR PARTICULAR SITUATION.**

26    1.    Claims Satisfied With Payments.

27    a.    Gain/Loss on Exchange

28    As a general rule, a creditor whose existing Claims are satisfied with payments under the

1    Plan or will recognize gain or loss on the actual or constructive exchange of such creditor's

2    existing Claims (other than Claims for accrued interest) for the consideration received equal to

3    the difference between (i) the "amount realized" in respect of such Claims, and (ii) the creditor's

4    tax basis in such Claims.  The "amount realized" will be equal to the sum of the Cash and (i) as to

5    a cash-basis taxpayer, the fair market value of all other consideration received, and (ii) as to an

6    accrual-basis taxpayer, the fair market value of the other consideration received, less any amounts

7    allocable to interest, unstated interest or original issue discount.

8        The general rule governing gain/loss and exchanges is qualified, with the actual gain/loss

9    realized affected by, among other things, the application of tax free treatment in certain situations,

10   including, without limitation, whether the exchange would otherwise qualify as a reorganization,

11   or as the exchange of a "security" under Internal Revenue Code Section 354.  **AGAIN,**

12   **CREDITORS ARE ADVISED TO SEEK THEIR OWN TAX COUNSEL TO PROPERLY**

13   **ASSESS THE TAX CONSEQUENCES IN THEIR PARTICULAR SITUATION.**

14                b.        Tax Basis and Holding Period of Items Received

15       Pursuant to Internal Revenue Code Section 1223, the aggregate tax basis in the items

16   received by a creditor will equal the amount realized in respect of such items (other than amounts

17   allocable to any accrued interest).  The holding period for items received in the exchange will

18   begin on the day following the exchange.

19                c.        Determination of Character of Gain

20       Under the general rule governing exchanges under the Internal Revenue Code, in the case

21   of a creditor whose existing Claims constitute capital assets in such creditor's hands, the gain

22   required to be recognized will be classified as a capital gain, except to the extent of interest

23   (including accrued market discount, if any), with any gain recognized thereon generally treated as

24   ordinary income to the extent of accrued market discount.  In this regard, it should be noted that

25   Internal Revenue Code section 582(c) provides that the sale or exchange of a bond, debenture,

26   note or certificate, or other evidence of indebtedness by a bank or certain other financial

27   institutions shall not be considered the sale or exchange of a capital asset.  Accordingly, in this

28   context, any gain recognized by such creditors as a result of the Plan's implementation would

1    presumably be ordinary income, notwithstanding the nature of their Claims.  As a general rule,

2    any capital gain recognized by a creditor will be long-term capital gain with respect to those

3    Claims for which the creditor's holding period is more than one year, and short-term capital gain

4    with respect to such Claims for which the creditor's holding period is one year or less.  Again, the

5    actual characterization of gain/loss in this particular instance pursuant to the general rules

6    governing exchanges is qualified by, among other things, the qualifications noted above with

7    respect to realization of gain/loss and exchanges.  **CREDITORS SHOULD BE ADVISED TO**

8    **SEEK   THEIR   OWN   TAX   COUNSEL   TO   PROPERLY   ASSESS   THE   TAX**

9    **CONSEQUENCES IN THEIR PARTICULAR SITUATION.**

10       2.    Receipt of Interest.

11       Income attributable to accrued but unpaid interest will be treated as ordinary income,

12   regardless of whether the creditor's existing Claims are capital assets in its hands.  A creditor

13   who, under its accounting method, was not previously required to include in income accrued but

14   unpaid interest attributable to existing claims, and who exchanges its interest Claim for Cash or

15   other property pursuant to the Plan, will be treated as receiving ordinary interest income to the

16   extent of any consideration so received allocable to such interest, regardless of whether that

17   creditor realizes an overall gain or loss as a result of the exchange of its existing Claims.  A

18   creditor who had previously included in income accrued but unpaid interest attributable to its

19   existing claims will recognize a loss to the extent such accrued but unpaid interest is not satisfied

20   in full.  For purposes of the above discussion, "accrued" interest means interest which was

21   accrued while the underlying Claim was held by the creditor.  The extent to which consideration

22   distributable under the Plan is allocable to such interest is uncertain.

23       3.    Other Tax Considerations.

24           a.    Market Discount

25       If a creditor has a lower tax basis in one of Debtors' obligations than its face amount, the

26   difference may constitute market discount under Internal Revenue Code section 1276.  (Certain

27   obligations are excluded from the operation of this rule, such as obligations with a fixed maturity

28   date not exceeding one year from the date of issue, installment obligations to which Internal

1    Revenue Code section 453B applies and, in all likelihood, demand instruments).

2          Holders in whose hands Debtors' obligations are market discount bonds will be required

3    to treat as ordinary income any gain recognized upon the exchange of such obligations to the

4    extent of the market discount accrued during the holder's period of ownership, unless the holder

5    has elected to include such market discount in income as it accrued.

6                b.        Withholding

7          The Reorganized Debtor will withhold any amounts required by law from payments made

8    to creditors.   In addition, Creditors may be required to provide general tax information to the

9    Debtor in order to receive distributions pursuant to the Plan.

10          **D.        Transfer Tax Issues for the Florida Properties.**

11          Real estate transfer taxes (sometimes called deed recordation taxes) are imposed on the

12    sale or transfer of real property located in the states of Florida and South Carolina.   The tax is

13    usually based on or measured by the consideration paid for or the fair market value of the real

14    estate.   The tax is commonly collected by the local official responsible for recording deeds to real

15    estate, and it must be paid prior to the deed to the property being recorded.   In a number of cases,

16    the tax is paid and evidenced by the affixing of stamps to the deed.   Debtors have investigated this

17    issue and believe that a transfer of the undivided tenant-in-common interests in the Properties to

18    the Reorganized Debtor may trigger the imposition of a transfer tax.   Accordingly, in order to

19    avoid the imposition of this tax, GTSPPI will contribute the 100% limited liability company

20    membership interests for Debtors GTS and Gulfstream and non-debtors KT Terraza and FLJC to

21    the Reorganized Debtor.   Debtors anticipate that such transfer taxes would be approximately

22    $500,000 to $700,000.

23          **E.        Tax Consequences to Members**.

24          In accordance with the Plan, holders of equity Interests will not receive any recovery or

25    distribution on such Interests.   A holder of such an Interest will recognize a loss in an amount

26    equal to such holder's adjusted tax basis in the Interest at the time at which such Interest become

27    worthless.   Holders of such Interests should consult their tax advisors regarding such timing.   The

28    character of any recognized loss will depend upon several factors including, but not limited to, the

1  status of the holder, the nature of the Interest in the holder's hands, the purpose and circumstances

2  of its acquisition, the holder's holding period, and the extent to which the holder had previously

3  claimed a deduction for the worthlessness of all or a portion of the Interest.

4       **F.     Admonishment to Creditors and Interest Holders**.

5       **THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX**

6  **CONSEQUENCE TO EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST.**

7  **FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND,**

8  **IN SOME CASES, UNCERTAIN.    THEREFORE, IT IS IMPORTANT THAT EACH**

9  **HOLDER OF A CLAIM OR AN EQUITY INTEREST OBTAIN HIS, HER OR ITS OWN**

10 **PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH**

11 **HOLDER OF A CLAIM OR AN EQUITY INTEREST AS A RESULT OF THE PLAN.**

12 **DEBTORS URGE ALL PARTIES TO CONSULT THEIR OWN TAX ADVISORS.**

13      **XVII.  AMENDMENTS AND REVOCATION TO THE PLAN**

14      **A.     Amendment of the Plan**.

15      The Plan may be amended or modified in the manner prescribed in Section 1127 of the

16 Bankruptcy Code.  At any time before the Confirmation Date, the Proponent may alter, amend, or

17 modify the Plan under Section 1127(a) of the Bankruptcy Code, provided that such alteration,

18 amendment, or modification does not materially and adversely affect the treatment and rights of

19 the holders of Claims under the Plan.   After the Confirmation Date and before substantial

20 consummation of the Plan as defined in Section 1101(2) of the Bankruptcy Code, the Proponent

21 may, under Section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect

22 or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the

23 Confirmation Order, and such matters as may be necessary to carry out the purposes and effects

24 of the Plan, so long as such proceedings do not materially and adversely affect the treatment of

25 holders of Claims under the Plan; provided, that prior notice of such proceedings shall be served

26 in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.  A holder

27 of a Claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or

28 rejected, as the case may be, the Plan as modified, unless, within applicable time periods, such

holder changes its previous acceptance or rejection.

**B.      Revocation or Withdrawal of the Plan**.

The Proponent reserves the right to revoke or withdraw the Plan at any time before the Confirmation Date.  The Proponent reserves the right to revoke or withdraw the Plan, without limitation, if the Proponent determines in good faith that any condition to Confirmation of the Effective Date of the Plan is unlikely to be satisfied as required herein.  If the Plan is withdrawn or revoked, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed a waiver of any Claims by or against Debtors, their Estates, or any other Person in any further proceedings involving Debtors or their Estates or an admission of any sort, and the Plan and any transaction contemplated by the Plan shall not be admitted into evidence in any proceeding.

**XVIII.** **MISCELLANEOUS PROVISIONS**

**A.      Retention of Jurisdiction.**

Until the Plan has been fully consummated, the Bankruptcy Court shall retain jurisdiction for all purposes including, but not limited to, the following:

- •      Reexamination of any Claim, excluding its classification hereunder, which has been allowed for purposes of voting, determination of any objection filed to any Claim and determination of any motion to subordinate any Claim;

- •      Determination of all questions and disputes regarding all assets of the Estate, and determination of all causes of action, controversies, disputes, or conflicts involving Debtors or their assets, whether or not subject to action pending as of the Confirmation Date, between Debtors, and any other party, including, but not limited to, any right of Debtors to recover assets pursuant to the provisions of the Bankruptcy Code;

- •      Correction of any defect, curing of any omission or reconciliation of any inconsistency in the Plan or the order of confirmation as may be necessary or appropriate to carry out the purpose and intent of the Plan;

- •      Enforcement and interpretation of the Plan;

- •      Except as otherwise provided in the Plan, entry of orders approving any requests for allowance of professional fees incurred in connection with this Chapter 11 Case;

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894884v1

83

**DEBTORS' JOINT DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN**

- Entry of any order, including the Final Decree and Order Closing the Chapter 11 Case;

- Determination of any issue, violation, injunction, contempt, relief, or other proceeding as contemplated under the Bankruptcy Code or as necessary to enforce the discharge provided for in the Plan; and

- Entry of one or more Orders of Distribution upon the request of Debtors. Nothing herein shall be deemed to require Debtors to obtain any Order(s) of Distribution prior to making distributions hereunder.

### B.    Payment of Statutory Fees.

The Disbursing Agent shall pay all U.S. Trustee's fees until such time as the Bankruptcy Court enters a Final Decree and Order Closing the Chapter 11 Case.

### C.    Effectuating Documents and Further Transactions.

The Disbursing Agent or the Proponent shall be authorized and required to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

### D.    Limitation of Liability.

Neither the Proponent, Debtors, any Estate representative, nor any of their respective current or former officers, directors, subsidiaries, affiliates, members, managers, shareholders, partners, representatives, employees, attorneys, advisors and agents, or any of their respective successors and assigns, and their respective property, shall have or incur any liability to any Person or Persons, or any of their respective officers, directors, subsidiaries, affiliates, members, managers, shareholders, partners, representatives, employees, attorneys, advisors and agents, or any of their respective successors and assigns, and their respective property, for any act taken or omitted to be taken in connection with, relating to, or arising out of (i) the operations or administration of Debtors or their Estates, (ii) the Chapter 11 Case, the administration of the Chapter 11 Case or the distributions under the Plan; (iii) this Disclosure Statement, including any information provided or statement made in this Disclosure Statement or omitted therefrom, (iv) the negotiation, filing, prosecution, administration, formulation, implementation, confirmation or consummation of the Plan, including all prepetition activities in connection

1    therewith, or (v) any contract, instrument, release or other agreement or document created in

2    connection with or related to the Plan, excepting, however, any act or omission arising out of such

3    Person's gross negligence or willful misconduct as determined in a Final Order by a court of

4    competent jurisdiction, provided, nevertheless, that any such Person to whom this Section applies

5    shall not be deemed grossly negligent or determined to have engaged in willful misconduct if

6    such Person reasonably relied upon the advise of counsel.

7        **E.    Releases.**

8            1.    Released Claims.

9        Upon the Effective Date, and for good and valuable consideration, the adequacy of which

10   is hereby confirmed, the Proponent, their Estates, the Managing Member, and Member, and each

11   Claim holder who has voted in favor of the Plan or accepted any Distribution under the Plan,

12   whether directly or, through any Agent or representative, (each a "**Releasing Party**"), shall be

13   bound to give this release of all "**Released Claims**" (as defined below).  Such Releasing Party

14   shall be deemed, to the maximum extent permitted by applicable law, to forever release, waive

15   and discharge all claims (other than rights under the Plan in respect of Allowed Claims against

16   Debtors, the Causes of Action vesting in the Reorganized Debtor and the Avoidance Actions ),

17   obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities

18   whatsoever in connection with, against or related to any or all of the Assets, the Properties, the

19   Purchase Agreement, Debtors (including the pre-petition events and post-petition events

20   described in the Disclosure Statement), the Chapter 11 Case, the Disclosure Statement or this

21   Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or

22   unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise

23   that are based in whole or part on any act, omission, transaction, event or other occurrence taking

24   place on or prior to the Effective Date in any way relating to any or all of Debtors (including the

25   pre-petition events and post-petition events described in the Disclosure Statement), the Assets, the

26   Properties, Debtors (including the pre-petition events and post-petition events described in the

27   Disclosure Statement), the Chapter 11 Case, the Disclosure Statement or this Plan, and that may

28   be asserted by or on behalf of such Releasing Party (each a "**Released Claim**") against any of the

1    Releasing Parties and each of their respective directors, officers, employees, members, partners,

2    agents, financial advisors, representatives, affiliates, attorneys and professionals.

3        2.    Release of Claims Against KT Terraza and FLJC.

4        GTS and Gulfstream collectively hold an undivided sixty percent (60%) tenant-in-

5    common interest to the Properties; however, as tenant-in-common interest holders, GTS and

6    Gulfstream are jointly and severally liable for one hundred percent (100%) of the Claims.

7    Accordingly, this Plan classifies and treats one hundred percent (100%) of the Claims that have

8    arisen in connection with the Properties.  If a Creditor wishes to receive a distribution under this

9    Plan, such Creditor will be asked to release its claims against KT Terraza and FLJC in exchange

10   for payment of its Allowed Claim under this Plan.  Such release will be set forth in the Ballot for

11   voting on the Plan.

12       **F.    Successors and Assigns.**

13       The rights, benefits, and obligations of any Person named or referred to in the Plan shall

14   be binding upon, and shall inure to the benefit of, the heir, executor, administrator, or permitted

15   successor or assignee of such Person.

16       **G.    Governing Law.**

17       Subject to the provisions of any contract, certificates of incorporation, by-laws,

18   instrument, release, or other agreement or document entered into in connection with the Plan, the

19   rights and obligations arising under the Plan shall be governed by, and construed and enforced in

20   accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules, and the

21   applicable laws of the State of California.

22

23

24

25

26

27

28

1

## XIX.    CONCLUSION

2          Debtors have proposed this Plan in a good faith effort to maximize the recovery for all

3    creditors, to stabilize the Properties, and to use the Property Revenue to pay creditors the best

4    return possible on their Allowed Claims.  Debtors believe that the Plan is in the best interest of

5    Creditors and urge Creditors to vote to accept the Plan.

6    DATED: December 7, 2009                    BUCHALTER NEMER
                                                A Professional Corporation
7

8
                                          By:   /s/ Bernard D. Bollinger, Jr.
9                                               BERNARD D. BOLLINGER, JR.
                                                Attorneys for Debtors GTS Property Portfolios
10                                              B-3, LLC and Gulfstream Apt. Portfolio, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1
BERNARD D. BOLLINGER, JR. (SBN 132817)
    Email: bbollinger@buchalter.com
2
PAUL S. ARROW (SBN 136870)
    Email: parrow@buchalter.com
3
ANTHONY J. NAPOLITANO (SBN 227691)
    Email: anapolitano@buchalter.com
4
BUCHALTER NEMER
A Professional Corporation
5
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017-2457
6
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
7

**Creditor Information Hotline:  (213) 891-5800**
8

Attorneys for Debtors and Debtors-in-Possession
9
GTS PROPERTY PORTFOLIOS B-3, LLC and
GULFSTREAM APT. PORTFOLIO, LLC
10

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                  **LOS ANGELES DIVISION**

14

| | |
|---|---|
| 15  In re | Case No. 2:09-bk-14774-SB |
| 16  GTS PROPERTY PORTFOLIOS B-3, LLC, a Nevada limited liability company, | [Jointly Administered Case Nos. 2:09-bk-14774-SB and 2:09-bk-15342-ER] |
| 17 | |
| 18         Debtors and         Debtors-in-Possession. | Chapter 11 |

15  In re

16  GTS PROPERTY PORTFOLIOS B-3,
LLC, a Nevada limited liability company,

17
        Debtors and
18        Debtors-in-Possession.

19  ☐    Affects GTS PROPERTY
20  PORTFOLIOS B-3, LLC, a Nevada limited
liability company
21
☐    Affects GULFSTREAM APT.
22  PORTFOLIO, LLC, a Delaware limited
liability company,
23
☒    Affects both Debtors
24

25

Case No. 2:09-bk-14774-SB

[Jointly Administered Case Nos. 2:09-bk-14774-SB and 2:09-bk-15342-ER]

Chapter 11

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION [Affects both Debtors]**

[Disclosure Statement, Motion and Notice concurrently filed herewith]

**Disclosure Statement Hearing:**

Date:       January 12, 2010
Time:       2:00 p.m.
Place:       Courtroom 1575
            255 East Temple Street
            Los Angeles, CA 90012

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000088

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     REPRESENTATIONS ..................................................................................... 1

III.    DEFINITIONS AND RULES OF CONSTRUCTION ..................................... 1

    A.      Definitions .......................................................................................... 1

    B.      Rules of Construction and Computation of Time ................................. 14

IV.     CLASSIFICATION OF CLAIMS AND INTERESTS ..................................... 15

    A.      Class 1 – Administrative Expense Claims ........................................... 15

    B.      Class 2 – GE Capital Allowed Secured Claim ..................................... 15

    C.      Class 3 – Mechanics' Lien Claims ...................................................... 16

    D.      Class 4 – Employee Wage Claims ...................................................... 17

    E.      Class 5 – Security Deposit Claims ...................................................... 17

    F.      Class 6 –Property Tax Claims ............................................................ 17

    G.      Class 7 – General Unsecured Claims – Trade Creditors ...................... 17

    H.      Class 8 – GE Capital Unsecured Deficiency Claim ............................. 17

    I.      Class 9 –Administrative Convenience Class ........................................ 18

    J.      Class 10 – Existing Equity Interests ................................................... 18

V.      TREATMENT OF ALLOWED CLAIMS AND INTERESTS ........................ 18

    A.      Treatment of Class 1 – Administrative Expense Claims....................... 18

    B.      Treatment of Class 2 – GE Capital Secured Claim ............................. 19

    C.      Treatment of Class 3 – Mechanic's Lienholder Claims ....................... 22

    D.      Treatment of Class 4 – Priority Unsecured Employee Wage Claims .... 23

    E.      Treatment of Class 5 – Priority Unsecured Security Deposit Claims .... 24

    F.      Treatment of Class 6 - Priority Unsecured Tax Claims ....................... 25

    G.      Treatment of Class 7 – General Unsecured Claims - Trade Creditors .. 26

    H.      Treatment of Class 8 – GE Capital Unsecured Deficiency Claim ........ 27

    I.      Treatment of Class 9 – Administrative Convenience Class ................... 28

    J.      Treatment of Class 10 – Existing Equity Interests .............................. 28

    K.      Confirmation by cramdown ................................................................ 28

VI.     MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... 29

    A.      Formation of Reorganized Debtor and Transfer of Assets................... 29

    B.      Reorganized Debtor – Powers, Duties and Management...................... 29

    C.      Issuance of Equity Interests of Reorganized Debtor ........................... 31

    D.      New Value Contribution and Required Market Test............................ 32

    E.      Deemed Substantive Consolidation.................................................... 38

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                    i

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000089

## TABLE OF CONTENTS

### (continued)

| | | Page |
|---|---|---|
| VII. | PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN | 38 |
| | A. Creditor Claims | 38 |
| | B. Minimum Distributions and Reallocations of Unclaimed Funds | 39 |
| VIII. | EFFECTIVE DATE | 39 |
| IX. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 39 |
| X. | EXONERATION AND RELIANCE | 40 |
| | A. Exoneration | 40 |
| | B. Reliance | 41 |
| XI. | MISCELLANEOUS PROVISIONS | 41 |
| | A. Revocation or Withdrawal of the Plan | 41 |
| | B. Modification of Plan | 41 |
| | C. Administrative Claims Bar Date | 42 |
| | D. Confirmation Order | 42 |
| | E. United States Trustee's Fees | 42 |
| | F. Closing of the Case | 42 |
| | G. No Interest | 43 |
| | H. No Attorneys' Fees | 43 |
| | I. Governing Law | 43 |
| | J. Discharge | 43 |
| XII. | RETENTION OF JURISDICTION | 43 |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

ii

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000090

## I.    **INTRODUCTION**

This Joint Chapter 11 Plan of Reorganization, including any modifications or amendments (the "**Plan**"), is proposed by GTS Property Portfolios B-3, LLC ("**GTS**") and Gulfstream Apt. Portfolio, LLC ("**Gulfstream**"), debtors and debtors-in-possession in the above-captioned jointly administered bankruptcy cases (collectively, "**Debtors**").  This Plan proposes the reorganization of Debtors and distributions to creditors in accordance with the priorities set forth in the Bankruptcy Code [1] and as agreed to under the Plan.  In a summary, the Plan filed by Debtors is premised on the continued operation of the Properties and use of the cash flows generated therefrom to make distributions to the holders of Allowed Claims and Interests in accordance with the priorities set forth in the Plan.  In order to adequately capitalize the Reorganized Debtor, Debtors' Plan is a "new value" Plan whereby GTSPPI will contribute to the Reorganized Debtor the equity interests of FLJC, which holds an undivided ten percent tenant-in-common interests in the Properties, and the equity interests of KT Terraza, which holds an undivided thirty percent (30%) tenant-in-common interest in the Properties.  Moreover, GTSPPI will also contribute $1,000,000 to the Reorganized Debtors in order to provide adequate working capital and to fund initial Plan payments.  Accompanying this Plan is a Disclosure Statement approved by the Bankruptcy Court that provides adequate information for interested parties to make an informed decision on whether to vote in favor or against Debtors' Plan.

## II.    **REPRESENTATIONS**

ALL CREDITORS ARE ENCOURAGED TO CONSULT THE APPROVED DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## III.    **DEFINITIONS AND RULES OF CONSTRUCTION**

### A.    **Definitions**

Except as expressly provided otherwise herein, or unless the context otherwise requires, the following terms will have the meanings stated.  The singular/plural uses or the conjunctive and disjunctive uses thereof will be interchangeable, and the terms will include masculine, feminine and neutral genders.  Additional quoted terms are defined as set forth in the text of the

---

[1]  All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code") unless otherwise noted.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

1

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000091

Plan and/or Disclosure Statement.  The defined terms used in the Plan and Disclosure Statement are as follows:

1.    **Administrative Expense Claim** shall mean:  (a) every cost or expense of administration of the Bankruptcy Case, including any actual and necessary post-petition expenses of preserving the Estate; (b) any actual and necessary post-petition expenses of Debtors; (c) any professional fees allowed by the Bankruptcy Court pursuant to interim and final approvals in accordance with Sections 330, 331, and 503(b); and (d) all fees and charges assessed against the Estate under Chapter 123 of Title 28 of the United States Code.

2.    **Administrative Expense Claims Bar Date** shall mean the first Business Day after the 60th day after the Effective Date.

3.    **Allowed Claim** shall mean every Claim against the Bankruptcy Estate that has been scheduled by Debtors on Schedules D, E, and F to their bankruptcy petition, and every Claim against the Bankruptcy Estate as to which a proof of such Claim has been filed timely by the Bar Date (or appropriate application as to Administrative Expense Claims) and:  (i) as to which no objection to the allowance of such Claim has been filed within any applicable time period fixed by the Plan or the Bankruptcy Court; or (ii) as to which the order allowing such Claim has become final and non-appealable without any appeal, review, or other challenge of any kind to that order having been taken or being still timely.  If any Claim or the Creditor asserting such Claim is subject to any defense, setoff, counterclaim, recoupment, or other adverse Claim of any kind of Debtors, including, but not limited to, any pending appeal or unexpired right to appeal, that Claim will be deemed a Disputed Claim and it will not become an Allowed Claim unless and until all disputes are resolved or adjudicated fully and finally, with all appellate rights having been exhausted.

4.    **Assets** shall mean Debtors' real and personal property, including, but not limited to, the Properties, and rights and interests appurtenant thereto, and any executory contracts, unexpired leases, permits and approvals relating to any of the foregoing.

5.    **Avoidance Actions** shall mean any and all rights of action of Debtors under Sections 506(c), 544, 545, 546, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                    2

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000092

1    Code, or similar state laws, other than those dismissed, released, settled, or compromised under

2    the Plan.

3          6.    **Ballot** shall mean a form of ballot served by Debtors on the holders of all

4    Claims entitled to vote on the acceptance or rejection of this Plan, which shall provide a checkbox

5    for such Claimants to indicate their vote and, if applicable, checkboxes for the making of any

6    additional elections that such Claimants are entitled to make under the terms of the Plan.

7          7.    **Bankruptcy Case** shall mean the above-captioned jointly administered

8    bankruptcy case, designated as Case No. 2:09-bk-14774-SB and Case No. 2:09-bk-15342-SB,

9    commenced by Debtors filing of a voluntary petition on the Petition Date.

10          8.    **Bankruptcy Code** shall mean Title 11 of the United States Code, 11

11    U.S.C. §101 *et. seq.*, as it may be amended from time to time.

12          9.    **Bankruptcy Court** or **Court** shall mean the United States Bankruptcy

13    Court for the Central District of California or such other court that exercises jurisdiction over all

14    or part of the Bankruptcy Case including the United States District Court for the Central District

15    of California to the extent that the reference of the Bankruptcy Case is withdrawn.

16          10.    **Bankruptcy Estate** or **Estate** shall mean the estate created pursuant to

17    Section 541 upon Debtors' commencement of the Bankruptcy Case.

18          11.    **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure,

19    as amended from time to time, and any Local Rules of the Bankruptcy Court, as applicable to the

20    Chapter 11 Bankruptcy Case.

21          12.    **Bar Date** shall mean July 31, 2009, the date set by the Bankruptcy Court

22    by which creditors were required to have filed proofs of claim.

23          13.    **Bethany** shall mean The Bethany Group, LLC, a California limited

24    liability company.

25          14.    **Bethany Holdings** shall mean Bethany Holdings Group, LLC, a Nevada

26    limited liability company.

27          15.    **Bethany Property Management Agreement** shall mean the Property

28    Management Agreement (B3 Portfolio) dated September 6, 2009 by Bethany, as Agent, and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1    3

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000093

1  Gulfstream, GTS, KT Terraza and FLJC, as Owners, for the retention of Bethany to manage the

2  Properties prepetition.

3      16.    **Business Day** shall mean every day except Saturdays, Sundays, and federal

4  and state holidays observed by the Bankruptcy Court.

5      17.    **Cash** shall mean cash and cash equivalents, including, but not limited to,

6  bank deposits, checks and other similar forms of negotiable instruments of payment or exchange.

7      18.    **Causes of Action** shall mean all of the Bankruptcy Estate's existing and

8  potential claims and causes of action, including but not limited to any claims that may be brought

9  by a debtor-in-possession under the Bankruptcy Code and applicable state law, and causes of

10 action that were pending or could have been brought by Debtors at the Petition Date.

11     19.    **Chartwell** shall mean Chartwell Management LLC, the property managers

12 retained by Debtors pursuant to the Property Management Employment Order to manage the

13 South Carolina Properties.

14     20.    **Claim** shall mean "Claim" as defined in Section l01(5) of the Bankruptcy

15 Code.

16     21.    **Claimant** shall mean the holder of a Claim.

17     22.    **Claims Objection Date** shall mean the date by which Debtors or any

18 interested party must file objections to Claims, which shall be the first Business Day after 90 days

19 after the Effective Date.

20     23.    **Class** shall mean each of the classifications of Claims and Interests

21 described in the Plan.

22     24.    **Class 4 Employee Wage Claims** shall mean the accrued but unpaid pre-

23 petition wages of employees that did not receive a payment pursuant to this Court's Wage Order

24 plus the unpaid accrued vacation, sick and severance pay for all eligible pre-petition employees.

25     25.    **Class 8 Distribution Percentage** is the percentage paid of the Class 8 GE

26 Capital Unsecured Deficiency Claim calculated with regard to the total value of cash and the GE

27 TIC Interest that GE Capital receives pursuant to this Plan on account of its Class 8 Allowed

28 Claim.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

4

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000094

26.    **Confirmation Date** shall mean the date the Bankruptcy Court enters the Confirmation Order on the Court docket.

27.    **Confirmation Hearing** shall mean a hearing conducted by the Bankruptcy Court pursuant to Section 1128(a) for the purpose of determining whether to enter a Confirmation Order.

28.    **Confirmation Order** shall mean an order entered by the Bankruptcy Court approving and confirming the Plan, which shall not have been stayed by a court of competent jurisdiction.

29.    **Creditor** shall mean "Creditor" as defined in Section 101(10) of the Bankruptcy Code and will include every holder of a Claim, whether or not such Claim is an Allowed Claim.

30.    **Debtors** shall collectively mean GTS Property Portfolios B-3, LLC, a Nevada limited liability company, and Gulfstream Apt. Portfolio, LLC, a Delaware limited liability company.

31.    **Disbursing Agent** shall mean the Reorganized Debtor, or such other person or entity specified in the Confirmation Order that will perform any duties of the Disbursing Agent as set forth in this Plan.

32.    **Disclosure Statement** shall mean the "Joint Disclosure Statement Describing Debtors' Joint Chapter 11 Plan Of Reorganization," in the form approved by the Bankruptcy Court or as it may be altered, amended, or modified thereafter from time to time.

33.    **Disputed Claim** shall mean every Claim that is not an Allowed Claim.

34.    **Distribution Dates** shall mean the Initial Distribution Date and at least the first Business Day of each calendar quarter thereafter, or any other date on which the Debtor elects to or is required to make a distribution under the terms of this Plan.

35.    **Effective Date** shall mean the date selected by Debtors that is at least 10 days after but no more than 45 days after the Confirmation Date, unless the Confirmation Order is stayed pursuant to an order of the Bankruptcy Court or another court of competent jurisdiction. Debtors shall designate the dated selected as the Effective Date in a written designation filed with

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                    5

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000095

1  the Court after the Confirmation Order is entered on the docket and on or before the Effective

2  Date.

3          36.    **Equity Auction Proceeds** shall mean the proceeds generated from the

4  New Value Auction of the New Value Interest.

5          37.    **Executory Contract** shall mean every unexpired lease and other executory

6  contract that is subject to being assumed or rejected under Section 365 of the Bankruptcy Code.

7          38.    **Final Order** shall mean an order or judgment of the Bankruptcy Court

8  which shall not have been reversed, stayed, modified or amended, and as to which the time to

9  appeal from or to seek review or rehearing of, shall have expired, and as to which no appeal or

10 petition for review, or rehearing is pending, or if appealed from, shall have been affirmed and no

11 further hearing, appeal or petition can be taken or granted, or as to which no stay has been entered

12 to affect the operative provisions of such order of judgment.

13         39.    **FLJC** shall mean B3 FLJC, LLC, a Delaware limited liability company.

14         40.    **GE Capital** shall mean General Electric Capital Corporation, a Delaware

15 corporation, and its successors and assigns.

16         41.    **GE Capital Claim** shall mean Claim of GE Capital as of the Petition Date

17 in the amount of $161,814,464.36 for monies that GE Capital alleges is due and payable under the

18 GE Capital Loan.

19         42.    **GE Capital Deficiency Claim** shall mean the allowed Unsecured Claim of

20 GE Capital treated under Class 8 of the Plan.

21         43.    **GE Capital Loan** shall mean the original loan commitment made by

22 GE Capital to Gulfstream on March 27, 2006, in the designated loan amount of $159,160,000.00,

23 evidenced by the GE Capital Loan and Security Documents, the GE Capital Tranche A Note, and

24 the GE Capital Tranche B Note.

25         44.    **GE Capital Loan and Security Documents** shall mean all documents

26 evidencing the terms of the Loan Agreement dated March 27, 2006 between Gulfstream, as

27 Borrower, and GE Capital, as Lender, and all amendments thereto (the "**Loan Agreement**"); the

28 UCC-1 Financing Statement filed with respect to Gulfstream with the Delaware Department of

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    6

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000096

State on April 3, 2006 bearing File No. 6111575 7; any additional documents or amendment thereto relating to the TIC Assumption Security Amendments; and the following mortgages or deeds of trusts:

- For Ashton Ridge:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1162; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1188.

- For Deerfield:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1162; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 12, 2006 in the Public Records of Duval County, Florida, in Official Records Book 13192, Page 1196.

- For Oakwood Village:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 13, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 583; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 13, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 617.

- For Ventura Landing:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 13, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 583; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 12, 2006 in the Public Records of Orange County, Florida, in Official Records Book 8585, Page 609.

- For Cooper's Pond:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 6, 2006 in the Public Records of Hillsborough County, Florida, in Official Records Book 16317, Page 559; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee,

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                   7

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000097

recorded on April 6, 2006 in the Public Records of Orange County, Florida, in Official Records Book 16317, Page 585.

- For Braesview:  Deed of Trust, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Grantor, for the benefit of GE Capital, as Beneficiary, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12040, Page 600; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12040, Page 620.

- For La Jolla:  Deed of Trust, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Grantor, for the benefit of GE Capital, as Beneficiary, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12039, Page 2174; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 5, 2006 in the Real Property Records of Bexar County, Texas at Volume 12039, Page 2193.

- For Quail Run:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 6, 2006 in the Official Records of Richland County, South Carolina, in Record Book 1170, Page 673; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 6, 2006 in the Official Records of Richland County, South Carolina, in Record Book 1170, Page 673.

- For Woodland Village:  Mortgage, Security Agreement and Fixture Filing dates as of March 27, 2006, executed by Gulfstream, as Mortgagor, for the benefit of GE Capital, as mortgagee, recorded on April 6, 2006 in the Official Records of Lexington County, South Carolina, in Record Book 10959, Page 313; and Assignment of Rents and Leases dated as of March 27, 2006 by Gulfstream, as Assignor, and GE Capital, as Assignee, recorded on April 6, 2006 in the Official Records of Lexington County, South Carolina, in Record Book 10959, Page 335.

45.    **GE Capital Surcharge Claim** shall mean the Debtors' Claim to be made in a pleading commencing an Adversary Proceeding seeking a determination that a portion of GE Capital 's Allowed Secured Claim be surcharged pursuant to Section 506(c) of the Bankruptcy Code for the expenses paid by Debtors, including attorneys' fees and costs, to preserve GE Capital 's secured interest in the Properties.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                          8

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000098

46.     **GE Capital Liens** shall mean all liens arising out of the GE Capital Loan and Security Documents.

47.     **GE Capital Secured Property Value** shall mean the Secured Property Value established with regard to the GE Capital's allowed Secured Claim.

48.     **GE Capital TIC Interest** shall mean the undivided ten percent (10%) tenant-in-common interest to the Properties that Reorganized Debtor will contribute to GE Capital in satisfaction of the GE Capital Unsecured Deficiency Claim.

49.     **GE Capital Tranche A Note** shall mean the Promissory Note dated March 27, 2006, executed by Gulfstream in favor of GE Capital, in the designated loan amount of $153,400,000.00.

50.     **GE Capital Tranche B Note** shall mean the Promissory Note dated March 27, 2006, executed by Gulfstream in favor of GE Capital, in the designated loan amount of $6,500,000.00 (and reduced to $5,760,000.00 pursuant to the GE Capital Loan Agreement).

51.     **General Unsecured Claim** shall mean every Unsecured Claim that will be classified and paid under the Plan, and which is not an Administrative Expense Claim, Priority Unsecured Claim, or a Claim classified within any other Class under this Plan.

52.     **GTS** shall mean debtor GTS Property Portfolios B-3, a Nevada limited liability company, and debtor and debtor-in-possession in the above-captioned jointly administered bankruptcy case.

53.     **GTSI** shall mean Great Transamerican Strand Investments, Inc., a Delaware corporation, and the holder of one hundred percent (100%) of the shares of GTSPPI.

54.     **GTSPPI** shall mean GTS Property Portfolios, Inc., a Nevada corporation, the holder of one hundred percent (100%) of the membership interests of GTS, Gulfstream, KT Terraza and FLJC.

55.     **Gulfstream** shall mean debtor Gulfstream Apt. Portfolio, LLC, a Delaware limited liability company, and debtor and debtor-in-possession in the above-captioned jointly administered bankruptcy case.

56.    **Initial Distribution Date** shall mean the first date on which any payment under this Plan is made, which shall be no later than the 10th Business Day following the Effective Date.

57.    **Interests** shall mean any existing, pre-Confirmation Date equity security of Debtors, including, but not limited to, the limited liability company membership interests, warrants, options or other rights exercisable or convertible into such limited liability company membership interests.

58.    **KT Terraza** shall mean KT Terraza I, LLC, a Delaware limited liability company.

59.    **Lien(s)** shall mean a lien as defined in Section 101(37) of the Bankruptcy Code, except a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 550, 552, 553, or 549 of the Bankruptcy Code.

60.    **Lincoln** shall mean Lincoln Property Company and its affiliates retained by Debtors pursuant to the Property Management Employment Order to manage the Florida Properties and the Texas Properties.

61.    **Local Property Managers** shall mean Chartwell and Lincoln collectively.

62.    **LTV** shall mean LT Ventures, LLC, the financial advisors and portfolio asset managers retained by Debtors pursuant to the Property Management Employment Order.

63.    **Mechanics' Lienholders** shall mean the parties who assert mechanic's and materialmen 's liens against the Properties.

64.    **Mechanics' Lienholders Claims** shall mean the Allowed Claim of the Mechanics' Lienholders.

65.    **Person** shall mean any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated association or organization, or other "person" as defined in Section 101 of the Bankruptcy Code as well as any governmental agency, governmental unit or associated political subdivision.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

10

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000100

66.     **Petition Date** shall collectively mean March 3, 2009 and March 10, 2009 for GTS and Gulfstream, being the respective dates on which Debtors filed their voluntary petition in the Bankruptcy Court.

67.     **Plan** shall mean the Joint Chapter 11 Plan of Reorganization filed by Debtors on December 7, 2009, along with every modification or amendment thereof or thereto.

68.     **Plan Expense Reserve Fund** shall mean a sum of money to be reserved for the payment of expenses relating to the administration of the Bankruptcy Case, including without limitation the claims of Debtors' professionals, court costs and any fees owed to the Office of the United States Trustee.  The Plan Expenses Reserve Fund shall be funded on the Effective Date with Debtors' operating reserves and Equity Auction Proceeds, if any, and thereafter disbursed in accordance with the Plan and any applicable further Orders of the Court.

69.     **Plan Section 1111(b) Interest Rate** shall mean 2.00% per annum, or such other rate of interest as shall be mutually agreed upon by Debtors and the holders of Claims that elect treatment of their Allowed Claims pursuant to Section 1111(b) of the Bankruptcy Code, and that are entitled to receive interest from Debtors under the terms of the Plan, or such other rate as determined by the Court to meet requirements under Section 1129(a) and (b) of the Bankruptcy Code.

70.     **Plan Secured Interest Rate** shall mean 4.75% per annum, or such other rate of interest as shall be mutually agreed upon by Debtors and the holders of Claims entitled to receive interest from Debtors under the terms of the Plan, or such rate as determined by the Court to meet requirements under Section 1129(a) and (b) of the Bankruptcy Code.

71.     **Plan Unsecured Interest Rate** shall mean that rate of interest in effect on the Effective Date that is the Federal Judgment Interest Rate pursuant to 28 U.S.C. § 1961.

72.     **Preference Period** shall mean collectively the ninety day (or one year for insiders) periods of time pursuant to Section 547(b)(4) preceding the date of the filing of the bankruptcy petition of each respective Debtor.

73.     **Priority Unsecured Claim** shall mean every Unsecured Claim against Debtors that is not an Administrative Expense Claim, a General Unsecured Claim or a Secured

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                              11

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000101

1  Claim, and which is asserted by the Creditor holding such Claim to be entitled to priority under

2  any applicable provisions of Section 507(a).

3          74.    **Properties** shall mean the following nine multi-family residential

4  apartment complexes located in Texas, Florida and South Carolina:

5  •    Ashton Ridge is a 356 unit apartment complex located at 5959 Fort
6         Caroline Road, Jacksonville, Duval County, Florida ("**Ashton Ridge**");

7  •    Deerfield is a 256 unit apartment complex located at 11711 Lane Avenue
        South, Jacksonville, Duval County, Florida ("**Deerfield**");

8
9  •    Oakwood Village is a 278 unit apartment complex located at 4755 North
        Goldenrod Road, Orlando, Orange County, Florida ("**Oakwood**");

10 •    Ventura Landing is a 184 unit apartment complex located at 6203 Curry
11       Ford Road, Orlando, Orange County, Florida ("**Ventura**");

12 •    Cooper's Pond is a 463 unit apartment complex located at 6221 North
        Dale Mabry Highway, Tampa, Hillsborough County, Florida ("**Cooper**"
13       and together with Ashton Ridge, Deerfield, Oakwood, and Ventura, the
        "**Florida Properties**");
14
15 •    Braesview is a 396 unit apartment complex located at 11501 Braesview
        Drive, San Antonio, Bexar County, Texas ("**Braesview**");

16 •    La Jolla is a 300 unit apartment complex located at 10707 IH 10 West,
17       San Antonio, Bexar County, Texas ("**La Jolla**" and together with
        Braesview, the "**Texas Properties**");
18
19 •    Quail Run is a 332 unit apartment complex located at 3509 Lake Avenue,
        Columbia, Richland County, South Carolina ("**Quail Run**"); and

20 •    Woodland Village is a 308 unit apartment complex located at 2221 Bush
21       River, Columbia, Lexington County, South Carolina ("**Woodlands**" and
        together with Quail Run, the "**South Carolina Properties**").

22         75.    **Property Management Employment Order** shall mean this Court's

23 Order Granting Debtor 's Emergency Motion Pursuant to 11 U.S.C. § 327 for Order Authorizing

24 Debtor to Employ LTVentures, LLC as Portfolio Asset Manager and to Employ Local Property

25 Managers entered on April 2, 2009.

26         76.    **Property Revenue** shall mean any and all income generated by the

27 Properties.

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                    12

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000102

77.    **Proponent** shall mean Debtors GTS and Gulfstream.

78.    **Rent Ready Units** shall mean apartment units in a sufficiently habitable condition for prospective tenants to immediately move into.

79.    **Reorganized Debtor** shall mean the post-confirmation limited liability company that will be formed to hold the equity interests of GTS, Gulfstream, KT Terraza and FLJC following the Effective Date to be governed by its Articles of Organization and Operating Agreement and any amendments thereto required under the Plan, as well as the terms of the Plan.

80.    **Schedules** or **Debtors' Schedules** shall mean the schedules of assets and liabilities, the list of holders of interests, and the statements of financial affairs filed by Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements may have been or may be supplemented or amended from time to time.

81.    **Secured Claim** shall mean every Claim against Debtors (including every secured portion of a Claim which is not fully secured) that is asserted by the Creditor holding such Claim to be secured by a lien, security interest, or assignment encumbering property in which Debtors holds an interest; provided, however, that such Claim will be a Secured Claim only to the extent of the validity, perfection, and enforceability of the claimed lien, security interest, or assignment and only to the extent of the value of the interest of the Creditor holding such Claim against such property of Debtors.

82.    **Secured Property Value** shall mean the value of any Claimant's lien or security interest in property of Debtors, which shall be equal to the lesser of: (a) the Claimant's Claim; or (b) the fair market value of all property of Debtors securing such claim, less the value of any security interests of higher priority in the same property held by other Claimants.

83.    **Security Deposit Claim** shall mean any Claim of an individual arising from the deposit, before the Petition Date, of money in connection with the rental of a unit at one of the Properties, which was not refunded, in whole or in part, to residents that vacated their respective units at the Properties prior to the Petition Date, up to the statutory limit of $2,425.00 per claimant provided for in Section 507(a)(7).

Buchalter Nemer
A Professional Corporation
Los Angeles

BN 4894886v1    13

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000103

84.    **TIC Agreement** shall mean the Tenant-In-Common Agreement concerning the Properties executed on or about September 15, 2006 by the TIC Owners.

85.    **TIC Assumption Agreement** shall mean the Assumption Agreement entered into on August 29, 2006, Gulfstream, as the existing borrower, and FLJC, KT Terraza, and GTS, collectively, as the additional borrowers, and GE Capital, as administrative agent.

86.    **TIC Assumption Security Amendments** shall mean all documents evidencing the amendment of the GE Capital Loan and Security Documents with respect to the acquisition of tenant-in-common interests to the Properties entered into on August 29, 2006 by Gulfstream, as existing borrower, GTS, KT Terraza and FLJC, as grantees, and GE Capital, as administrative agent, and recorded thereafter in various public records offices.

87.    **TIC Owners** shall mean collectively debtor Gulfstream, debtor GTS, KT Terraza and FLJC.

88.    **Unsecured Claim** shall mean every Claim against the Debtor, regardless of the priority of such Claim, which is not a Secured Claim.

B.    **Rules of Construction and Computation of Time.**

The following rules of interpretation and computation of time shall govern the Disclosure Statement and the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or Schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections, articles, and schedules are references to sections, articles, and schedules of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                   14

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000104

1  for convenience of reference only and are not intended to be a part of or to affect the

2  interpretation of this Plan; (h) subject to the provisions of any contract, certificates of

3  incorporation, by-laws, instrument, release, or other agreement or document entered into in

4  connection with this Plan, the rights and obligations arising under this Plan shall be governed by,

5  and construed and enforced in accordance with, federal law, including the Bankruptcy Code and

6  Bankruptcy Rules; (i) the rules of construction set forth in Section 102 of the Bankruptcy Code

7  will apply; and (j) in computing any period of time prescribed or allowed by this Plan, the

8  provisions of Bankruptcy Rule 9006(a) will apply.

9  **IV.    <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>**

10    All Claims and Interests are classified under the Plan as set forth in this Section.  At the

11  time of the confirmation hearing, any Class that does not contain an Allowed Claim (or a Claim

12  temporarily or provisionally allowed by Bankruptcy Court for voting purposes) will be deleted

13  from the Plan with respect to voting on confirmation of the Plan.  The Classes of Claims under

14  this Plan are as follows:

15  **A.    CLASS 1 – ADMINISTRATIVE EXPENSE CLAIMS**

16    This Class is comprised of all Administrative Expense Claims, including Claims of

17  Debtors' bankruptcy counsel and other professionals, such as LTV, retained by Debtors, unpaid

18  United States Trustee's Fees, and any other Allowed Claims expressly approved by the Court

19  under Section 503(b).  This Class is estimated to include approximately $450,000 of attorneys'

20  fees and costs of Buchalter Nemer plus $125,000 for the 20% holdback of compensation due and

21  owing to LTV.  Debtors expect that the unpaid Administrative Expense Claims will total no more

22  than $600,000 at the Effective Date.  Debtors anticipate that most Administrative Expense Claims

23  will be funded through the net operating proceeds of the Properties and the Equity Auction

24  Proceeds.

25  **B.    CLASS 2 – GE CAPITAL ALLOWED SECURED CLAIM**

26    This Class is comprised of the GE Capital Allowed Secured Claim.  GE Capital asserts or

27  will assert that its Allowed Secured Claim is secured by a first priority lien on the Properties and

28  the Property Revenue derived therefrom, pursuant to the terms of the GE Capital Loan and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                      15

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000105

1    Security Documents.  GE Capital has asserted that indebtedness is in excess of $161.8 million.

2    The value of the Properties is $91.6 million.  Accordingly, the GE Capital Secured Claim is $91.6

3    million and the GE Capital Unsecured Deficiency Claim is approximately $70.9 million.

4       (1) **Valuation of Secured Claim**.  The *amount* of the Allowed Secured Claim

5    of GE Capital is subject to the provisions of Section 506(a) of the Bankruptcy Code in that it is

6    limited to the value of the property of Debtors in which GE Capital holds a valid lien interest.

7       (2) **Debtors' Disputes re Claim Amount**.  The *amount* of the GE Capital

8    Secured Claim (and any Allowed Unsecured Claim) of GE Capital is subject to Debtors'

9    surcharge claims against GE Capital under Section 506(c) of the Bankruptcy Code.

10      (3) **Adjudication of GE Capital Allowed Secured Claim**.  The GE Capital

11   Allowed Secured Claim will not become an Allowed Secured Claim until such time as the Court

12   enters an order that has become a Final Order resolving the various disputes regarding the amount

13   of GE Capital 's Secured Claim subject to any reduction for the GE Capital Surcharge Claim.

14   Such adjudication will take place in connection with the confirmation hearing on Debtors' Plan.

15      (4) **Disallowed Class 2 Claims**.  Any portion of the Class 2 Claim that is

16   Disallowed as a Class 2 Allowed GE Capital Secured Claim but is otherwise an Allowed Claim

17   shall be treated as a Class 7 – GE Capital Unsecured Deficiency Claim in accordance with the

18   Court orders Allowing such Claims.

19     **C.** **CLASS 3 – MECHANICS' LIEN CLAIMS**

20     This Class is comprised of the holders of Allowed Claims that are secured by valid and

21   perfected statutory liens on the Properties pursuant to the applicable laws of the States in which

22   the Properties are located relating to the provision of labor, professional services, materials,

23   machinery, fixtures or tools in the construction, alteration or repair of any building, other

24   structure or improvement upon or for the benefit of the Properties ("**Mechanic's Lien Statutes**").

25   Debtors are aware of numerous mechanics' liens recorded as of the Petition Date.  Since the

26   Mechanics' Lien Claims are completely undersecured, these Allowed Claims will be treated as

27   Unsecured Claims – Trade Creditors under Class 7 of this Plan.  Moreover, any unperfected liens

28   or other claims on account of the Properties or Debtors of the type identified in the Mechanic's

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
BN 4894886v1  16

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000106

1   Lien Statutes will be treated as Unsecured Claims - Trade Creditors under Class 7 of this Plan.

2           **D.    CLASS 4 – EMPLOYEE WAGE CLAIMS**

3           This Class is comprised of the holders of any Allowed Unsecured Claims entitled to

4   priority pursuant to Section 507(a)(4) for unpaid employee wage claims.  Class 4 Allowed Claims

5   will be Allowed and paid subject to the statutory cap presently set at $10,950.00 as provided in

6   the treatment provisions of Class 4, with the balance being treated as a General Unsecured Claim

7   in Class 7 of this Plan (or Class 9 depending on the residual balance of such Claim).

8           **E.    CLASS 5 – SECURITY DEPOSIT CLAIMS**

9           This Class is comprised of the holders of any Allowed Claims for a refund of Security

10  Deposits under Section 507(a)(7).  Class 5 Allowed Claims will be Allowed and paid subject to

11  the statutory cap presently set at $2,425.00 as provided in the treatment provisions of Class 5,

12  with the balance being treated as a General Unsecured Claim in Class 7 of this Plan (or Class 9

13  depending on the residual balance of such Claim).

14          **F.    CLASS 6 –PROPERTY TAX CLAIMS**

15          This Class is comprised of the holders of Allowed Claims arising out of the pre-petition

16  assessment by any governmental unit of any ad valorem property tax under Section 507(a)(8) of

17  the Bankruptcy Code.

18          **G.    CLASS 7 – GENERAL UNSECURED CLAIMS – TRADE CREDITORS**

19          Class 7 shall consist of the holders of Allowed Claims arising from the provision of labor,

20  professional services, materials, machinery, fixtures or tools in the construction, alteration or

21  repair of any building, other structure or improvement upon or for the benefit of Debtors'

22  Properties.  From a review of its records, Schedules to its Bankruptcy Petitions and the Proofs of

23  Claim filed to date, Debtors estimate that the amount of Class 7 Allowed Claims will be in excess

24  of $3.5 million, which includes the Class 3 unsecured deficiency claims of Mechanics'

25  Lienholders, and any Class 4 and Class 5 Allowed Claims that exceed the statutory limits

26  proscribed by Section 507(a) of the Bankruptcy Code.

27          **H.    CLASS 8 – GE CAPITAL UNSECURED DEFICIENCY CLAIM**

28          Class 8 is comprised of all Allowed Claims of GE Capital asserted by GE Capital that is



BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    17

---

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000107

1  not the Allowed GE Capital Secured Claims as provided for in Class 2.  The total Claim asserted

2  by GE Capital is believed to be in the approximate amount of $161,800,000.  Based on the value

3  of the Properties, Debtors believe that the unsecured deficiency claim allowed in Class 7 will be

4  approximately $70,200,000.

5        **I.**     **CLASS 9 – ADMINISTRATIVE CONVENIENCE CLASS**

6       This Class consists of Allowed Claims that would ordinarily be treated in Class 7 but for

7  the amount of such Allowed Claim does not exceed $500.00 pursuant to Section 1122(b) of the

8  Bankruptcy Code.  This Class will also consist of holders of Allowed Claims that exceed the

9  $500.00 administrative convenience limit, but that elect to have their Allowed Claim reduced to

10  the $500.00 administrative convenience amount.  There are a sufficient number of smaller claims

11  to support the creation of this Class 9.

12        **J.**     **CLASS 10 – EXISTING EQUITY INTERESTS**

13       Class 10 is comprised of the holders of the existing membership interests in GTS and

14  Gulfstream and includes any interest in Debtors, as well as any rights or Claims asserted against

15  Debtors with regard to such Interests.

16  **V.**     **TREATMENT OF ALLOWED CLAIMS AND INTERESTS**

17       The following is the description of the treatment proposed for the Claims by each Class of

18  Creditors, Class of Interests, and holders of Administrative Expense Claims of these Estates as

19  classified in the Plan.  The Plan is intended to treat all Claims against the Estates of whatever

20  character, whether or not contingent or liquidated, and whether or not allowed by the Court

21  pursuant to Section 502(h) of the Bankruptcy Code.  However, only those Claims that are

22  Allowed Claims under the Plan, and allowed pursuant to Section 502(a) of the Bankruptcy Code,

23  will receive payment under the Plan.

24        **A.**     **TREATMENT OF CLASS 1 – ADMINISTRATIVE EXPENSE CLAIMS**

25       Class 1 Allowed Claims shall be paid in full on the later of (1) the Effective Date, (2) the

26  date on which such Claim becomes an Allowed Claim, or (3) the date that payment of such

27  Allowed Claim is due under ordinary business terms.  In the event Debtors do not have sufficient

28  funds to pay all Allowed Administrative Expense Claims that are due in full on the Effective

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1     18

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000108

1    Date, any unpaid balance, upon prior agreement in writing by the holder of such Allowed

2    Administrative Claim and Debtor, may be paid on an agreed deferred schedule.  Any such

3    agreements shall be disclosed in writing prior to the Effective Date, and shall not prejudice the

4    priority of such Allowed Administrative Claim in any further or other proceedings thereafter.

5    *Class 1 Claims are not entitled to vote on the Plan.*

6    **B.    TREATMENT OF CLASS 2 – GE CAPITAL SECURED CLAIM**

7                    1.    **Valuation Limitation.**

8            The Class 2 Allowed Claim shall be limited to the GE Capital Secured Property Value,

9    less the value of the GE Capital Surcharge Claim, if any.  In the event Debtors and GE Capital are

10   not able to agree on the Secured Property Value on or before the Confirmation Date, Debtors may

11   file a motion to value the secured portion of GE Capital's Allowed Claim pursuant to Section

12   502(b) of the Bankruptcy Code.  The valuation issue may be determined at the Confirmation

13   Hearing or at a separate hearing.

14                   2.    **Lien Retention.**

15           To the extent determined by a Final Order arising out of an Adversary Proceeding or other

16   proceeding regarding the valuation of the GE Capital Surcharge Claim, the holder of the Allowed

17   Class 2 Secured Claim shall retain its lien interests in the Properties as security for its Allowed

18   Secured Claim.  The GE Capital Loan and Security Documents shall remain of record, except that

19   they shall be modified by written and recorded amendment as necessary to be made consistent

20   with the terms of the Plan, the Confirmation Order, and any Final Order regarding the Class 2

21   Claims.

22                   3.    **Section 1111(b) Election.**

23           As set forth in more detail below, if the holder of the Class 2 Claim timely elects to be

24   "fully secured" under Section 1111(b)(2) of the Bankruptcy Code, then the Secured Property

25   Value must still be determined for purposes of calculating interest payments due under the Plan,

26   but the amount of the lien securing the Allowed Class 2 Secured Claim will not be limited to the

27   Secured Property Value.  Thus, if GE timely makes the Section 1111(b) election, the interest

28   payments due to GE Capital will be reduced based on the Plan Section 1111(b) Interest Rate.  The

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    19

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000109

1    mention of any valuation report, appraisal, or opinion of value in this Plan or in the Disclosure

2    Statement shall not act to bind Debtors or any other party to a particular valuation of the

3    Properties, which remains to be determined by agreement or by the Court.

4                    **4.    Payment of the Allowed Class 2 Secured Claim.**

5                        (1)    <u>Bifurcated Claim</u>.

6            Unless GE Capital is eligible to and timely elects in writing (See Fed. R. Bankr. P. 3008)

7    to be "fully secured" by asserting its rights under Section 1111(b)(2) of the Bankruptcy Code, any

8    Allowed Claims of GE Capital in excess of the Allowed Class 2 Secured Claim shall be treated as

9    a Class 8 GE Capital Unsecured Deficiency Claim.  The principal and interest on the GE Capital

10   Allowed Class 2 Claim shall be paid as set forth in this subsection if GE Capital's Allowed Claim

11   is valued and bifurcated into an Allowed Secured Class 2 Claim and an Allowed GE Capital

12   Unsecured Deficiency Claim treated under Class 8.

13                        (i)    **Payments on the Allowed Secured Class 2 Claim**.

14   Following entry of a Final Order determining the value of the GE Capital Secured Property Value

15   and the GE Capital Surcharge Claim, and therefore, the amount of the Allowed Class 2 Claim,

16   Reorganized Debtor shall commence making monthly payments to GE capital on account of the

17   Allowed Class 2 Claim.  Reorganized Debtor shall pay the Holder of the Allowed Class 2 Claim

18   monthly interest-only payments calculated based on the Plan Secured Interest Rate over a 10-year

19   period.  The balance of the Allowed Secured Class 2 Claim shall be paid in full at the end of the

20   10th year following the Effective Date accomplished through the sale or refinancing of the

21   Properties.  Debtors anticipate that the Property Revenue from the ongoing operation of the

22   Properties will be sufficient to pay monthly payments to GE Capital on account of its Allowed

23   Class 2 Claim.  Payment in full or partial satisfaction of the Allowed Class 2 Claim may be made

24   at any time without penalty.  The following chart summarizes such payments:

25

| Estimated GE Capital Secured Property Value: | $91,600,000 |
|---|---|
| Anticipated Effective Date: | May 1, 2010 |
| Payment Frequency: | Monthly |
| Estimated Periodic Payment: | $362,583.33 |

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    20

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000110

| Plan Secured Interest Rate: | 4.75% |
| Estimated Total Payment: | $135,110,000.00 |

(ii)    **Interest on the Allowed Secured Class 2 Claim**. Commencing on the Effective Date, the Allowed Secured Class 2 Claim shall accrue interest at the Plan Secured Interest Rate.  Interest shall not be capitalized, and there shall not be interest assessed on the unpaid, accrued interest.

(2)    ALTERNATIVE - Fully Secured Treatment – 1111(b) Election.

In the event that GE Capital is eligible to and elects to be "fully secured" by asserting an election to be treated under Section 1111(b) of the Bankruptcy Code, then GE Capital shall receive the alternative treatment set forth in this subsection.  If Section 1111(b) treatment is timely and validly elected, then GE Capital's Allowed Class 2 Claim will receive the same treatment set forth above in subsection (I) Bifurcated Treatment, except the following modifications shall apply:

(i)    **No Deficiency Claim**.  GE Capital shall forgo and waive any unsecured deficiency claim and shall have no Allowed Unsecured Claim in Class 8;

(ii)    **Interest on the Allowed Secured Class 2 Claim**. Commencing on the Effective Date, the Allowed Secured Class 2 Claim shall accrue interest at the Plan Section 1111(b) Interest Rate.  Interest shall not be capitalized, and there shall not be interest assessed on the unpaid, accrued interest.

(iii)    **Extended Term**.  Because of the large difference between the full lien amount and the value of the Properties, the effect of this election would be to require a substantially larger payout to Class 2 Claims over the life of the Plan, even though interest will only be earned and paid on the GE Capital Secured Property Value.  To accommodate for the potential additional amounts due over and above the GE Capital Secured Property Value, the payment terms under this election shall be extended.  Thus, under the Section 1111(b) election, the period for Class 2 payments shall be extended to at least a 20-year period, and at the end of such time (*i.e.*, the 20th-year Anniversary of the Effective Date) the entire unpaid amount of the Class 2 Allowed Secured Claim must be fully satisfied.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

21

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000111

1   (iv)    **Final Payoff**.  Under the Section 1111(b) election, the

2   Allowed Class 2 Secured Claim (on the Effective Date) shall be deemed satisfied in full when the

3   gross amount of distributions made to GE Capital under the Plan (whether denominated principal

4   or interest payments) equals the Allowed Class 2 Secured Claim.

5   5.    **Additional Limitations on Class 2 Allowed Claim.**

6   Under any of the foregoing provisions, the Allowed Class 2 Secured Claim shall not

7   include any default interest, prepayment penalties, yield maintenance premiums, late charges,

8   amounts due under any penalty rate provision or penalty provisions of the GE Capital Loan or the

9   GE Capital Loan and Security Documents, or attorneys' fees or costs that accrued or arose after

10   the Petition Dates.  After the Effective Date, the holder of the Class 2 Allowed Secured Claim

11   may not seek reimbursement or add to the amount of the Class 2 Allowed Secured Claim any

12   default interest, appraisal fees, title costs, charges, attorneys' fees or other amounts unless there

13   has been a default by Debtors with respect to the payments required under the Plan.  Any and all

14   costs, fees, late fees, default interest, penalty provisions or charges arising or relating to events

15   occurring prior to the Effective Date shall be waived and forever released unless included and

16   allowed as part of the Allowed Class 2 Secured Claim.  On the Effective Date, the GE Capital

17   Loan and Security Documents shall be deemed amended such that the terms of the Plan shall

18   control; no condition that existed prior to the Effective Date, including the filing of these Cases,

19   shall serve as a basis for asserting a default under the GE Capital Loan and Security Documents.

20   *The Class 2 Claim is impaired and its Holder is entitled to vote to accept or reject the Plan*.

21   **C.    TREATMENT OF CLASS 3 – MECHANIC'S LIENHOLDER CLAIMS**

22   The Allowed Class 3 Mechanic's Lienholder Claims shall be treated as follows:

23   1.    **Treatment of Class 3 Claims**.

24   (a)    **Valuation Limitation**.  The Class 3 Allowed Claim shall be

25   limited to the value of the holders ("**Class 3 Claimants**") of all Allowed Class 3 Secured Claims'

26   validly perfected lien interests in the Properties as of the Petition Date, less any senior liens or

27   Allowed Secured Claims having higher priority ("**Secured Property Value**").  In the event

28   Debtors and Class 3 Claimants are not able to agree on the Secured Property Value applicable to

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

22

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000112

1   Class 3 on or before the Confirmation Date, then Debtors may file a motion to value the secured

2   portion of Class 3 Claimants' Allowed Claims pursuant to Section 502(b) of the Bankruptcy

3   Code.  The valuation issue may be determined at the Confirmation Hearing or at a separate

4   hearing.  The Class 3 Allowed Secured Claims shall have *pari passu* priority within one another.

5   It is anticipated that the Secured Property Value will be substantially less than the total amount of

6   the GE Capital Claim thereby leaving the Class 3 Allowed Claims completely undersecured.

7   Accordingly, the entire amount of the Class 3 Allowed Claims will be treated in Class 7.  For

8   purposes of the Plan, the holders of the Allowed Class 3 Secured Claim shall release any lien

9   interests in the Properties in exchange for payment of their Allowed Class 3 Secured Claims.

10             (b)      **Section 1111(b) Election**.  Since the Class 3 Allowed Claims are

11  completely undersecured, such liens securing those Claims are of inconsequential value and are

12  thereby prevented from making the Section 1111(b) election.

13             2.      **Payment of the Allowed Class 3 Secured Claims**.

14             (a)      ~~**Bifurcated Claims**~~.  Any Allowed Claims of Class 3 Claimants in

15  excess of the Allowed Class 3 Secured Claim shall be treated as a Class 7 General Unsecured

16  Claims.  Debtors anticipate that the entirety of the Allowed Class 3 Claims will be an unsecured

17  deficiency claim treated under Class 7.  For payment information on Class 7, see Treatment of

18  Allowed Class 7 Claims, *infra*.

19             (b)      **ALTERNATIVE -Fully Secured Treatment – 1111(b) Election**.

20  Since the value of the liens securing the Class 3 Allowed Claims are of inconsequential value, the

21  Class 3 Claimants are not entitled to the Section 1111(b) election.

22  ***Class 3 Claims are impaired and their holders are entitled to vote to accept or reject the Plan***.

23      **D.      TREATMENT OF CLASS 4 – PRIORITY UNSECURED EMPLOYEE
               WAGE CLAIMS**

24
         The holder of an Allowed Class 4 Claim will be paid on account of the Class 4 Claim an

25  amount equal to the lesser of: (1) the statutory cap of $10,950.00 set forth in Section 507(a)(4) of

26  the Bankruptcy Code, or (2) the amount of the unpaid accrued wages, vacation, sick and

27  severance pay on which the Allowed Class 4 Claim is based.  The Reorganized Debtor shall pay

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                    23

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000113

each holder of an Allowed Class 4 Claims one hundred percent (100%) of the Allowed Class 4 Claims quarterly over the one year period following the Effective Date of the Plan. Interest shall accrue on the Allowed Class 4 Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full. Any Claims asserted in Class 4 that are Allowed Claims that exceed the statutory cap shall be treated as a General Unsecured Claim in Class 7 of the Plan. The following chart summarizes the payments to the holders of the Class 4 Allowed Claims:

| Total Amount of Class 4 Allowed Claims: | $160,050.27 |
|---|---|
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment: | May 1, 2011 |
| Estimated Total Payment: | $160,310.35 |
| Plan Unsecured Interest Rate: | 0.26% |
| Percent of Allowed Claim Paid: | 100% |

***Class 4 Claims are impaired and their holders are entitled to vote to accept or reject the Plan***.

**E.    TREATMENT OF CLASS 5 – PRIORITY UNSECURED SECURITY DEPOSIT CLAIMS**

The holder of an Allowed Class 5 Claim will be paid on account of the Class 5 Claim, an amount equal to the lesser of: (1) the statutory cap of $2,425.00 set forth in Section 507(a)(7) of the Bankruptcy Code, or (2) the amount of the security deposit on which the Allowed Class 5 Claim is based. The Reorganized Debtor shall pay each Holder of an Allowed Class 5 Claims one hundred percent (100%) of the Allowed Class 5 Claims quarterly over the one year period following the Effective Date of the Plan. Interest shall accrue on the Allowed Class 5 Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full. Any Claims asserted in Class 5 that are Allowed Claims that exceed the statutory cap shall be treated as a General Unsecured Claims in Class 7 of the Plan. The following chart summarizes the payments to the holders of the Class 5 Allowed Claims:

| Total Amount of Class 5 Allowed Claims: | $62,238.89 |
|---|---|
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | August 1, 2010 |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                    24

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000114

| Payment Frequency: | Quarterly |
|---|---|
| Final Payment: | May 1, 2011 |
| Estimated Total Payment: | $62,340.03 |
| Plan Unsecured Interest Rate: | 0.26% |
| Percent of Allowed Claim Paid: | 100% |

*Class 5 Claims are impaired and their holders are entitled to vote to accept or reject the Plan.*

### F.    TREATMENT OF CLASS 6 - PRIORITY UNSECURED TAX CLAIMS

The holder of an Allowed Class 6 Claim will be paid on account of the Class 6 Claim, an amount equal to the assessed ad valorem property tax under Section 507(a)(8) of the Bankruptcy Code.  The Reorganized Debtor shall pay each Holder of an Allowed Class 6 Claims one hundred percent (100%) of the Allowed Class 6 Claims on or before 60th day following the Effective Date of the Plan.  Interest shall accrue on the Allowed Class 6 Claim from the Effective Date at the Plan Unsecured Interest Rate until paid in full.  The following chart summarizes the payments to the holders of the Class 6 Allowed Claims:

| Total Amount of Class 6 Allowed Claims: | $11,323.49 |
|---|---|
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | June 29, 2010 |
| Payment Frequency: | Once |
| Estimated Total Payment: | $11,328.40 |
| Plan Unsecured Interest Rate: | 0.26% |
| Percent of Allowed Claim Paid: | 100% |

*Class 6 Claims are impaired and their holders are entitled to vote to accept or reject the Plan.*

### G.    TREATMENT OF CLASS 7 – GENERAL UNSECURED CLAIMS - TRADE CREDITORS

The holders of Allowed Class 7 Claims shall receive, on account of their Allowed Class 7 Claims, deferred cash payments equal to a percentage of their Allowed Class 7 Claim to be calculated with regard to the Class 8 Distribution Percentage.  For example, if the Class 8 GE Capital Unsecured Deficiency Claim is valued at $70 million, and the GE Capital TIC Interest that GE Capital will receive in satisfaction of its Class 8 deficiency claim is valued at $7.0

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

25

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000115

million, then the Class 8 Distribution Percentage is ten percent (10%), and the holders of the Allowed Class 7 Claims will receive a ten percent (10%) distribution on account of their Allowed Class 7 Claim. The current percentage is calculated to be 5.5%, subject to any upward revision on or before the Confirmation Hearing.

The Reorganized Debtor shall pay each Holder of an Allowed Class 7 Claim the Class 8 Distribution Percentage of the Allowed Class 7 Claims quarterly over a two year period with the first payment commencing on the Effective Date and with each subsequent payment made every ninety (90) days thereafter until the Allowed Class 7 Claim is paid in full. Interest shall accrue on the Allowed Class 7 Claim from the Effective Date at the Plan Unsecured Rate Interest until paid in full. The following chart summarizes the payments to holders of the Class 7 Allowed Claims:

| Total Amount of Class 7 Allowed Claims Greater Than $500: | $1,886,006.74 |
|---|---|
| Amount of Class 3 Claim Greater Than $500: | $1,788,535.65 |
| Amount of Class 4 Unsecured Excess Claim Greater than $500: | $9,842.34 |
| Total Amount Treated Under Class 7: | $3,684,384.73 |
| Percent of Allowed Claim Paid: | 5.5% |
| Amount of Class 7 Claims to be Paid: | $202,641.16 |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment Date | May 1, 2012 |
| Estimated Total Payment: | $203,233.89 |
| Plan Unsecured Interest Rate: | 0.26% |

***Class 7 Claims are impaired and their holders are entitled to vote to accept or reject the Plan***.

### H.   TREATMENT OF CLASS 8 – GE CAPITAL UNSECURED DEFICIENCY CLAIM

Class 8 consists of the GE Capital Unsecured Deficiency, which shall be calculated pursuant to a Final Order by this Court determining the amount of the GE Capital Secured Property Value and any reduction for the GE Capital Surcharge Claim. GE Capital shall receive, on account of its Allowed Class 8 - GE Capital Unsecured Deficiency Claim, the GE Capital TIC

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    26

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000116

Interest, which is an undivided ten percent (10%) tenant-in-common interest in the Properties.

Prior to the Effective Date, GTSPPI will transfer its one hundred percent (100%) equity interest

in FLJC to Reorganized Debtor.  Within five (5) business days following the Effective Date,

Reorganized Debtor will transfer its one hundred percent (100%) equity interest in FLJC to GE

Capital or its authorized designee.  The following chart summarizes the payments to the Holder of

the Class 8 Allowed Claim:

| | |
|---|---|
| Total Amount of Class 8 Allowed Claim: | $70,214,464 |
| Anticipated Effective Date: | May 1, 2010 |
| GE Capital TIC Interest Distribution Date: | May 6, 2010 |
| GE Capital TIC Interest Percentage: | 10% |
| Value of GE Capital TIC Interest: | $3,356,891 |
| Amount of New Value Cash Contribution | $500,000 |
| Initial Cash Contribution Payment Date: | August 1, 2010 |
| Payment Frequency: | Quarterly |
| Final Payment Date | May 1, 2012 |
| Estimated Total Payment: | $501,462.50 |
| Plan Unsecured Interest Rate: | 0.26% |
| Total Consideration for Class 8 Allowed Claim: | $3,858,353.50 |
| Percent of Allowed Claim Paid: | 5.5% |

***The Class 8 Claim is impaired and its Holder is entitled to vote to accept or reject the Plan***.

**I.      TREATMENT OF CLASS 9 – ADMINISTRATIVE CONVENIENCE
CLASS**

Class 9 – Administrative Convenience Class shall consist of Allowed Class 7

Claims where the amount of such Allowed Claim is less than or equal to $500.00 pursuant to

Section 1122(b) of the Bankruptcy Code.  Class 9 shall also consist of the Allowed Claims of

Classes 3, 4, 5, 6, and 7, where the amount of such claim is greater than $500.00 and where the

Holder of such claim elects to have such Claim reduced to $500.00 and treated as a Class 9

Claim.  The holders of an Allowed Class 9 Claim will receive on account of the Class 9 Claim a

payment of $500.00 on the Effective Date.  The following chart summarizes the payments to the

holder of the Class 8 Allowed Claim:

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

27

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000117

| Total Amount of Class 9 Allowed Claims: | $25,447.02 |
| Anticipated Effective Date: | May 1, 2010 |
| Initial Payment Date: | May 1, 2010 |
| Payment Frequency: | Once |
| Estimated Total Payment: | $25,447.02 |
| Percent of Allowed Claim Paid: | 100% |

*Class 9 Claims are impaired and their holders are entitled to vote to accept or reject the Plan.*

### J.    TREATMENT OF CLASS 10 – EXISTING EQUITY INTERESTS

The holders of the existing membership interests in Debtors shall not receive anything on account of its existing equity interest.  Instead, GTSPPI will contribute the New Value Contribution, which will permit it to acquire an equity interest in the Reorganized Debtor. *Class 10 Interests are held by Insiders or Affiliates of Debtors and they are not entitled to vote to accept or reject the Plan.*

### K.    CONFIRMATION BY CRAMDOWN

Debtors hereby request confirmation of this Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any Class of Claims that is impaired and does not vote to accept this Plan, and with respect to any Class of Claims or Interests that is deemed to have rejected this Plan.

### VI.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Formation of Reorganized Debtor and Transfer of Assets.

On or before the Effective Date, Reorganized Debtor will be formed as a Delaware limited liability company by the filing of the Reorganized Debtor Certificate of Formation with the Delaware Secretary of State.  Reorganized Debtor will be treated as a partnership for federal income tax purposes.  If any changes to the Reorganized Debtor's corporate documents are required under the terms of this Plan or the Confirmation Order, then such amendments shall be made prior to the Effective Date.  On the Effective Date, GTSPPI will contribute the 100% membership interests of GTS and Gulfstream to Reorganized Debtor.  Further, Reorganized Debtor will acquire substantially all of the assets of Debtors.  In addition, contemporaneously with such acquisition, Reorganized Debtors will assume the obligations set forth in the Plan.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                              28

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000118

**B.     Reorganized Debtor – Powers, Duties and Management.**

After the Confirmation Date, as well as after the Effective Date, the Reorganized Debtor shall be empowered to and shall continue its ordinary course business operations.  The Reorganized Debtor shall be governed by its Articles of Organization and Operating Agreement, and be empowered to do all business without Bankruptcy Court approval including but not limited to the items discussed below, unless such act is specifically limited by this Plan.

1.     <u>Leasing of Units at the Properties</u>.  The Reorganized Debtor shall have the power to operate its business and the Properties in the ordinary course.  Reorganized Debtor's operations shall include all decisions with regard to the rental and marketing of the Properties and performing repairs to the Properties necessary to retain a competitive market housing product.

2.     <u>Authority to Prosecute Claims</u>.  The Reorganized Debtor shall have the power to bring, dismiss or compromise any Causes of Action, and other proceedings discussed herein, and all matters pertaining to the implementation of this Plan.

3.     <u>Retention and Payment of Professionals</u>.  Until the Effective Date, all applicable Bankruptcy Code Sections and Rules pertaining to the employment and compensation of Professionals shall be applicable to the Case.  However, from and after the Effective Date, the Reorganized Debtor is empowered to retain and compensate professional persons in the ordinary course of business for all services provided after the Effective Date.

4.     <u>Act as Disbursing Agent</u>.  Unless otherwise set forth in the Confirmation Order, the Reorganized Debtor shall act as Disbursing Agent under the Plan.  The Disbursing Agent shall ensure that Initial Distributions provided for under this Plan are accurately and timely made.  The Disbursing Agent shall create and maintain a register of all Allowed Claims and a record of all payments made on account of such Allowed Claims.  The Disbursing Agent shall calculate (with the assistance of any professionals deemed necessary) the pro-rata distributions and make other calculations necessary to implement the provisions of this Plan regarding distributions to Creditors.

5.     <u>Extraordinary Transactions Regarding the Properties</u>.  If at any time after the Effective Date, the Reorganized Debtor obtains opportunities for new financing, new equity

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                      29

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000119

1    funds, or a sale of the Properties that is sufficient satisfy the Allowed Claims and Interests

2    hereunder that have not been previously satisfied, and such opportunity is in the Reorganized

3    Debtor's business judgment a beneficial transaction for the Reorganized Debtor and Creditors and

4    Interest holders, the Reorganized Debtor may proceed with such transaction after satisfying the

5    following conditions:  (1) Reorganized Debtor shall provide prior written notice of the proposed

6    transaction to any unpaid creditors holding Allowed Claims or Disputed Claims under the Plan at

7    least fifteen (15) days prior to entering into such transaction (though the Reorganized Debtor may

8    enter into such transaction if it is expressly subject to the provisions of the Plan and this

9    Paragraph), (2) any person, including the Reorganized Debtor, may request a court hearing to

10    object to or to facilitate consummation of the proposed transaction within the fifteen (15) day

11    period (or prior thereto for the Reorganized Debtor).  The standard in such hearing shall be

12    whether the proposed transaction satisfies the criteria in this paragraph and is generally in the best

13    interests of the Reorganized Debtor, its Creditors and its holders of Interest.

14            6.    Vesting of Property.  Pursuant to Sections 541(a) and 1141(b) of the

15    Bankruptcy Code, all property of Debtors will vest in the Reorganized Debtor at Confirmation,

16    free and clear of all liens, Claims, encumbrances and interests, except as expressly provided in the

17    Plan in regard to Allowed Secured Claims.

18            7.    Post Confirmation Management and Compensation.  The Reorganized

19    Debtor itself shall be managed after the Effective Date by the current management of GTSPPI,

20    LTV and the Local Property Managers, the very same individuals that were instrumental in the

21    successful rehabilitation, repopulation and turnaround of the Properties. Debtors shall not

22    compensate the management of GTSPPI for their management services, except for

23    reimbursement of direct expenses made or incurred by them on behalf of the Reorganized Debtor

24    or the Properties after the Effective Date that are otherwise authorized under the Plan.  Following

25    confirmation, the Reorganized Debtor shall retain LTV to continue serving as its portfolio asset

26    manager and financial advisor and Chartwell and Lincoln to serve as local property managers.

27            8.    Post Confirmation Notice.  Any Creditor desiring to be notified of any

28    court proceedings or other notices under the Plan to be made after the Effective Date **must file** a

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

30

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000120

1    Request for Notice with Debtors and the Clerk of the Bankruptcy Court within thirty (30) days of

2    receiving a written notice of the entry of the Confirmation Order.  The Confirmation Order will

3    set forth this requirement, and shall be served on all creditors and interested parties.  All parties

4    requesting such notice or entitled to notice shall be included on the post-confirmation notice list

5    (the "**Post Confirmation Notice List**")

6              9.      <u>Reports After the Effective Date</u>.  The Reorganized Debtor, beginning six-

7    months after the Effective Date, and thereafter at least once per year, shall provide parties on the

8    Post-Confirmation Notice List a financial report summarizing the operations of the Reorganized

9    Debtor, the receipts and disbursements made by the Reorganized Debtor, and an update of the

10   payments made to each Class under the Plan.

11         **C.      Issuance of Equity Interests of Reorganized Debtor.**

12         Reorganized Debtor will be authorized to issue one class of limited liability company

13   membership interest, referred to in this Disclosure Statement as the "**New Shares**."  The New

14   Shares consist of the Series A Shares, which Reorganized Debtor shall be authorized to issue

15   10,000 shares.  On the Effective Date, Reorganized Debtor issue all 10,000 shares of the Series A

16   Shares to the successful New Value Auction Bidder.  The Series A Shares shall be validly issued,

17   fully paid and non-assessable as of the Effective Date.  The Series A Shares shall be fully vested

18   upon issuance.  New Shares generally will be entitled to allocation of profits and losses, and the

19   distribution of cash flow from operations and capital transactions, by Reorganized Debtor.

20   Reorganized Debtor will make distributions from available cash designed to enable the holders to

21   pay taxes on operating income allocated to them by Reorganized Debtor, such taxes being

22   computed on the assumption that each holder is subject to taxation at the maximum effective

23   federal, state and local income tax rates applicable to a corporation doing business in California

24   ( "**Tax Distributions**").  No Tax Distributions shall be made on account of cash liquidity events,

25   *e.g.*, a sale of the assets of Reorganized Debtor for cash.

26         The New Shares will be entitled to a single vote per share.  Subject to certain exceptions,

27   all the holders of New Shares will vote together as a class.  Subject to a Shareholders Agreement

28   to be entered into as of the Effective Date among Reorganized Debtor and the holders of New

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

31

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000121

1  Shares, the holders of New Shares shall be entitled to elect the Board of Directors of Reorganized

2  Debtor.  Certain matters may require the affirmative vote or written consent of holders of a

3  supermajority of the then outstanding New Shares.  In addition, certain matters may require the

4  affirmative vote or written consent of a majority or supermajority of each series of New Shares.

5  Additional classes of limited liability company interests may be authorized by the Board.

6       **D.**     **New Value Contribution and Required Market Test.**

7       1.   <u>New Value Contribution</u>.  GTSPPI will acquire one hundred percent

8  (100%) of the equity interests of Reorganized Debtor (the "**New Value Interest**") in exchange its

9  contribution of (i) one hundred percent (100%) of its equity interests in KT Terraza, (ii) one

10  hundred percent (100%) of its equity interests in FLJC, and (iii) $2,500,000 (the "**New Value**

11  **Contribution**").  GTSPPI will be entitled to receive a fifteen percent (15%) preferred divided on

12  account of the cash component of the New Value Contribution payable from Net Cash Flow as

13  provided for in **Exhibit 2.**

14       2.   <u>Market Test of New Value</u>.  In order to determine whether GTSPPI's

15  proposed New Value Contribution is fairly valued and to maximize the amount of the New Value

16  Contribution, Debtors will conduct an auction of the New Value Interest (the "**New Value**

17  **Auction**") prior to the Confirmation Hearing.  The New Value Auction shall take place on

18  _____, 2010, which is two Business Days prior to the date of the Confirmation Hearing, at

19  the offices of Buchalter Nemer located at 1000 Wilshire Boulevard, Suite 1500, Los Angeles,

20  California 90017.

21       3.   <u>New Value Auction Procedures</u>.  The New Value Auction shall be

22  conducted in accordance with the following procedures:

23       a.   Qualification of Competing Bidders.  In order for a competing bidder to

24  qualify to bid at the New Value Auction (a "**Qualified Bidder**") each competing bidder must:

25       (i)   submit with its New Value Competing Bid (as defined below)

26  information sufficient so as to demonstrate the Qualified Bidder's financial ability

27  to consummate the transaction as proposed (which information may be considered

28  by the Debtors' professionals and which information may be submitted in

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                         32

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000122

1    confidence, provided that failure to disclose information to an objecting party may

2    adversely effect such Qualified Bidder's status as a competing bidder) and must

3    be determined by Debtors to be able to consummate such transaction. Each such

4    Qualified Bidder agrees, by submitting a bid, to comply with all reasonable

5    requests from the Debtors for information regarding the Qualified Bidder's

6    financial condition and ability to consummate the transactions; and

7    (ii)    submit a New Value Competing Bid (as defined below) so that it is

8    received by Debtors by 12:00 p.m. PST on _____, 2010 (the "**Bid Due**

9    **Date**") [which date shall be five (5) Business Days prior to the date of the

10    Confirmation Hearing] through the following representatives:

11          Bernard D. Bollinger, Jr., Esq.
              Buchalter Nemer, PC
12          1000 Wilshire Boulevard, Suite 1500
              Los Angeles, California 90017
13          Telephone: (213) 891-0700
              Facsimile: (213) 896-0400
14

15    (iii)    submit a deposit in the amount of twenty percent (20%) of the

16    proposed New Value Competing Bid (the "**Deposit**"), via cashier's check or wire

17    transfer payable to Gulfstream Apt. Portfolio, LLC, as Debtor-in-Possession,

18    pursuant to wire instructions available upon request from Debtors;

19    (iv)    by entering into a New Value Acquisition Agreement,

20    (v)    by entering into a New Value Acquisition Agreement or

21    submitting a New Value Competing Bid, each Qualified Bidder shall be deemed

22    to have consented to the core jurisdiction of the Bankruptcy Court and to have

23    waived any right to jury trial in connection with any disputes relating to the New

24    Value Auction and/or sale of the New Value Interest; and

25    (vi)    As the initial bidder, GTSPPI is deemed a Qualified Bidder without the

26    need to comply with the foregoing.

27    b.    ~~Competing Bids~~. The term "New Value Competing Bid" means an offer to

28    purchase the New Value Interest in a writing signed by an authorized representative of the

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1    33

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000123

1   Qualified Bidder and which:

2            (i)      contains a detailed description of all relevant terms or conditions

3        that differ from the terms and conditions contained in the respective New Value

4        Agreement (to the extent not disclosed, the terms of the bid shall be presumed to

5        be identical to those in the applicable New Value Agreement except for those

6        terms relating to the Break-Up Fee and Expense Reimbursement);

7            (ii)     is accompanied by (a) a proposed agreement, executed by an

8        authorized representative of the Qualified Bidder subject only to Debtors'

9        acceptance at the conclusion of the New Value Auction (as the same may be

10       modified during the auction) and approval of the Bankruptcy Court, and (b) a

11       redline showing the differences between the Bidder's proposed agreement and the

12       New Value Agreement;

13           (iii)    is accompanied by the Deposit described above;

14           (iv)     is accompanied by appropriate evidence of corporate authority for

15       submitting a New Value Bid on the Qualified Bidder's behalf; and

16           (v)      proposes a closing date no later than the Confirmation Date.

17           c.       Auction.  If a New Value Competing Bid by a Qualified Bidder other than

18   by GTSPPI is timely submitted, the New Value Auction will be held at the place and on the date

19   and time noted above.

20           d.       Bidding Process at the New Value Auction.  The New Value Auction will

21   be conducted by Debtors, subject to the Court's further orders, as follows:

22           (i)      New Value Bids.  Debtors shall have the discretion to conduct the

23       New Value Auction as it deems likely to maximize the proceeds from sale of the

24       New Value Interest, net of transaction and other costs.  GTSPPI's proposed New

25       Value Contribution as set forth herein shall be deemed to be the opening bid.

26           (ii)     First Overbid.  The first overbid, if any, shall be the highest

27       Competing Bid with a Present Cash Value (defined below) that exceeds the offer

28       set forth herein by at least the amount of the maximum Break-Up Fee and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                          34

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000124

Expense Entitlement plus an amount to be determined by Debtors and disclosed upon request to competing Bidders (the "**First Overbid**").  The term "Present Cash Value " means the value attributed to a Competing Bid by Debtors as though it were made in cash at closing, taking into account discounts for future payments, discounts for risks, the Break-Up Fee and Expense Entitlement, and, as appropriate, intangible benefits.  Debtors shall upon request explain to the Bankruptcy Court at the Confirmation Hearing its analysis respecting Present Cash Value of each Competing Bid.

(iii)    Bid Increments.  Each bid after the First Overbid shall exceed the previous bid in Present Cash Value by an amount to be determined by Debtors and announced at or prior to the New Value Auction.

(iv)    Bidding Rounds.  Each Qualified Bidder shall have a reasonable opportunity after the commencement of the New Value Auction to make an overbid.  If no overbids are made, Debtors will close the bidding and award the sale to the Qualified Bidder whose bid has the highest Present Cash Value as determined by Debtors and approved by the Court.  If a qualified overbid is made, each Qualified Bidder will have a reasonable opportunity to make additional overbids.

(v)    Prohibition on Credit Bidding.  The New Value Auction is a sale of the equity interests of Reorganized Debtor and is being conducted under Sections 1123 and 1129 of the Bankruptcy Code.  As such no holder of a lien on any assets of the Debtors shall be permitted to credit bid pursuant to Section 363(k) of the Bankruptcy Code as such section is inapplicable to the New Value Auction.

e.    Winning Bids and Next Highest Bids.  At the conclusion of the auction process, including the combined portions referenced above, Debtors shall declare the last and highest bid for the New Value Interest as determined by Debtors the "**Winning Bid**" (made by the "**Winning Bidder**").  The next highest or otherwise best offer after the Winning Bid is the

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    35

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000125

1  "**Next Highest Bid**" (made by the "**Next Highest Bidder**").

2  f.  Back Up Bidder(s).  By participation in the New Value Auction, each

3  Qualified Bidder agrees that if it is a Next Highest Bidder, its Next Highest Bid will remain open

4  for five (5) business days after conclusion of the Confirmation Hearing in order to consummate

5  the sale of the New Value Interest to the Next Highest Bidder if for any reason the Winning

6  Bidder fails to close the sale contemplated by the Winning Bid.

7  g.  Deposits.  Debtors shall place all Deposits into a non- interest bearing trust

8  account pending conclusion of the Confirmation Hearing.  The Deposit (and interest thereon, if

9  any) of the Winning Bidder will constitute a deposit toward the Winning Bidder's payment

10  obligations and will constitute non-exclusive liquidated damages in the event the transaction does

11  not close as a result of a breach by the Winning Bidder.  The Deposit of the Next Highest Bidder

12  shall be returned to the Next Highest Bidder the earlier of two (2) business days after the closing

13  of the transaction and seven (7) business days after conclusion of the Confirmation Hearing.  All

14  other Bid Deposits together with interest thereon will be returned to their respective Competing

15  Bidders within two (2) business days of the conclusion of the Confirmation Hearing.

16  h.  Modification.  Debtors may supplement or modify the Bid Procedures as

17  they deem appropriate at or before the Auction.

18  i.  Breakup Fee and Expense Reimbursement.  Debtors are authorized to enter

19  into Purchase Agreements providing GTSPPI with a break-up fee (the "**Break-Up Fee**") and

20  reimbursement of Plan-related expenses (the "**Expense Reimbursement**") in the aggregate

21  amount of $500,000.  The Bankruptcy Court hereby approves Debtors' payment to GTSPPI of the

22  Break-Up Fee and the Expense Reimbursement in the event of a Break-Up Entitlement (as

23  defined below).  The Bankruptcy Court finds and concludes that (a) Debtors' determination to

24  agree to the Break-Up Fee and Expense Reimbursement is a good faith business judgment,

25  reasonable under the circumstances; (b) payment of the Break-Up Fee and Expense

26  Reimbursement is in the best interests of creditors in these cases; (c) inclusion of the Break-Up

27  Fee and Expense Reimbursement is likely to encourage bidding from other persons with interest

28  in the New Value Interest; (d) the Break-Up Fee and Expense Reimbursement represent a fair and

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

36

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000126

1    reasonable percentage of the proposed purchase price and is reasonably related to the risk, effort,

2    and likely expense of GTSPPI; (e) the Break-Up Fee and Expense Reimbursement are consistent

3    with comparable fees and expense reimbursements outside the bankruptcy context; and

4    (f) payment of the Break-Up Fee and Expense Reimbursement under the circumstances of a

5    Break-Up Entitlement is thus an actual, necessary expense of the estate.

6              j.    Break-Up Entitlement.  "**Break-Up Entitlement**" shall mean (a) GTSPPI

7    has not withdrawn its offer for the New Value Interest prior to the Auction; (b) GTSPPI is not the

8    Winning Bidder at the New Value Auction; and (c) the Winning Bidder (or the Next Highest

9    Bidder, if not the GTSPPI) actually closes the purchase of the New Value Interest in accordance

10    with the results of the New Value Auction (or in accordance with subsequent orders of the Court

11    following the New Value Auction).  In the event of a Break-Up Entitlement, at closing of the sale

12    of the New Value Interest to the Winning Bidder (or Next Highest Bidder, if appropriate), (a) the

13    Break-Up Fee shall be paid at closing from the proceeds of closing; and (b) Debtors shall reserve

14    from the sale proceeds the maximum Expense Reimbursement and shall retain such amount

15    pending further order of the Court respecting final determination of the amount of such Expense

16    Reimbursement to which GTSPPI is entitled.  GTSPPI's right to such funds (to the extent of the

17    Court's determination of amounts due) shall be senior in interest to that of any other Person,

18    including without limitation any prepetition or postpetition secured creditor of Debtors.  The

19    Expense Reimbursement shall be an administrative claim payable forthwith upon such

20    submission to Debtors of documentation supporting the Expense Reimbursement, with the Court

21    retaining jurisdiction to resolve any such claim on shortened notice upon request of either party.

22              k.    If no Competing Bids are received from Qualified Bidders prior to the Bid

23    Due Date, Debtors shall expeditiously so notify the Court and other appropriate parties-in-

24    interest.  In such event, the New Value Auction will not be held and the Court will hold the

25    Confirmation Hearing.  If any Competing Bids are received from Qualified Bidders prior to the

26    Bid Due Date, Debtors shall expeditiously so notify the Court, GTSPPI, and other appropriate

27    parties-in-interest.  In such event, the New Value Auction will be held as described above,

28    followed by the Confirmation Hearing as scheduled above.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                    37

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000127

### E.    Deemed Substantive Consolidation.

The Plan is premised upon a "deemed" substantive consolidation of Debtors solely for purposes of allowance of Claims, voting confirmation and distributions under the Plan.  As a result of this limited substantive consolidation, (a) all property, rights and claims of Debtors shall be deemed pooled for purposes of allowance, treatment and distributions under the Plan, (b) a holder of a Claim against more than one Debtor arising from or relating to the same underlying debt that would otherwise constitute Allowed Claims against each Debtor, including, without limitation, Claims based on joint and several liability, contribution, indemnity, subrogation, guaranty and similar legal concepts, shall have only one Allowed Claim on account of such Claims, and (c) all Intercompany Claims shall be disregarded.  The Plan contemplates that the Reorganized Debtor will succeed to the interests of both Gulfstream and GTS upon entry of the Confirmation Order.  This Plan serves as a motion pursuant to Section 105(a) of the Bankruptcy Code seeking entry of an order substantively consolidating the Cases for the limited purposes described herein.

## VII.    PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

### A.    Creditor Claims.

No payments or distributions will be made to any Creditor on account of a Claim unless and until the Creditor's Claim is an Allowed Claim.  The Reorganized Debtor or any party-in-interest may object to the allowance of any Claim by filing a written objection with the Bankruptcy Court.  ***Objections must be filed on or before the Claims Objection Date.***  If the Reorganized Debtor or an interested party objects to a Claim, or the Claim is designated in this Plan as a Disputed Claim, then the Claim will be treated as a Disputed Claim until the objection has been settled or fully adjudicated, although the Bankruptcy Court may estimate or temporarily allow a Disputed Claim (e.g., for voting purposes).  Distributions to Classes of Creditors under the Plan will not be made until the Bankruptcy Court has entered Final Orders resolving all Claim objections with respect to that Class of Creditors, or Debtors has reserved an amount sufficient to pay the maximum estimated Allowed Claim.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

38

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000128

**B.** **Minimum Distributions and Reallocations of Unclaimed Funds.**

1.     Notwithstanding anything to the contrary in the Plan, no interim distributions shall be required to be made by Debtors in an amount of less than $100.00.

2.     The Disbursing Agent shall distribute funds to Claimants holding Allowed Claims in accordance with the treatment of Classes set forth in this Plan.

3.     In the event any distribution made hereunder is the subject of a check that has not been negotiated, a delivery that has been returned, is attributable to a Claim on which an address or other contact or identifying information of the Claimant is illegible, not current or is otherwise unclaimed, then the Disbursing Agent shall make a reasonable effort to locate the affected Claimant.  If the Disbursing Agent is unable to resolve the applicable issue within sixty (60) days from the Disbursing Agent's identification of the issue, then the Disbursing Agent may, after twenty (20) days notice to the Post-Confirmation Notice List, cancel the distribution and reallocate the unclaimed funds pursuant to the Claim priorities under the Plan.

**VIII.   EFFECTIVE DATE**

The Effective Date of the Plan is the date on which or from which Debtors must perform certain duties under the Plan.  The Effective Date of the Plan will be a date selected by Debtors that is at least ten (10) days after but no more than forty-five (45) days after the Confirmation Date, unless the Confirmation Order is stayed pursuant to an order of the Bankruptcy Court or another court of competent jurisdiction.  Debtors shall designate the date selected as the Effective Date in a written designation filed with the Court after the Confirmation Order is entered on the docket and on or before the Effective Date.  Upon occurrence of the Effective Date, Debtors shall provide all creditors and interested parties with a notice indicating that the Plan has become effective, and providing notice of the election to be included in the Post-Confirmation Notice List.  The date of service of said notice, or any defect therein or failure to provide such notice shall not change the Effective Date of this Plan, which shall be determined under this paragraph.

**IX.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Executory contracts and unexpired leases that are not otherwise assumed or rejected pursuant to a motion filed with the Court prior to the Confirmation Date, shall be assumed

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                          39

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000129

1  pursuant to the Plan as of the Effective Date and the cure amount with respect to such executory

2  contracts and unexpired leases shall be paid by the Reorganized Debtor as soon as practicable

3  following the Effective Date.

4  **X.      EXONERATION AND RELIANCE**

5       **A.      Exoneration.**

6       Debtors, their members, managers, employees, agents, attorneys, financial advisors, and

7  other professionals and the Disbursing Agent shall not be liable to any Claimant or other party

8  with respect to any action, forbearance from action, decision, or exercise of discretion taken

9  during the period from the date appointed until the closure of this case in connection with:  (i) the

10  implementation of any of the transactions provided for or contemplated in the Plan; or (ii) the

11  administration of the Plan or the assets and property to be distributed pursuant to the Plan, other

12  than for willful misconduct or gross negligence.  Nothing in this paragraph is intended to or shall

13  modify the right of claimants that have direct claims against such persons, whether by guaranty or

14  other contract.

15       **B.      Reliance.**

16       Debtors, their members, managers, employees, agents, attorneys, financial advisors, and

17  other professionals may rely upon the opinions of counsel, certified public accountants, and other

18  experts or professionals employed by Debtors and such reliance shall conclusively establish good

19  faith.    In any action, suit, or proceeding (other than an action involving the allowance or

20  disallowance of a Claim) by any Claimant, interest holder, or other party-in-interest contesting

21  any action or non-action of Debtors, or their respective affiliates, officers, directors, shareholders,

22  representatives, attorneys, financial advisors, and agents as not being in good faith, the reasonable

23  attorneys' fees and costs of the prevailing party shall be paid by the losing party and as a

24  condition to going forward with such action, suit, or proceeding.  At the outset thereof the

25  contesting party thereto shall be required to provide appropriate proof and assurance of its

26  capacity to make such payments of reasonable attorneys' fees and costs in the event it fails to

27  prevail.

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                40

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000130

## XI.    MISCELLANEOUS PROVISIONS

### A.    Revocation or Withdrawal of the Plan.

The Proponent reserves the right to revoke or withdraw the Plan at any time before the Confirmation Date.  The Proponent reserves the right to revoke or withdraw the Plan, without limitation, if the Proponent determines in good faith that any condition to Confirmation of the Effective Date of the Plan is unlikely to be satisfied as required herein.  If the Plan is withdrawn or revoked, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed a waiver of any Claims by or against Debtors, their Estates, or any other Person in any further proceedings involving Debtors or their Estates or an admission of any sort, and the Plan and any transaction contemplated by the Plan shall not be admitted into evidence in any proceeding.

### B.    Modification of Plan.

Debtors may propose amendments to, or modifications of the Plan under Section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan, in the Plan documents, or the Confirmation Order or any other order entered for the purpose of implementing the Plan, in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of Claimants are not materially and adversely affected.

### C.    Administrative Claims Bar Date.

Unless otherwise ordered by the Bankruptcy Court, the Confirmation Order will operate to set a bar date for filing applications for Administrative Claims (other than the Administrative Claims of professionals retained by Debtors), which Administrative Claims Bar Date shall be sixty (60) days after the Effective Date.  Any Claimant holding an Administrative Claim against the Estates must timely file an application for allowance of such Administrative Claim on or before the Administrative Claims Bar Date.  The notice of Effective Date will set forth such date and constitute notice of the Administrative Claims Bar Date.  The Debtor will have sixty (60) days after the Administrative Claims Bar Date to review and object to such Claims.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

41

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000131

1

### D.    Confirmation Order.

2

In addition to the requirements set forth in the Plan, the Confirmation Order shall also

3

ratify transactions consistent with the provisions of the Plan effected by Debtors during the

4

periods commencing on the date of filing of the Bankruptcy Case and ending on the Effective

5

Date.

6

### E.    United States Trustee's Fees.

7

So long as the case is open, the Reorganized Debtor will pay the required statutory fees to

8

the Office of the United States Trustee.

9

### F.    Closing of the Case.

10

At such time as the Plan has been substantially consummated, that is, when all things

11

requiring action by the Court have been done and the Plan has been substantially implemented,

12

this case shall be closed.   To close the case Debtor shall file an Application for Final Decree

13

showing that the case has been substantially consummated.  If elected by the Reorganized Debtor,

14

"substantial consummation" shall be deemed to have occurred after the date on which the

15

Reorganized Debtor has made any required initial distributions to creditors or interested parties as

16

required hereunder on the Initial Distribution Date.

17

### G.    No Interest.

18

Except as expressly stated in the Plan or otherwise allowed by the Bankruptcy Court no

19

interest, penalty, or late charge arising after the Filing Date is to be allowed on any Claim.

20

### H.    No Attorneys' Fees.

21

No attorneys' fees shall be paid with respect to any Claim except as specified herein or

22

allowed by a Final Order of the Bankruptcy Court.

23

### I.    Governing Law.

24

Subject to the provisions of any contract, certificates of incorporation, by-laws,

25

instrument, release, or other agreement or document entered into in connection with the Plan, the

26

rights and obligations arising under the Plan shall be governed by, and construed and enforced in

27

accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules, and the

28

applicable laws of the State of California.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1

42

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000132

**J.      Discharge.**

In accordance with Section 1141(d)(1) of the Bankruptcy Code, entry of the Confirmation Order shall provide Debtors with a discharge of any Claim against Debtors, including, without limitation, any Claim that arose at any time before the entry of the Confirmation Order and any Claim of a kind described in Section 502(g) of the Bankruptcy Code.  Following the entry of the Confirmation Order, every holder of a Claim shall be precluded from asserting against Debtors, the Reorganized Debtor, and any assets of Debtors, any further Claim based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature which occurred prior to the Confirmation Date, except as provided in this Plan.

**XII.    RETENTION OF JURISDICTION**

Notwithstanding confirmation of this Plan or substantial consummation with respect to any Class, the Bankruptcy Court shall retain jurisdiction for the following purposes:

A.      Determination of the allowance and disallowance of Claims and Administrative Expense Claims;

B.      Resolution of controversies and disputes regarding the interpretation or enforcement of the terms of the Plan;

C.      Implementation of the terms, provisions and intent of the Plan and entry of orders in aid of implementation of the Plan, including but not limited to hearing and resolving any requests for clarification or instructions filed by the Reorganized Debtor, and in assistance of closing a sale or refinance of the Properties;

D.      Approving any modification of the Plan;

E.      Litigation of any Claims of the Estate, Claims against the Estate, Causes of Action over which the Bankruptcy Court has jurisdiction, and any other matters over which the Bankruptcy Court would have jurisdiction pursuant to 28 U.S.C. § 1334;

F.      Hearing and resolving any objection to the employment of a professional by Debtors;

G.      Hearing and resolving any requests for orders authorizing the disposition of any asset, including any Cause of Action;

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                                43

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000133

1          H.        Hearing and resolving any objections to the post-petition conduct, activities, fees

2    or expenses of Debtors or Reorganized Debtor;

3          I.        Hearing and resolving any motion to extend or shorten the term of the Plan; and

4          J.        Entry of a final decree closing this case.

5    DATED: December 7, 2009                    BUCHALTER NEMER
                                                A Professional Corporation
6

7

8                                               By:  /s/ Bernard D. Bollinger, Jr.
                                                    BERNARD D. BOLLINGER, JR.
9                                                   Attorneys for Debtors GTS Property Portfolios
                                                    B-3, LLC and Gulfstream Apt. Portfolio, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4894886v1                           44

**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Exhibit 1 Page 000134

# EXHIBIT 2

In re GTS Property Portfolios 3-3, LLC   Case No. 2:09-bk-14774-SB

## Gulfstream Portfolio
## 10 year Cash Flow Projection

| May 1 Commencement: | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Rental Income | $24,612,876 | $24,803,33 | $25,338,12 | $25,998,99 | $26,675,09 | $27,369,36 | $28,082,29 | $28,814,39 | $29,566,20 | $30,338,26 |
| Loss-To-Lease | ($1,080,451) | ($987,413) | ($401,126 | ($273,836 | ($140,204 | ($143,569 | ($147,014 | ($150,543 | ($154,156 | ($157,855 |
| Base Rental Income | $23,532,425 | $23,815,92 | $24,930,20 | $25,718,16 | $26,527,69 | $27,218,37 | $27,927,63 | $28,655,97 | $29,403,93 | $30,172,05 |
| Concessions | ($2,892,501) | ($1,977,377 | ($1,598,395 | ($1,508,020 | ($1,481,463 | ($1,520,741 | ($1,561,091 | ($1,524,289 | ($1,564,527 | ($1,605,861 |
| Credit Loss | ($432,798) | ($447,662 | ($440,166 | ($454,113 | ($468,496 | ($480,448 | ($492,716 | ($505,308 | ($518,232 | ($531,499 |
| Vacancy Loss | ($3,876,303) | ($2,826,157 | ($2,674,849 | ($2,535,587 | ($2,620,045 | ($2,686,771 | ($2,755,253 | ($2,825,540 | ($2,897,679 | ($2,971,722 |
| Total Rental Income | $16,330,823 | $18,564,72 | $20,216,79 | $21,220,44 | $21,957,68 | $22,530,41 | $23,118,57 | $23,800,84 | $24,423,50 | $25,062,97 |
| Other Income | $1,450,254 | $1,474,32 | $1,505,25 | $1,543,61 | $1,582,83 | $1,623,09 | $1,664,41 | $1,706,82 | $1,750,34 | $1,795,02 |
| Effective Gross Income | $17,781,077 | $20,039,05 | $21,722,05 | $22,764,05 | $23,540,52 | $24,153,51 | $24,782,98 | $25,507,66 | $26,173,84 | $26,857,99 |
| Expenses | | | | | | | | | | |
| Real Estate Taxes | $2,283,087 | $2,260,55 | $2,317,06 | $2,374,99 | $2,434,36 | $2,495,22 | $2,557,60 | $2,621,54 | $2,687,08 | $2,754,26 |
| Insurance | $1,022,391 | $1,039,15 | $1,070,33 | $1,102,44 | $1,135,51 | $1,169,58 | $1,204,66 | $1,240,80 | $1,278,03 | $1,316,37 |
| Utilities | $2,305,536 | $2,343,34 | $2,413,64 | $2,486,05 | $2,560,63 | $2,637,45 | $2,716,58 | $2,798,07 | $2,882,02 | $2,968,48 |
| Turnover | $1,576,225 | $937,147 | $1,075,334 | $1,102,21 | $1,129,77 | $1,158,01 | $1,186,96 | $1,216,64 | $1,247,05 | $1,278,23 |
| Repairs & Maintenance | $1,686,084 | $1,681,11 | $1,723,14 | $1,766,22 | $1,810,37 | $1,855,63 | $1,902,02 | $1,949,57 | $1,998,31 | $2,048,27 |
| General & Administrative | $678,226 | $685,02 | $702,15 | $719,70 | $737,69 | $756,14 | $775,04 | $794,42 | $814,28 | $834,63 |
| Management Fee | $585,938 | $612,55 | $655,77 | $685,08 | $706,82 | $724,60 | $743,49 | $765,23 | $785,21 | $805,74 |
| Management Set-Up | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Advertising | $416,116 | $421,57 | $432,11 | $442,91 | $453,98 | $465,33 | $476,96 | $488,89 | $501,11 | $513,64 |
| Asset MGMT Fee | $212,216 | $300,58 | $325,83 | $341,46 | $353,10 | $362,30 | $371,74 | $382,61 | $392,60 | $402,87 |
| Payroll | $2,834,144 | $2,872,81 | $2,944,63 | $3,018,25 | $3,093,71 | $3,171,05 | $3,250,33 | $3,331,58 | $3,414,87 | $3,500,25 |
| Total Expenses | $13,599,963 | $13,153,87 | $13,660,02 | $14,039,34 | $14,415,99 | $14,795,35 | $15,185,42 | $15,589,39 | $16,000,61 | $16,422,76 |
| | | | | | | | | | | |
| NOI | $4,181,114 | $6,885,17 | $8,062,02 | $8,724,71 | $9,124,53 | $9,358,15 | $9,597,56 | $9,918,26 | $10,173,238 | $10,435,23 |
| Standard Reserves | $825,150 | $826,86 | $847,54 | $868,72 | $890,44 | $912,70 | $935,52 | $958,91 | $982,88 | $1,007,460 |
| NOI After Reserves | $3,355,964 | $6,058,30 | $7,214,48 | $7,855,98 | $8,234,08 | $8,445,44 | $8,662,03 | $8,959,35 | $9,190,35 | $9,427,77 |
| Debt Service | $4,351,000 | $4,351,00 | $4,351,00 | $4,351,00 | $4,351,00 | $4,351,00 | $4,351,00 | $4,351,00 | $4,351,00 | $4,351,00 |
| NOI After Debt Service | ($995,036) | $1,707,308 | $2,863,48 | $3,504,98 | $3,883,08 | $4,094,44 | $4,311,03 | $4,608,35 | $4,839,35 | $5,076,77 |
| Plan Payment to Creditors | $586,799 | $353,80 | | | | | | | | |
| Net Cash Flow | ($1,581,834) | $1,353,503 | $2,863,48 | $3,504,98 | $3,883,08 | $4,094,44 | $4,311,03 | $4,608,35 | $4,839,35 | $5,076,77 |

In re:
GTS Property Portolios B-3, LLC

CHAPTER: 11

Debtor(s).

CASE NUMBER: 2:09-bk-14774 SB

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
BUCHALTER NEMER, 1000 Wilshire Blvd., Suite 1500, Los Angeles, CA 90017

A true and correct copy of the foregoing document described as  DEBTORS' JOINT DISCLOSURE STATEMENT
DESRIBING DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION [Affects both Debtors]      will be served or was
served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** - Pursuant to controlling General
Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to
the document. On  December 7, 2009      I checked the CM/ECF docket for this bankruptcy case or adversary
proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at
the email addressed indicated below:

- Paul S Arrow    parrow@buchalter.com, ifs_filing@buchalter.com
- Bernard D Bollinger    bbollinger@buchalter.com, IFS_filing@buchalter.com;smartin@buchalter.com
- Drew A Callahan    dcallahan@piteduncan.com, kduke@piteduncan.com
- Dan E Chambers    dchambers@jmbm.com
- Russell Clementson    russell.clementson@usdoj.gov
- Eric A Cook    ecook@ebglaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Randolph C Houts    rhouts@gmail.com
- Anthony J Napolitano    anapolitano@buchalter.com, IFS_filing@buchalter.com
- Lawrence Peitzman    lpeitzman@pwkllp.com
- Stephanie M Seidl    sseidl@sheppardmullin.com
- David B Shemano    dshemano@pwkllp.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>** (indicate method for each person or entity served):
On  December 7, 2009      I served the following person(s) and/or entity(ies) at the last known address(es) in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States
Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes
a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.
Hon. Samuel L. Bufford, U.S. Bankruptcy Court, Roybal Federal Building, 255 E. Temple St., Room 1582, Los Angeles,
CA 90012-3332 (courtesy copies bin outside courtroom 1575) – via hand delivery

☐ Service information continued on attached page

**III. <u>SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL</u>** (indicate method for each person or entity
served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on December 7, 2009      I served the following person(s)
and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission
and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later
than 24 hours after the document is filed.
Stephanie M. Seidl – sseidl@sheppardmullin.com
Russell Clementson – Russell.clementson@usdoj.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 7, 2009 | Shirlene Martin | /s/ Shirlene Martin |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

American LegalNet, Inc.
www.FormsWorkflow.com

Secured Creditor List

| | |
|---|---|
| Secured Creditor<br>General Electric Capital Corporation<br>GE Real Estate Asset Mgr Bethany<br>1901 Main Street, 7th Floor<br>Irvine, California 92614 | |

**GTS and Gulfstream**
**Mechanic's Liens**

| | |
|---|---|
| A & A Painting & Beyond, Inc.<br>P.O. Box 272457<br>Tampa, Florida 33688-2457 | Affordable Air Conditioning, Inc.<br>28 Sebastian Avenue<br>St Augustine Florida, 32084 |
| ALB, Inc.<br>5558 Greenland Road<br>Jacksonville, Florida 32258 | All Pro Plumbing Services, Inc.<br>7205 Edgewater Drive<br>Orlando, Florida 32810 |
| All Weather Contractors<br>5151 Sunbeam Road, Suite 2<br>Jacksonville, Florida 32257 | Apartment Hunters<br>3610-2 N. Josey Lane, #223<br>Carrollton, TX  78007 |
| Arbor Contract Carpet, Inc.<br>2100 E. Union Street, Suite 100<br>Irving, Texas 75061 | ASAP Plumbing<br>PO Box 48070<br>Jacksonville, Florida 32241 |
| B & G Refrigeration Co, Inc.<br>3230 Kline Road<br>Jacksonville, Florida 32246 | Big Gator Construction Company, Inc.<br>PO Box 19653<br>Jacksonville, Florida 32245 |
| Builder Specialties, Inc., dba ARD Distributors, Inc.<br>1600 NW 159th Street<br>Miami, Florida 33169 | Caudill Supply, Inc.<br>5571 Los Santos Way<br>Jacksonville, Florida 32211 |
| Central Florida Sewer & Drain Cleaning, Inc.<br>864 Oak Manor Circle<br>Orlando, Florida 32825 | Changing Surface, Inc.<br>9650 Datapoint, Suite 104<br>San Antonio, TX  78229 |
| Colors Unlimited<br>8760-A Research Blvd., #244<br>Austin, TX  78758 | Corporation Premium<br>7611 S. Orange Blossom Trail, Suite 122<br>Orlando, Florida 32809 |
| Critical Intervention Services, Inc.<br>1621 S. Missouri Avenue<br>Clearwater, Florida 33756 | Cutting Edge Carpet, Inc.<br>730 West Washington Street<br>Orlando, Florida 32805 |
| Dahlhausen<br>806 Cedar Trail<br>Boerne, TX  78006 | David Gray Plumbing, Inc.<br>Attn: Gary D. Gray<br>8850 Corporate Square Court<br>Jacksonville, Florida 32239 |
| Easterday Plumbing, Inc.<br>6653 Powers Avenue, Suite 241<br>Jacksonville, Florida 32217 | Elite Apartment Services – San Antonio<br>13814 Lookout Road, Suite 2<br>San Antonio, TX  78233 |
| Empire Cleaning Services<br>6512 Swissco Drive, Suite 1433<br>Orlando, Florida 32822 | Empty Pail Painting Co., Inc.<br>4245 Apollo Avenue<br>Jacksonville, Florida 32226 |
| Gerald Wingo<br>6915 Partridge Lane<br>Orlando, Florida 32807 | Growing Solutions<br>2606 Melrose Canyon<br>San Antonio, TX  78232 |
| HD Supply<br>10641 Scripps Summit Court<br>San Diego, CA 92131 | House of Floors<br>8521 Sunstate Street<br>Tampa, Florida 33634-7600 |
| Jacksonville Turnkey, Inc.<br>1612 E. Beaver Street<br>Jacksonville, FL 32202 | Just Company<br>5803 Joiner, #89<br>San Antonio, TX  78265 |
| Landrum A/C<br>14476-109 Duval Place West<br>Jacksonville, FL 32218 | Lifestyle Carpets, Inc.<br>5723 Benjamin Center Drive<br>Tampa, Florida 33634 |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

American LegalNet, Inc.
www.FormsWorkflow.com

| | |
|---|---|
| Lifestyle Carpets, Inc.<br>725 North Magnolia Avenue<br>Orlando, Florida 32803 | M & M Painting and Construction<br>27018 Blanco Road<br>San Antonio, TX  78260 |
| Maid Easy, Inc.<br>2002 N.W. Military Highway<br>San Antonio, TX  78213 | MoveForFree.com, Inc.<br>8535 Wurzbach Rd., Suite 101<br>San Antonio, TX  78240 |
| Quest Carpet Solutions<br>3610-2 N. Josey Lane, Suite 223<br>Carrollton, TX  75007 | Quest Carpet Solutions<br>6243 IH - 10 West, Suite 800<br>San Antonio, TX  78201 |
| R & R Maintenance<br>11700 Philips Highway<br>Jacksonville, Florida 32256 | R&R Maintenance, Inc.<br>6734 Greenland Industrial Blvd.<br>Jacksonville, Florida 32258 |
| R.L. Haines Construction, LLC<br>2235 Mercator Drive<br>Orlando, Florida 32807 | Rasa Floors, L.P.<br>P.O. Box 110067<br>Carrollton, TX  75011 |
| Ravitsky Bros. Inc.<br>13814 Lookout Road, Suite 2<br>San Antonio, TX  78233 | Redi-Carpet Sales of Houston, Ltd.<br>10225 Mula Rd., #120<br>Stafford, TX  77477-3315 |
| Rolland Reash Plumbing<br>11501 Columbia Park Dr. W #208<br>Jacksonville, Florida 32258 | Service Depot of San Antonio, LLC<br>102 Old Bowman Rd., Ste. D<br>Round Rock, TX  78681 |
| Sparkle Enterprises<br>P.O. Box 34653<br>San Antonio, TX  78265 | Suastegui's International Landscaping Services<br>414 Frances Circle<br>Ruskin, Florida 33570 |
| Sun Service Carpets & More<br>1008 Fountain Road<br>Jacksonville, Florida 32205 | Sun Terra Landscape Services, L.P.<br>2007 Rutland<br>Austin, TX  78758 |
| The BAP Company, Inc.<br>14286-19 Beach Blvd., Suite 309<br>Jacksonville, Florida 32277 | The Glidden Company, dba ICI Paints<br>11256 Cornell Park Drive, Ste. 500<br>Cincinnati, OH  45242 |
| The Sherwin-Williams Company<br>2100 Lakeside Dr., Suite 400<br>Richardson, TX  75082 | The Sherwin-Williams Company<br>2699 Lee Road, Suite 200<br>Winter Park, FL  32789 |
| The Tub Man Co.<br>9340 Windsor Lake Blvd.<br>Columbia, SC 29223-1108 | U.S. Heating & Air Conditioning, Inc.<br>624 Douglas Ave., Ste. 1402<br>Altamonte Springs, FL  32714 |
| Vamvoras, Ltd.<br>4734 Shavano Oak<br>San Antonio, TX  78249 | West Coast Master Painters, Inc.<br>4804 W. Gandy Blvd.<br>Tampa, Florida 33611-3003 |
| Wilmar Ind., a division of Interline Brands, Inc.<br>200 East Park Drive, Suite 200<br>Mt. Laurel, NJ  08054 | Wilson Carpet Service, Inc.<br>2805 Ilene Drive<br>Jacksonville, Florida 32216-5040 |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

BN 3716582v1

American LegalNet, Inc.<br>www.FormsWorkflow.com